04/26/2002  37:26   7818605268          STEPHEN GERSON MD              PAGE  01

STEPHEN N. GERSON, M.D., M.B.A
12 CLEMATIS ROAD
LEXINGTON. MA 02421
TEL: (781) 861-7458
FAX: (781) 860-5268
E-MAIL   sngerson@juno.com

4/26

To: Jennifer Nowicki

ASAP

PRUR00475

April 16, 2002

**STEPHEN N. GERSON, M.D., M.S.M.**
**12 CLEMATIS RD**
**LEXINGTON, MA  02421**

Jennifer Nowicki

RE: DAWN A. RUTHERFORD
    Claim No.: 10421380

File Review:

I    SUMMARY OF CASE AND REVIEW QUESTIONS:

The claimant is a 35-year-old female who was reportedly healthy until August 2001  She has carried the diagnoses of fibromyalgia, Epstein-Barr infection, chronic fatigue syndrome as well as degenerative joint disease and disc disease of the cervical and lumbosacral spine. She was reportedly well and since September of 2001, she has had a variety of studies and diagnostic evaluations and has been given these diagnoses by a variety of physicians such as Dr. Michael Kurtz, Dr. Jeffrey Mandel and reportedly in November of 2001 had a positive antibody test for Epstein-Barr syndrome.  On 12/4/01, she had sleep studies which reported an absence of stage III and IV sleep which were thought to be consistent with fibromyalgia.  An EEG indicated an absence of stage III and IV sleep and was found to contribute to her fatigue and pain.  The pain has been in the neck and low back, radiating into both lower extremities.  She also complains of severe hand and foot pain with numbness and tingling.  She reportedly has difficulty moving or walking and walks with a cane.  She complains of weakness and decreased use of both hands. On 12/20/01, a physical exam reported decreased range of motion due to pain and tenderness to palpation in the thigh, knee and calf areas.  She reportedly had limitation of motion in her hand joints with grip strength decreased bilaterally.  On back examination, she was tender to light palpation through the cervical and lumbosacral spine with positive tender points in the anterior chest wall, occiput, cervical and sacroiliac spine.  The above information by Dr. Sloane Polito indicates she was also taking Xanax and Klonopin, two analgesics, Norco and morphine and a muscle relaxant Soma, all of these medications causing drowsiness and decreased mental clarity, reportedly preventing her from functioning at a normal level.  He states she is unable to sit or stand for periods longer than 10 minutes and the only position she can maintain without significant pain is lying down.

1.    Is there is a pre-existing psychiatric condition prior to 8/1/00?
2.    What is my opinion of her current psychiatric treatment?
3.    Is there is any pure psychiatric impairment involved in her constellation of medical issues at this time?

II.    DOCUMENT REVIEW:

1.    Employee statement dated 8/20/01.  Her income is $85,000 and she has STD coverage.  Work absence is not related to illness.  Her occupation is software product producer.  Her supervisor is Pam Soggy.

2.    Employee statement dated 8/23/01.  Indicates she is 40 years old and her illness is extreme fatigue, nausea, headaches, lower back pain, is feverish, muscle and joint pains.  She has not filed a Workman's Comp claim  She says she gets state disability benefit of $336 a week.

3.    Attending physician's statement dated 8/26/01, signed by James F. Leoni Family Practice.  He states that the symptoms that caused her to stop working are nausea, back pain, fatigue, anxiety.  She stopped working 8/1/01.  When then is unknown.  Usual duration of the condition is months.  Employee has never had this condition before.  It is not an on-the-job injury.  Other medical history is lifelong headaches/migraines beginning 1989.  Physical symptoms include fatigue, back pain, anxiety and nausea.  These affect job performance and she is unable to concentrate, unable to sit and stand.  He recommends sleep study, counseling, physical therapy.  Blood pressure was 120/90.  Diagnoses:  Fatigue.  There have been no significant psychosocial events recently.  Her current supports are her family and her doctor.  Current activities are that she is housebound, mostly secondary to back pain and fatigue.  Spouse is employed as a graphic designer.  She is too fatigued to work.  Has severe back pain which inhibits concentration.  Her visit was 8/11/01; last visit was 8/27/01.  She is on Celexa, Ativan and Aciphex.  Expects the anxiety to be

PRUR00476

contro led. fatigue improved and back pain relieved. In terms of a return to work plan, answering the question, "What work duties can the employee perform?", he says "usual". "What duties can the employee not perform?" "None." Some changes would allow employee time for recovery. job modification—none needed, trial work—none needed. part-time work—none needed, any other job—none needed. In terms of the steps the employee has taken to return to work. has initiated investigation into diagnosis and fully needs to be away from work for at least one month. James F. Leoni, M.D.

4.     A collection of documents. Dr. Leoni's notes beginning 9/17/01.  A letter dated 9/17/01 states that disability began August 14, 2001 and extended until 10/20/01  Diagnoses:  Low back pain. fatigue depression and anxiety. September 14, 2001 letter from Dawn Rutherford to Dr. Leoni. It states she is writing to apprise him of current physical, emotional and psychological condition. "I am concerned that my disability period is due to expire September 20, 2001." She states her physical symptoms have not improved in the last month. These symptoms include extreme fatigue in addition to constant chronic low back pain, shooting pain down her right leg, numbness in her right leg, chronic pain in her neck and vertebrae. nausea, stomach cramps. irritable bowels. loss of appetite, debilitating tension headaches and migraine headaches. occasional low grade fevers as well as chronic sore throat. "In addition. I have muscle aches and pains in my legs, shoulders and arms. These are all symptoms that I have previously reported. I continue to experience chronic anxiety attacks. Previously that happened primarily in the evenings  but with the events of the week. I feel very anxious whenever I have to go out. It is sometimes relieved by Xanax. I have not felt any relief from Celexa or Ambien. To make matters worse, I was contacted Wednesday by my employer to inform me that my position has been completely eliminated. Simply put. I no longer have a job and it certainly doesn't help my condition. I am also under the care of Dr. Barbara Badham (presumably a psychologist who she sees twice a week for counseling)." "After losing six jobs now in the last several years. I can assure you that I am completely physically, mentally and emotionally incapable of performing the duties of and returning to my previous occupation  I desperately need vocational rehab."  (which she is beginning to discuss with Dr. Badham).  "Due to the above combined circumstances. I am respectfully requesting that my disability is extended to the maximum time allowable while I have the opportunity to restore my physical, psychological and emotional health and complete a vocational rehab program."  A November 20, 2001 letter from Dr. Leoni stating the claimant is disabled and he is extending her disability 1/7/02. There is a large group of progress notes stating she is suffering from exhaustion, severe for two to three weeks. These progress notes begin August 14, 2001 presumably from Dr. Leoni. although the signature is illegible. "The patient complains of suffering from exhaustion, severe two to three weeks, complaining of nausea upon wakening cramps. forgetfulness, hot flashes mid day.  Weight is 192 pounds.  Blood pressure is 140/100. Question a 20-pound weight loss over the past three to four months.  Impression:  (1) fatigue; (2) sleep apnea; and (3) nausea. August 20, 2001:  The patient is improved from the last visit, tearful and worried. Requested to be tested for Lyme disease and FSH. The patient complains of low back pain, pain in the neck, shaking, sudden (illegible). Complains of a variety of pain and fever. "Very anxious about not being able to do her job because of illness." Also having headaches. Still with loose stools three to four times a day.  Impression:  Nausea, back pain, headache. loose stools and anxiety. Variety of blood tests and x-rays. August 23: No show. 8/23/01 later advised to start Celexa and increase Ativan. 8/27: Complains of migraine. Headache is located behind the eyes, throb and the back of the neck. Nauseated all day  8/27/01: Had a sore throat 20 days ago. That has improved. Continues to complain of a variety of pains and physical symptoms. Impression: Headaches. possibly migraine. Declines lumbar puncture. Nausea, back pain, chest pain, anxiety  Continue Celexa. Xanax 0.25 q. 8 h.. Norco 10/325 q. 6 h. CAT scan of the abdomen and pelvis. May need MRI of back and referral to GI. 8/27: Has appointment with psychologist. 9/4: Met with Dr. Badham. Headache is improved. Continues with low back pain. Impression: Depression. anxiety, back pain. nausea. 9/20: Continues with symptoms and has sore throat. Fail on trazodone 25 at bedtime. Discussed disability with patient  "I feel that because of the multitude of problems, the patient will not be able to work for three months. I will extend disability." EKG (undated) is unremarkable. Urinalysis: Unremarkable. CBC 8/15/01: Unremarkable. Electrolytes. liver function tests, TSH 8/15: Unremarkable. 8/21: Stool analysis Unremarkable. 8/25. Stool culture unremarkable. 8/24 Lyme antibodies are negative. 8/25. Parasites are negative. 8/21: Lumbosacral spine studies and MRI show (1) mild facet joint degenerative changes seen bilaterally from L3 through S1; (2) no evidence of significant disc bulging or herniation. CAT scan of the abdomen and pelvis shows probably 3x2 cm right ovarian cyst. Further evaluation with ultrasound may be beneficial.  Otherwise unremarkable. 8-21: Pap smear unremarkable. 9/2'/01 letter from Dr. Leoni to whom it may concern. indicates claimant has multiple problems, including back pain, abdominal pain,

PRUR00477

neck pain, depression and severe anxiety and that he extends her disability to 1/7/02. A typewritten note dated 9/20/01, presumably from Dr. Leoni, indicates a list of 15 or 16 ongoing symptoms, including shoulder and muscle spasm, neck muscle spasm, chronic and severe hot flashes, pain in the 7th vertebrae of the neck, chronic and severe low vertebrae back pain, severe shooting pains from the lower leg back down the right leg, numbness on the top of the right leg when lying down, chronic nausea, vomiting, waking up in the morning with nausea, waking up in the middle of the night with nausea, diarrhea after eating solid foods and cramping diarrhea 100% of the time, bowel movements three to five times a day, chronic exhaustion, periods of wakefulness three to four hours, unable to focus and concentrate, forgetful, insomn a, extremely anxious about sleeping at night, occasional earache in the left ear, sore throat, fevers, 100° to 101° spikes two to three times a week, chronic and painful tension headaches daily, chronic and painful migraine headaches one to three times a week, severe anxiety attacks mostly in the evenings or in public, shortness of breath, dizziness, ringing in the ears, pounding in the head and depression.

5.    Note dated 9/20.01 from Barbara Badham, Ph.D, stating the patient began seeing her August 28, 2001 for individual therapy for acute anxiety and depression and that due to her continued disability, I support a three-month extension period through January 7, 2002.

6    9/25-01 letter from Dr. Michael Kurtz/orthopedic surgeon stating to whom it may concern. Dawn Rutherford has degenerative disc disease and degenerative joint disease of the neck. She also has fibromyalgia (Dr. Gerson—he does not delineate the basis for his conclusion that she has fibromyalgia).

7.    Letter dated October 9, 2001 from Dawn Rutherford and her husband Daniel Keegan. The letter states that a variety of information has been provided to Prudential and "due to her medical condition and continued disability we respectfully request that future inquiries for additional information needed directly from Ms. Rutherford in writing so that we may review and understand them together". Attached letter from Dr. Michael Kurtz states her diagnoses are cervical and lumbosacral disease and degenerative joint disease and fibromyalgia and that she should not work from 10/11/01 to 12/5/01.

8.    Dated September/October 2001 intake by Barbara Badham, psychologist dated 8/24/01 indicated her occupation as producer employed by Scene 7, Her husband Daniel is 37 years old. She has medical problems, including fatigue, low back pain, neck pain, headaches, nausea, inability to concentrate. The rest is illegible. She is on Celexa and Xanax by Dr Leoni. In a letter dated September 20, 2001 from Dawn Rutherford to Barbara Badham, she said "I have been trying to reach you since yesterday afternoon. I did page you once last night and twice this morning but did not receive any response. (in bold letters) I am in a crisis mode. This is thanks to Dr. Leoni and his office." She states, the problems started when a letter that I wrote to Dr. Leoni which was marked confidential was faxed over to the Prudential Insurance Company yesterday". "This was a serious breach of confidentiality." Apparently Dr. Leoni felt faxed a psychotherapy process note to Prudential. She states "since Prudential is not my medical insurance carrier. I have not discussed my counseling sessions with them". "Dr. Leoni stated that it was you who suggested the month by month disability instead of the three-month period, and that during your conversation with him, you said nothing to him which would indicate that I could not return to my former profession." "I find this incredulous considering that the very first day I met with you, I recall you stating after our initial conversation that you would have no problem writing a letter right there and then stating I should not return to technology and it was not suited for me." "I have clearly told both Dr. Leoni and yourself that after being laid off from six technology jobs in the past several years, I am completely physically, mentally and emotionally incapable of performing the duties of and returning to that previous career field at any time." "I am trying to seek vocational rehabilitation." "Doesn't anyone listen to me or care?" How many times do I have to ask for help?" After what can only be described as a tortuous conversation, Dr. Leoni stated that he would agree to a three-month extension of my disability if you would provide him a letter stating that (1) I cannot return to my former profession; (2) I am seeking vocational testing/counseling through your office; (2) you support a three-month disability period." In underlined bold letters, there is a statement "Please support the disability period through Monday, January 7, 2002 so I will not have to go through any more deals with the insurance company over the holidays." "Please review (there must have been a letter for her to sign), and if it meets your approval, sign and fax over to Dr. Leoni's office prior to my appointment." 8/28/02 letter from Dawn Rutherford visits of August 28, September 6, 10, 12 and 17 apparently to Barbara Badham which states initial consultation was prompted due to depression, being ill

and unable to work, anxiety related to the workplace and industry instability issues (CFO resignation, problems in my job, rumors of bankruptcy, technology not working, lack of communication with management, lack of future in high tech after numerous layoffs). Discussed depression over unstable future in technology industry due to high corporate failure rate, loss of startup funding, lack of leadership, failures of new technologies which cause personal anxiety over financial and marital issues, "anxiety attack over termination of employment", lack of future for career, failures of industry and economy, no self-esteem, no self-confidence after so many bad career experiences, anxiety attacks over personal matters related to finances, disability issues, need for rehabilitation, extreme fear of failure, extreme fear of people, severe anxiety and depression over personal plans for the future, outside influences of war/bad economy, fear of jeopardizing marriage due to ongoing illness, depress on and anxiety, "don't know what is wrong with me", "don't ever feel healthy or well enough to function", extreme and overwhelming fatigue, must stay in bed most of the day, unable to function in terms of day-to-day activities.  Note entitled supplemental certification signed by Barbara Badham, indicating she has been seeing the patient since 9/27/01.  Diagnosis is anxiety disorder at this first appeared (illegible date), problems with concentration and fatigue, unable to perform job (note illegible) but it says January 7, 2002.  September 25 note from Barbara Badham says to whom it may concern. Department of Rehab.  She has been seeing me as a patient August 28, 2001 with two sessions a week for anxiety and depression.  "The combined combination of physical demands 10 to 12 hours as day, the exceptionally high level of stress and instability in the field of technology demonstrated by the fact that Ms. Rutherford has been laid off six times since 1999 through no fault of her own has contributed to her anxiety and depression."  "It is my determination she will be unable to return to a career in the field of technology."  "It is my recommendation that Ms. Rutherford receive occupational rehab in order to obtain an alternative employment opportunity."  Letter dated September 14, 2001 from Dawn Rutherford to Dr. Leoni.  She states "I am writing to apprise you of my current physical, emotional and psychological condition."  "I am concerned that my disability period is due to expire September 20, 2001."  She indicates how her physical symptoms haven't improved and she continued to experience anxiety attacks and so forth.  Letter October 16, 2001 signed by Dawn Rutherford and her husband Daniel Keegan to Ms. Fain, Prudential Insurance Company of America  they recount that Dr Kurtz has determined the patient has degenerative joint disease and they are pointing out this to Prudential in the context of their disability application for Dawn Rutherford.

9    Miscellaneous group of notes dated 10/9/01 through October from Physiotherapy Associates, indicating she has been having physical therapy.  They list the diagnosis on 8/13/01 as fibromyalgia.

10.   Summary from Barbara Badham of psychotherapy session notes sent to Aneesha Fain October 18, 2001 to Prudential Insurance.  There are one- and two-sentence notes summarizing a number of sessions, August 28, 2001:  Initial consultation.  She is experiencing anxiety over medical condition and inability to go to work.  September 6:  She is complaining of extreme fatigue, pain and anxiety about waiting to see an orthopedic surgeon.  September 10.  Depressed due to medical condition and concerned about her ability to work.  Anxious about financial situation.  September 12:  Tearful and anxious.  World Trade Center tragedy has impacted her due to loss of a friend.  She experiences fearful emotions and inability to sleep at night.  September 17, 2001:  Extreme discomfort in low back.  Complains of muscle spasm.  Anxious about being able to return to work.  September 20:  Discussed visit with primary care physician today.  Fatigue, pain, anxiety, confused and anxious due to lack of specific diagnosis.  September 24, 27, October 4, 8, 11:  Continues to be anxious and fearful and preoccupied with medical conditions.  October 13:  Discussed recommendation for a physical therapist, seek medical care, rheumatology specialist for fibromyalgia.  She is anxious and depressed over lack of improvement in her medical condition.  (Dr. Gerson—I point out that these are not actual copies of the record.  There is no indication of a problem list, treatment plan or any sense at all of what the approach in this psychotherapy is with the claimant Dawn Rutherford).

11.   Large collection of miscellaneous medical documents  October 19, 2001 document from the office of Robert Park, M.D.  Signature is illegible.  States she is 5 ft. 4 in., 189 pounds, 39-year-old new to practice to establish heath care.  Problem #1: Fibromyalgia.  She on temporary disability.  Sees Barbara Badham.  Much of this note is illegible.  Currently going to PT twice a week.  Problem #2:  Degenerative joint disease, cervical and lumbar spine.  OT per above.  Problem #3:  Sleep disorder with no effect from Ambien.  This provider takes a social history and a review of systems, much of which is illegible and concludes fibromyalgia, cervical and lumbar spine degenerative disc disease, sleep disorder.  Prescribed

04/26/2002  07:26    7818605268    STEPHEN JERSON MD    PAGE  05

Lortab q.i.d p.r.n. pain. Increase Xanax to 0.5 t.i.d  The patient has appointment with "fibromyalgia specialist", Dr. Mandel.  If needed, might consider referral to Dr Johnson for pain management. October 24, 2001 note indicates that in a letter to Prudential, notified that Dawn Rutherford has changed primary care physician to the practice of Dr. Barbara Finzen and Patricia ( illegible), family nurse practitioner. She is no longer treated by Dr. Leoni.  This is signed by Daniel Keegan and Dawn Rutherford.  Again is included here a September 20, 2001 letter from Barbara Badham to Dr. Leoni indicating "due to the physical demands, 10 to 12 hours ongoing stress and demonstrated instability in the field of technology, it is my determination that it is not a suitable career path for Ms. Rutherford." "It is my recommendation that she complete a career assessment evaluation test and seek training for an alternative employment opportunity." "Due to the nature of her continued disability, I support a three-month extension through 1 7/02."  8:22'01:  Lumbosacral spine films show the sacroiliac joints are normal. Documents dated 9/15/01 signed by Maury Schulkin, M.D. of emergency department. "I was satisfied that there was no undisclosed ingestants and there was an accidental, not intentional, minor overdose." "I felt the nausea could be explained by the combination of the Tylenol and Codeine and the wine and the lightheadedness." "I reassured the patient and her husband that she would be safe to go home and not require further diagnostic testing." Diagnosis: Accidental overdose of Xanax combined with Tylenol and Codeine and ethanol  A brief note from Jeffrey Mandel. M.D. dated 10/24/01 indicates fibromyalgia, chronic fatigue syndrome Recommendation: Rest, exercise, Klonopin.  Comment: Chronic illness.  Disabled six months to a year subsequent to further evaluation.

12.   11/1/01 from Dr. Barbara Badham to Prudential states events that lead to the patient leaving work for physical illness or acute stress.  Became unable to perform her job duties.  Physical complaints.  Poor concentration.  Objective mental impairment.  Anxiety disorder, NOS.  Life changes to deal with this. Stopping work and reducing normal activities  Begin meds  Starting physical therapy  Report no prior psychiatric history or hospitalization.  Treatment plan is outpatient psychotherapy once or twice a week with collateral contacts.  Not sure of current medications.  Obstacles to working include multiple physical impairment compounded by psychiatric symptoms.  Cooperative.  Extremely distressed.  Compliant with medical treatment.  Affect and mood depressed.  Behavior is frantic at times.  Impulse control appears (illegible).  Thought process.  Flight of ideas.  Mental confusion.  Poor concentration.  Intellectual function is above average.  Limited insight and judgment. Axis 1  Anxiety disorder. NOS: Axis 2:  Deferred  Axis 3:  Chronic fatigue syndrome. fibromyalgia, disc degeneration: Axis 4:  Occupational problems, economic problems: Axis 5:  Current GAF is 35  11/1/01 letter from Barbara Badham to Rachel Sweeney  "It has come to my attention that the purposes of my counseling sessions with Ms. Dawn Rutherford have come into question."  "Ms. Rutherford is not seeking any vocational rehab at this time due to her disabilities from fibromyalgia, cervical and lumbosacral degenerative disc disease, degenerative joint disease and chronic fatigue syndrome."  "Our focus has been on significant anxiety and depression." "We have been discussing the difficulties and challenges of attaining quality medical care for her disability."  "Ms. Rutherford cannot participate in any type of vocational rehab at this time due to the physical limitations of her ongoing disability and concomitant psychological difficulties."  10/19/01 note Patricia (Illegible).  Diagnosis: Fibromyalgia. 11/6/01 lab studies  C reactive protein.  EBV.  Acute infection antibodies  FBV is high at the rate of 71.  1/15/01 letter from Dr. Jeffrey Mandel.  The patient has diagnosis of chronic fatigue syndrome.  11/19/01 detailed letter from Jeffrey Mandel to Prudential Insurance Company of America which states the claimant has the following symptoms: Tender pain points throughout the pain, especially on hip joint, knees, shoulders, severe back and shoulder muscle spasm causing extreme pain constant over these areas, extreme fatigue even after a full night of sleep.  Any amount of exertion causes extreme fatigue, stiffness and pain in the joints, severe back pain in the lower vertebrae, soft tissue pain in the lumbosacral and cervical areas, tension and disabling migraine headaches, very sensitive to sounds, light and odors, at times difficulty concentrating because she can't focus her eyes on nearby objects, flu-like symptoms, cannot sit for more than 10 minutes without numbness in the legs, cannot stand upright for more than five to 10 minutes, feeling nausea coming and going through the day limited appetite due to stomach cramping and gas pains, unable to sleep with prescription sleep medicine, limited use of the right hand, swollen joints in the right hand, difficulty swallowing and choking, unexplained bruises on arms and legs. "It is my opinion that Ms. Rutherford is suffering from the onset of fibromyalgia and the onset of chronic fatigue syndrome."  Recommend treatment as a combination of prescribed medicine, rest and continued medical care.  "It should be noted that Ms. Rutherford has developed new symptoms since the onset of her illness 8/2001."  In October, she began to experience limited use of her right hand accompanied by joint

PRUR00480

pain.  Within the past week, she has experienced difficulty with swallowing and noticed unexplained bruises on her arms and legs.  "In my opinion, she is unable to work and is completely disabled and that she be placed on disability for a minimum of six months to one year under my care"—Jeffrey A. Mandel, M.D. 11/20/01 complaint letter from Dawn Rutherford that Prudential hasn't made a decision.  11/24/01 letter from Dan Keegan and Dawn Rutherford to Prudential again complaining about Prudential's inability to make a decision.  Letter again exploring disability processing issues from claimant to Prudential 11/26/01. 11/28/01 note from Jeffrey Mandel stating primary diagnosis is (1) fibromyalgia; (2) Epstein-Barr virus, onset of chronic fatigue syndrome   11/28/0?  physician office notes from Dr. Mandel:  The patient continues to suffer from severe chronic pain tender points and fatigue.  Her overall health has not improved.  Continues to experience daily pain upon awakening.  He goes on to list a variety of orthopedic and physical problems and indicates she continues to experience disabling fatigue.  Klonopin allows her to fall asleep for a couple of hours.  Sleep patterns continue to be disturbed as a result of ongoing anxiety concomitant with her illness.  She is disabled for six months.  Letter dated 11/27/01 from Dawn Rutherford to Pat (?), FNP, complaining of a chart inaccuracy in Pat (illegible) records related to note of October 29, 2001.  "Concerned about this because I am in the process with disability case issues and this incorrect data could have a serious detrimental effect on my case"  (in both letters) "I did not report or experience any illness whatsoever during the month of May through June of 2001.  In fact I was completely healthy for the entire year having not even visited a physician or taken a prescription medication until I became ill at the beginning of 8/2001."  "It is imperative that this miscommunication be corrected."  11/30/01 letter from Dr. Mandel to Rachel Evans Sweeney at Prudential.  Indicates that the Center for Disease Control does not have a standard diagnostic criteria regarding the onset of fibromyalgia.  Apparently Prudential was questioning the somewhat abrupt onset of the claimant's condition.  Letter from Pat (?) stating that they wanted to clarify a miscommunication.  "It is important to note that Ms. Rutherford did not experience any symptoms of fibromyalgia or any other illness prior to August 2001."  Dr. Michael Kurtz 12/3/01  No work from '12/3/01 through 1/14/02.  Letter unsigned 12/3/01 to Rachel Evans Sweeney about Dawn Rutherford recounting approximately 15 to 20 physical symptoms.  11/28/01 letter from Barbara Badham, Ph.D., her psychologist, indicating sessions 10/18, 22, 25, 29, 11/5, 13, 26 and 11/28, indicating the patient's focus in this therapy related to complaints about her physical condition and depression related to her frustration with Prudential for disability issues.  This seems to be almost the entire focus of this treatment.

13.    12/3/01 letter by Dr. Michael Kurtz to Prudential Insurance Company which is a follow-up document listing all of the claimant's symptoms that he feels support her diagnosis of fibromyalgia.  In his opinion, she is completely disabled and unable to work at that time.

14.    Group of miscellaneous medical notes and letters dated 12/10/01:  Takes Demerol.  The patient has intense pain, cannot turn over.  Both injections given on the same side at patient's request.  Group of lab studies: Electrolytes are essentially within normal limited dated 12/14/01.  These are apparently office notes according to a letter 12/7/01 from Daniel Keegan and Dawn Rutherford.  They note Dr. Kurtz indicates specific limitations, evidence of her continued disability that he discovered during this examination.  He discusses her limited mobility by 50% in terms of grip strength and so forth.  There is a note from Dr. Kurtz on 12/17/01 for treatment of her ongoing disabling condition of fibromyalgia, degenerative cervical and lumbosacral spine disease.  He reports multiple trigger points and he has prescribed physical therapy.  He states she continues to remain completely and totally disabled and unable to return to work the period of 12/17/01 to 1/17/02 and she will remain under his care.  12/14/01 letter from Daniel Keegan and Dawn Rutherford to Prudential Insurance, indicating "Ms. Rutherford is presently seeking the guidance of an attorney who will address the numerous inaccuracies in Dr illeg.? report and shall provide additional medical evidence to support Ms. Rutherford's complete and total disability."  Enclosed office notes from 12/12 from Dr. Mandel which report that he observed a severe lack of mobility to a requirement of a cane to walk, swelling in the joints of her fingers causing a 50% lack of dexterity and severe pain and tender points in the low back.  "We reserve the right to provide additional information as we receive it from healthcare providers and other sources as necessary to prove the complete and total disability of Ms. Rutherford."

15.    Job description.  Entitled software products producer.  This is dated 12/17/01 to Kathleen Boggs. Summary: The producer role is chartered with a successful delivery of a software product release, working

PRUR00481

with appropriate VP, drives schedules, features and budgets for the project. The producer is a central point person and liaison for engineering. QA, sales and executive management for all issues concerning the products. Responsibilities include central processing for Scene 7 software products to ensure that Scene 7 line of products functions as a line of products and works with marketing and engineering to establish feature set for products, working with engineering to establish the release schedule for the products, organize production and testing, coordinates all art assets, creates sample projects, portfolio and generally ensures that all products have all phases covered. works with technical editor on documentation, works with QA and engineering to manage the bug list and appropriate fixed, keeps everyone apprised of progress or problems encountered in working towards the scheduled goals, runs interference and troubleshoots department and staff time problems, tracks project costs. There is an attached note to this job description from Daniel Keegan that states "Dawn was a completely healthy individual prior to the onset of Epstein-Barr and fibromyalgia in August of this year (2001)." He goes on to outline a list of her physical problems. There is no documentation or allusion to any psychiatric issues.

16. Polysomnographic report indicates she is a 39-year-old woman evaluated for causes of difficulties initiating and attaining sleep. Sleep stage analysis indicated the patient has absence of stages III and IV sleep and reasonably normal percentage of stage REM as 14% for total sleep time of 257 minutes. Interpretation: Alpha intrusion and Xanax effect. "There is no indication of sleep apnea or periodic limb movements on this recording." Signed John F. Sassen, M.D.

17. A letter from Daniel Keegan and Dawn Rutherford dated January 1, 2002 to Prudential Appeals Review Unit. It goes on to explain the various treatment options for patients with fibromyalgia as well as the use of Tylenol for pain relief. She is taking morphine daily for pain and hydrocodone for breakthrough pain. The side effects of these drugs include drowsiness, dizziness, decreased ability to function and overall lack of mental clarity. Concludes by stating "extreme mental clarity" is required due to the demands of her project management job where Dawn was simultaneously required to manage multiple software development projects with very time wise resources and requirement". She was also required to lead meeting in a standing position or sit in meetings for hours at a time without a break, requiring intense mental concentration and focus. The patient was required to travel to the offices of her company in Brea where she was responsible for the overall integration of the entire line of software products, all technical literature as per her job description which was "required to run interference between the various groups of quality assurance engineering, project management and marketing located in San Rafael and Brea". He states in underlined bold letters that it would be impossible for my patient to accomplish any of these tasks in her current medical condition accompanied by chronic pain and disabling fatigue. He says she has difficulty in concentration and memory problems. although there is no documented testing by him of these functions.

18. A group of reports and letters that begin 1/2/02. There is a letter from Karen Kurtovich 1/4/02: "It should be noted the patient's overall condition is now 100% worse than it was when I saw her two months ago." She has severe functional limitations. demonstrating loss of muscle strength, range of motion and mobility. Her dexterity is reduced by at least 50% due to redness and swelling in the joints and knuckles of her hands. Included in this collection are a variety of documents from Drs. Mande. and Kurtz. There is a letter from Dawn Rutherford and Daniel Keegan to Jennifer Nowicki dated 1/11/02. They notify Prudential that she is represented by counsel, Mr. Richard Johnston. There is another document dated 1/8/02 from Dr. L. Sloane Polillo who states "Ms. Rutherford has been under my care since 12/20.01 for severe disabling conditions, including fibromyalgia. Epstein-Barr infection, chronic fatigue syndrome, degenerative disc disease of the cervical and lumbosacral spine and degenerative joint disease." "Ms. Rutherford is a 39-year-old woman who was previously healthy until August of 2001 when she began experiencing severe flu-like symptoms with fevers, back, neck joint and muscle pain and sleep disturbance with insomnia." He goes on to recount a variety of physical findings and that she is in treatment with Xanax and Klonopin, two narcotic medications and a muscle relaxant Soma. He notes that all of these medications cause drowsiness and decreased mental clarity, preventing Ms. Rutherford from functioning at a normal level. There is a letter 1/7/02 indicating that Richard Johnston is representing Dawn Rutherford. There is a letter dated 1/12/02 from Dawn Rutherford stating that the insurance company has informed her today that the Center for Disease Control criteria for diagnosis of chronic fatigue syndrome is six previous months of notable fatigue. She goes on to state "at the time of my examination with Dr. Mandel, I had not experienced six previous months of notable fatigue. This has raised a red flag for the insurance company." "They are

claiming CFS as a preexisting condition." 11/4/01 letter from Dawn Rutherford asking to have blood tests such as the Epstein-Barr antibody test and C reactive protein test There is an additional documents to Jennifer Newicki from Dawn Rutherford and Daniel Keegan stating "we do not understand why you have completely refused to return phone calls from Steve Shaw. attorney and Richard Johnston, attorney. We are working with community resources for independence of disability advocacy organization."

19.     1/14/02 series of letters. The first one is a note to whom it may concern from Barbara Badham, Ph.D., stating that Dawn Rutherford began seeing her as a patient on August 28, 2001 as a referral from Dr. James Leor L. Began treatment for acute anxiety and mild depression related to stress over the unknown nature of her medical condition  Treated Ms. Rutherford a total of 20 times and provided treatment notes. She was suffering from physical pain during the sessions. As time wore on, she became more anxious and more severely depressed.  Due to several acute reactions. doctors have been unable to find a suitable antidepressant which might help Ms. Rutherford.  Her mobility is limited.  It is my professional opinion that her acute anxiety and feelings of depression are concomitant to her physical illness and disabilities. Her combination of her disabling physical illness. chronic pain, fatigue. hopelessness. acute anxiety and depression have had devastating effects on both her physical and psychological health which completely disabled Ms. Rutherford and prevent her from being able to perform any type of work.  Her lack of mental clarity.  short-term memory loss and acute anxiety are diagnoses which I can confirm through my observations and discussions with Ms. Rutherford.  I concur her disability will last at least 12 more months. Letter 1/22/02 from Jeffrey Mandel, M.D.  He states "I concur with Ms. Kurtovich. the physiotherapist's findings, that describe loss of muscle strength. loss of range of motion. decreased grip strength, loss of dexterity and loss of mobility  He goes on to recount a variety of physical problems.

20.     Group of progress notes beginning 11/20/01 from Barbara Badham beginning October 18  Seen October 18, 22, 25, 29, November 5. 13. 26 which recounts mainly her complaints about physical problems  States she has a total disability and concludes with the statement. "the ongoing delays and refusal to pay Ms. Rutherford disability benefits only serve to exacerbate her condition, her pain and suffering, worsened anxiety and chronic pain.'  (Dr. Gerson—I would again reiterate these are not the actual progress notes but summary of office notes by Barbara Badham).  There is an attached 11/28/01 note by Jeffrey Mandel that indicates a variety of physical problems, irritable bowel and nausea.  "The patient continues to experience disabling fatigue."  Klonopin allows the patient to fall asleep for a couple of hours at n ght. She is still waking up in the middle of the night

21.     February 12, 2002 from the Disability Law Clinic. signed by Stephen Shaw. attorney for Dawn Rutherford that lists a variety of documents that have been sent.  In addition, there is a long letter dated February 12, 2002 which recounts the claimant's job description and her reported. in their opinion. inability to perform the duties of her job with a statement "it is overwhelmingly clear from the medical evidence that the claimant is unable to perform duties of her regular occupation".  There is a further attached letter dated 2/13 02 and 3/25/02 from Richard Johnston. attorney at law, stating I will no longer be representing Ms. Rutherford in the matter of her appeal of disability I TD

22.     Apparently recent, obtained by Jennifer Nowicki.  Conversation summary with Dr. Trahms.  Reports Dr. Trahms has seen the claimant once a week since January 2002. The claimant is very agitated, depressed, has severe panic attacks  Prescribed Xanax 2 mg t.i.d. for panic attacks.  She has had reactions to Effexor, Paxil, Elavil and trazodone and she is on a great deal of pain medication. including opioids. She is now on Prozac 20 mg and confined to her bed most of the time. She walks with a cane.  Dr. Trahms thinks the claimant may have chronic fatigue syndrome and has had severe reactions to many medications.  She cannot sleep and is essentially bedridden.  Dr Trahms states she is doing counseling and meds and continues to see the claimant weekly.  Plans to gradually increase antidepressants and mood stabilizers. She states the claimant is suicidal at this point.

PRUR00483

*#* *23*

April 23, 2002

RE:        DAWN A. RUTHERFORD
CLAIM#:    10421380

**Followup file note on doc call: 4/23/02**

Dr. Nancy Trahms indicated that she began seeing the claimant 1/15/2002 referred by her internist, Dr. Mandell. To her knowledge, there was no prior psychiatrist. She had reportedly been seeing a Dr. Barbara Badham and that was discontinued by the claimant because she did not feel that psychotherapy was helping. Dr. Trahms reported that the claimant was exposed to Epstein-Barr syndrome at Yosemite National Park. Indicates another friend who was exposed to this, came down with Epstein-Barr as well after a camping trip. There was a flu-like illness with joint pain and muscle pain. The claimant became bedridden, very depressed and anxious, and went to a number of M.D.'s. Dr. Trahms states the claimant was tried on a whole variety of medications but is very medication sensitive, and had to discontinue most of them. She has muscle spasms on Effexor, became dystonic on a variety of SSRI's, had diarrhea and nausea on these. On trazodone, she had nightmares and hallucinations and developed apparently severe sedation on Elavil. She has been on a variety of opiates such as fentanyl, morphine, and was given a Demerol shot which resulted in stuttering and facial paralysis which is persisting. MRI scan is negative. Dr. Badham is raising the question of progressive neuromuscular disease. For the past nine to ten months, the claimant drops things, is anxious, cannot do much of anything. Is now on Neurontin and Prozac and will be seeing a new rheumatologist. Dr. Davidson, who is reportedly a world expert that Dr. Trahms works with. She states that claimant has always been a very successful student, worked as a project manager, and coordinated high tech projects. Dr. Trahms indicates that this job changes (6) are not atypical in this high tech area, and the claimant is smart and congenial, has two years of college, seen as a bright and up and comer, and had many jobs where she earned up to $100,000 dollars a year because of her excellent work efficiency. Her husband is supportive. She was apparently raised by a very narcissistic mother. Because of claimant's severe depression and the fact that she is pretty much bedridden, her grandmother has come from the East and is trying to stabilize her being with her all day. The claimant spends the day watching TV. She can read on the computer, tracts Internet issues, although she complains of trouble with memory, concentration and attention. She is very self-centered, self-absorbed, and scared that she will lose her home. The provider believes she has a plan of suicide that she will not reveal and the claimant is vegetatively depressed and lost 20 pounds. Additional stressors are the fact that she learned in October that her brother, who she is very close to, is HIV positive. She is trying to be a support to him despite her own illness. Apparently in July, a half sister to whom she was not even close, suicided. She has guilt about not doing enough to help with the sister. Apparently her father remarried and the half sister is a product of that relationship.

In terms of a typical day, the patient spends the day in bed a lot, has physical therapy with general stretching. She researches her disease on the Internet and pretty much stays in bed. Paradoxically, she has an occasional good day where she is able to get up and walk around with her cane and feels better. This is very frustrating to her. Dr. Babham thinks this suggests a rheumatoid diagnosis.

She is despondent and will cry for hours. Dr. Badham feels she is beginning to get a little delusional in her thinking. She obsesses about the bad mothering she experiences. She thinks her husband does not love her. In fact, Dr. Trahms thinks the husband is very supportive, a reasonable and congenial guy, and feels patient's thinking is getting increasingly distorted. In a formal sense, Dr. Badham has not taken a full psychosocial history because of crisis orientation of the treatment.

Dr. Trahms thinks therapy would best be done twice a week, but the claimant lives 30 miles away and often cannot make it to therapy. Therapy is seen as cognitive, supportive, and psychopharmacology. There is no drug history, there is no recent job problems or conflict with supervisors or difficulty with the job. Dr. Trahms says she tried rehab for a week but it was too stressful and she could not handle it. In conclusion, Dr. Trahms sees her as a Type A individual with a lot of underlying anxiety and nervousness who holds herself in part together through being very confident in her work and now she is simply fragmented and cannot function.

Stephen N. Gerson, M.D.
SNG/nm

## CONCLUSIONS AND ANSWERS TO QUESTIONS

III.    Discussion and answers to questions:

Clearly the claimant has numerous problems from data provided. Meets criteria for a diagnosis of fibromyalgia and chronic fatigue syndrome with concomitant severe depression. She reportedly has had difficulty tolerating most antidepressant medications, is allegedly bedridden with suicidal thoughts and had a muscle paralysis secondary to a Demerol injection. In terms of a typical day. she is bedridden and is under the close observation of her grandmother She intermittently has good days and given her letters to Prudential Insurance and various providers, she apparently is able to be either organized herself or mobilize her husband to write these letters in a very coherent. well organized way. It is not precisely clear why she left seeing her prior therapist, Dr. Badham ( who called back and said she had nothing to add) . but she seems to be able to get providers to advocate very well for her  Dr. Trahms concurs that opiates are not an optimal treatment for her, but is willing to consider Remeron. She indicates claimant has severe signs of vegetative depression.is mostly bedridden and meets psychiatric criteria for diagnosis of Post Traumatic Stress Disorder.

### ANSWERS TO QUESTIONS

1.    Is there a preexisting psychiatric condition prior to 8/1/2000? There is no evidence that there was a major psychiatric condition prior to 8/1/2000. She did have a difficult early life, and has a Type A obsessional compulsive work orientation. but there is no documentation of substance abuse or any severe psychiatric issues such as major depression prior to 8 '1/2000

2.    My opinion of her current psychiatric treatment is that Dr. Trahms' treatment is reasonable. given the claimant's multiple medication sensitivities. Dr. Trahms has tried to mobilize her and communicated to the husband and grandmother taking care of her, and I think is an appropriate provider who is trying all reasonable medications.

3.    There is a psychiatric impairment as well as a constellation of medical issues. At this time, she is very depressed given the loss of her being able to work. Her workaholic defense style cannot be mobilized at this time. In addition. she likely as grief issues related to her brother's HIV status as well as the loss of her half sister due to suicide. She has an appropriate depressive reaction to her perceived medical conditions, given that they are severe and limiting her to a severe degree to the point where she has to walk with a cane. She has lost her work life as well, and is appropriately depressed because of this. Dr. Trahms believes, and I agree given her work history, that she would be motivated to get back to work and that given her impaired thinking.she is truly psychiatrically impaired at this point

Stephen N. Gerson. M.D.

SNG/nm

April 23, 2002

STEPHEN N. GERSON, M.D., M.S.M.
12 CLEMATIS RD
LEXINGTON, MA 02421

Dr Nancy Trahams
599 Sir Francis Drake Boulevard, Suite 304
Greenbrae, California 94904

RE:    DAWN A. RUTHERFORD

Dear Dr. Trahams,

Thank you very much for speaking with me about your patient, Dawn A. Rutherford, on 4/23/02. We spent about a half hour discussing this. You indicated your Federal Tax ID# is 941717187, and your fee for this half hour is $100.00 dollars. Please feel free to edit this document and return it to Jennifer Nowicki, Prudential Insurance Company, Disability Management Services, P.O. Box 13480, Philadelphia, PA, 19101. If you edit it, your final comments is what will be documented in the record.

You indicated that you began to see the claimant on January 15, 2002. You recounted her history of having been exposed to Epstein-Barr virus in Yosemite, and that a friend of hers had this as well. She developed flu-like syndrome with joint and muscle pain and became bedridden with subsequent depression, anxiety, went to a variety of M.D.'s, and was tried on a variety of medication such as Effexor, SSRI's, Elavil. She either had dystonia, nausea or vomiting, and developed nightmares and hallucinations on trazodone. You indicated that she has been on a fentanyl patch, morphine, Soma, and was given a Demerol shot with subsequent facial palsy and suffering. An MRI was negative, and you have been concerned about the question of some atypical progressive neuromuscular disease as in your experience chronic fatigue syndrome and fibromyalgia improve over a period of time, but she is getting worse. You indicated she is anxious, she drops things, cannot do much of anything, and her that her current medications are Neurontin and Prozac. You indicated that she will be seeing a new doctor, Dr. Davidson, a rheumatologist.

Her mental status and activities are that she has been very depressed, cries for hours, obsesses about bad mothering from a narcissistic mother, feels her husband does not love her. In fact, you indicated that he is supportive and is a reasonable individual. Your concerns of her thinking is distorted, and she has a suicidal plan that she is not sharing. Her grandmother has come from the East to stay with her and is taking care of her. The claimant's parents were divorced and father re-married, and she had a half sister from this marriage. This half sister suicided in July, and in October she had learned that her brother to whom she was close with, was HIV positive. You indicated that she had been staying in bed a lot, does research work on the Internet, has some muscle stretching, and spends most of the time in bed all day watching TV. In terms of past performance, you indicated she was a high functioning individual with two years of college, was very successful in her work earning over $100,000 dollars a year as a project manger. You indicated she now is self-absorbed, cannot concentrate, has lost 20 pounds, and is vegetatively depressed. You indicate that she tried rehab for a week but could not handle it and went back to bed. You felt that her premorbid structure was Type A obsessional personality, and now that she cannot function, she has become more anxious and has been having more difficulty, given that she cannot utilize her prior coping style. You feel that optimal treatment will be twice a week, there is no substance abuse history, and you indicated ideally that you would like to see her twice a week and might consider Remeron.

In conclusion, I want to thank you very much for discussing your patient Dawn Rutherford with me.

Sincerely,

Stephen N. Gerson, M.D.

SNG/nm

PRUR00486

FROM :                    FAX NO. :                Jan. 16 2002 11:53AM  P1

# Nancy A. Trahms, M.D.
599 Sir Frances Drake Blvd., Suite 304
Greenbrae, CA 94904-1732
415-461-9200

January 15, 2002

**SENT VIA FAX**

Prudential Insurance Company
Disability Management Services
Appeals Unit
ATT: Jennifer Nowicki
Claim # 10421380
SS# 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
Claimant: Dawn A. Rutherford

## RE: New health care provider with additional medical evidence

Attached please find a completed Mental Status Evaluation for Ms. Dawn Rutherford who is under my care for acute anxiety and major depression.

Ms. Rutherford has advised me that she is appealing a Long Term Disability decision made by Prudential.   The attached Mental Status Evaluation should be included in her administrative record to be evaluated as part of her appeal.

Upon review of her medical records,  I concur with Ms. Rutherford's other health care providers that she is completely and totally disabled.  Due to her chronic pain, acute anxiety and severe depression, which cause a lack of mental clarity, poor concentration, and fragmented thoughts, she is unable to work at any type of occupation.    Her disability is expected to last a minimum of twelve [12] additional months but, may become permanent depending upon her response to treatment or other complications.

If you should have any questions, or require further information, I may be contacted at the above address and telephone number.

*Nancy A. Trahms*

Nancy A. Trahms, M.D.

PRUR00514

## Peter H. Stein, M.D.
### Rheumatology

599 Sir Francis Drake Boulevard #204
Greenbrae, CA 94904
Tel: 415-464-9604
Fax: 415-464-0171

Diplomate, American Board
of Internal Medicine,
Rheumatology

January 14, 2002

To Whom It May Concern:

**Re:   DAWN RUTHERFORD**

I am writing in behalf of Dawn Rutherford who has recently developed severe fibromyalgia. She suffers very severe pain, fatigue and sleep disorder. She has very poor tolerance of activity. She is in the throws of a very severe presentation with fibromyalgia.

In this setting, I do not think patient is capable of work at this time. I do hope that once she learns better management skills for her pain and gets this very stressful period that she may be able to return to at least part time work in the future. However, at this time she cannot possibly consistently show up at work and perform well enough to satisfy an employer. I feel strongly that she deserves disability status for at least the next six months.

Thank you for your attention

Sincerely,

PETER H STEIN, M.D.

PHS/fl

MSE for: <u>Dawn A Rutherford</u>    Date <u>11/1/01</u>    (Initial Evaluation?) <u>Yes</u>

**Brief History**

What events or difficulties led to patient leaving work (not the diagnosis)? *Physical illness and acute stress*

How did their functioning (activities change (at work, at home, socially)? When? *Client became unable to perform her normal job duties*

List observations or behaviors, in your office, that document the change in functioning at work and non-work activities
*obvious physical discomfort, visible fatigue, poor concentration, crying jags, panic attacks*

What objective mental impairment underlies these changes? Please document with events and observations
*Anxiety Disorder NOS (i.e., mixed anxiety - depression disorder)*

What specific life changes has the employee had to make to deal with things they cannot do?
*Stop work, reduce normal activities, begin meds, start PT*

Provide relevant details of past work, social and psychiatric history and treatment.
*No prior psychiatric history or hospitalization*

What clinical and functional observations support the DSM IV diagnosis?
*Patient displays acute signs of anxiety and depression*

**Treatment**

List current treatment frequency and Plan. Recent changes? *outpatient psychotherapy, 1 - 2x/week with collateral contacts + Referral to PMD*

List current medications and dosages. Recent changes?
*Not sure of current status; their doctor keeps altering her medications and dosages due to changes in medical diagnosis*

**Employment**

Describe the current plan, steps and timing for returning to employment.
*The plan is to properly identify her medical dx and to stabilize her level of emotional functioning*

What partial work tasks could the employee do now? *possibly telephone calls, but patient is unable to return to the workplace for this*

List current obstacles to working.
*Multiple physical impairments compounded by psychiatric symptoms*

**Mental Status Examination**

Appearance and Attitude (Events and observations supporting opinion) *casual but neat appearance, cooperative but extremely distressed, compliant with medical treatment, oriented X3*

Affect and Mood (Events and observations supporting opinion)
*see descriptions above*

Behavior and Impulse Control (Events and observations supporting opinion) *Behavior is frantic at times; impulse control appears adequate (no evidence of suicidal self-injurious acts)*

Thought processes, Memory, Concentration (Events and observations supporting opinion) *Flight of ideas, mental confusion, poor concentration but memory generally appears in tact*

Intellectual function and Organization (Events and observations supporting opinion)
*Above average*

FROM : Barbara Badham,Ph.D.          FAX NO. : 7077761169          Nov. 01 200. 04:54PM  P3

---

insight and Judgement (Events and observations supporting opinion)
*Limited insight and judgment*
*As client tends to obsess/worry over external*
*events to the detriment of focus on self*

Has the CAGE questionnaire been administered?
*I do not know what this is.*

Diagnosis (DSM IV)

Axis I    *Anxiety Disorder NOS (300.00)*

Axis II   *Diagnosis Deferred (799.9)*

Axis III  *Chronic fatigue syndrome; fibromyalgia, degenerative disk & joint conditions*

Axis IV   *Occupational problems, economic problems*

Axis V    *Current GAF : 35*

PRUR00556

concluded, **"The patient's complaint of non-restorative sleep is compatible with the findings of alpha intrusion on the electroencephalgram."**

Most people with fibromyalgia also have an associated sleep disorder known as alpha- EEG anomaly  Ms. Rutherford's sleep study confirmed through the readings of the electroencephalgram that she suffers from this disorder.  In this disorder, the individual's deep sleep periods are interrupted by bouts of waking-type brain activity, resulting in poor sleep.  Ms. Rutherford sleep difficulties have resulted in disabling chronic fatigue, muscle pain and weakness. and overall lack of mental clarity, the combination of which is totally incapacitating and cause Ms. Rutherford to be completely and totally disabled

In a study conducted at the University of Connecticut School of Medicine, researchers found clinical evidence to support that Fibromyalgia patients experience severe sleep problems, lack of Stage III and Stage IV sleep which leads to incapacitating fatigue and disabling muscle pain  This detailed study and analysis found that poor sleep resulted in significantly more pain. However, the problems did not end there. The researchers found that a night of poor sleep was followed by a significantly more painful day, and a more painful day was followed by a night of even poorer sleep. This causes a cycle of disabling pain and chronic fatigue in Fibromyalgia patients. Ms. Rutherford's suffers from this combination of pain and fatigue which severely limits her physical activity and endurance and completely prevents her from performing the normal and customary functions of her job.

Sleep deprivation is a serious condition which can greatly affect the cognitive functioning and mental abilities of those which suffer from it.  "The serious disabling affects of sleep disturbances can not be minimized and can produce a disabling affect on overall physical health' according to Dr  James O' Brien, MD, President and CEO of talkaboutsleep com  Dr. O'Brien is a pulmonologist who has been in private practice for over 20 years and became involved in sleep medicine 12 years ago where he founded his sleep study clinic in Germantown. Tennessee  The following physicians and specialists serve on Dr  O'Brien's medical advisory board. Lawrence I  Barsh, DMD, Jed Black, MD, Cynthia Dorsey, Ph.D , Kasey Kai-Chi Li, DDS. MD, Ann E. Rogers. Ph D , RN; Kingman P  Strohl. MD

The patient experiences extreme fatigue and has reported that she has had difficulty staying awake during meetings, remembering and managing the extensive technical details of the software development projects which she had been responsible for as well as difficulty in remaining awake during her drive home from work

On October 24, 2001, after initial examination of Ms Rutherford. I found that she was experiencing symptoms of Fibromyalgia, including widespread pain in the left and right side of the body; pain upon digital palpation of the occiput, low cervical, trapezius, supraspinatus, second rib, gluteal, greater tronchanter [bilateral, posterior to the trochanteric prominence, and knee tender points performed with an approximated exerted force of 4 kg  I observed the patient express pain upon digital palpitation of the above tender points  The patient experienced severe axial skeletal pain of the cervical spine upon my physical examination as well as widespread pain throughout her anterior chest and thoracic spine  She experienced muscle pain throughout the upper and lower part of her body, including extremities during palpation. During examination, the patient

2

PRUR00600

exhibited numbness in her upper right leg, tingling sensations which became "needle like" and painful in her hands and feet. Upon examination, I observed, swelling and redness in the joints of the patients right and left hand. All of the above mentioned severely limited her dexterity and thus her ability to perform the customary and necessary functions of her occupation including writing by long hand and typing project reports. At this time the patient is unable to walk without the aid of a cane and the assistance of her husband due to 50% lack of mobility.

The patient is experiencing difficulty in concentration and memory problems. These affect her cognitive abilities to perform an increasingly mentally demanding job. The patient is experiencing episodes of myofascial paresis, which prevent her from speaking properly and greatly impedes her ability to communicate in an effective and intelligent manner. During our initial examination, the patient required that I stop as she demanded immediate use of the toilet facilities due to an outbreak of her irritable bowel syndrome which she has been experiencing since August 2001. This disease is very disruptive to the patient's daily activities and often causes pain and bloating, fluid retention, nausea, and crampy abdominal pain. This also limits her appetite further weakening her overall condition.

<u>Treatment options</u>

Ms. Rutherford is currently undergoing hydro-physical therapy when she is able as a treatment for her Fibromyalgia in conjunction with prescriptions for Morphine and Hydrocodone to control pain, Carisoprodol to control muscle spasms and Xanax to relieve anxiety. She is also taking Klonopin for sleep.

<u>Antidepressants</u>

Studies suggest that antidepressants help between a third and a half of patients. Doses used for fibromyalgia are generally lower than for depression, so combinations may be an option. Benefits may be strongest with a combination of drugs from two classes, the tricyclics and SSRIs. None have been well researched for fibromyalgia, however. It should be noted that some patients report *worse* symptoms with antidepressants. Ms Rutherford has reported a worsening of symptoms upon taking the antidepressants Paxil, Elavil, Trazadone, and Celexa. Ms. Rutherford has experienced severe allergic reactions to medications requiring emergency room care.

*Tricyclics.* Tricyclics not only help relieve depression but they also have properties that reduce sleeplessness and muscle pain. The tricyclic drug most commonly used for fibromyalgia is amitriptyline (Elavil, Endep), which produces modest benefits with pain, but which can lose effectiveness over time. Other tricyclics include desipramine (Norpramin), doxepin (Sinequan), imipramine (Tofranil), amoxapine (Asendin), trazodone (Desyrel), and nortriptyline (Pamelor, Aventyl). Generally only small doses are necessary for relief of fibromyalgia, so, although tricyclics have a number of side effects, they may occur less frequently in fibromyalgia patients than in those taking tricyclics for depression. Side effects most often reported include dry mouth, blurred vision, sexual dysfunction, weight gain, difficulty in urinating, disturbances in heart rhythm, drowsiness, and dizziness. Like all medications, tricyclics must be taken as directed, overdose can be life threatening. Ms. Rutherford has had severe side effects from Elavil including

}

PRUR00601

- Tramadol (Ultram) is a pain reliever that has been used as an alternative to opioids It has helped some people and was thought not to be addictive, although dependence and abuse have been reported. It can cause nausea.
- Anti-inflammatory drugs, which are commonly used for arthritic conditions are less useful for the pain of fibromyalgia, since the pain is not caused by muscle or joint inflammation. Such drugs include corticosteroids and nonsteroidal anti-inflammatory drugs (NSAIDs), such as aspirin, ibuprofen (Advil), and others.

Ms. Rutherford is currently taking Morphine daily for pain and Hydrocodone for break through pain. The side affects of these drugs include drowsiness, dizziness, decreased ability to function, and overall lack of mental clarity prevent Ms Rutherford from functioning on a normal level or performing the normal and customary functions of any occupation.

Ms Rutherford has experienced severe allergic and life threatening reactions to many of the medications previously listed above. These reactions have caused convulsions, severe muscle pain, dystonic shock, diarrhea, vomiting and have all required emergency room hospitalization Extreme caution is necessary when prescribing any new medications for Ms. Rutherford due to her previous allergic reactions.


## CONCLUSION

Extreme mental clarity is required due to the demands of her project management job where Dawn was required to simultaneously manage multiple software development projects with varying timelines, resources and requirements. The patient was also required to either lead meetings in a standing position or sit in meetings for hours at a time without a break requiring intense mental concentration and focus. The patient was required to travel to the offices of her company in Brea, where she was responsible for the overall integration of the entire line of software products, all technical literature and as per her job description "was required to run interference between the various groups of Quality Assurance, Engineering, Product Management and Marketing" located in San Rafael and Brea. **It would be impossible for my patient to accomplish any of these tasks in her current medical condition accompanied by chronic pain and disabling fatigue.**

The combination of her chronic pain. chronic fatigue, difficulty in concentration, memory problems, irritable bowel syndrome. fibromyalgia and severe lumbrosacral and cervical pain make it impossible for the patient to perform the required duties of any job whatsoever. She is unable to function at a normal mental or acceptable physical level of performance for this or any other occupation.

Based on my examinations, observations and review of the medical evidence, Ms Rutherford's disability is expected to last a minimum of twelve [12] months, but may become a permanent disabling condition based on the patient's individual response to treatment.

PRUR00603

December 22, 2001

**SENT VIA CERTIFIED MAIL**
**Item 70011940000234164527**

Appeals Review Unit
Prudential Insurance Company of America
Disability Management Services
P.O. Box 13840
Philadelphia, PA 19101

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

**ADDITIONAL MEDICAL INFORMATION AND CASE HISTORY REGARDING THE ONGOING DISABILITY OF MS. DAWN RUTHERFORD**

**THIS INFORMATION IS TO BE INCLUDED AS PART OF Ms. Rutherford's OFFICIAL ADMINISTRATIVE RECORD AND FILE WITH PRUDENTIAL REGARDING HER ONGOING DISABILITY**

Enclosed please find Office Visit notes from 12/17/01 when Ms. Rutherford visited the office of Orthopedic Specialist, Dr. Michael A. Kurtz. Read the office visit notes thoroughly as they document Dr. Kurtz's examination and observations of Ms. Rutherford's worsening condition, redness and swelling in her fingers, lack of mobility, lack of dexterity, results of grip strength test and worsening Fibromyalgia.

We are submitting Rutherford's **ACTIVE** job description provided by Kathleen Boggs, Human Resources Manager from Scene7, Inc. This vital piece of data must become part of the formal administrative record as it has been referred to many times but specifically reviewed. This job description uses many **ACTIVE verbs**, which would be contrary to the claims that Ms. Rutherford held a sedentary position. **We don't think that "Runs interference" or "Drives the schedule, features and budget" or "Conducts usability test" or "Organize Production and BETA testing" or "Work with QA and Engineering to manage bug fixes" can be considered SEDENTARY RESPONSIBILITIES IN ANY WAY SHAPE OR FORM. These are action verbs indicative of both physical and mental job requirements. The people involved with these responsibilities were located in geographically diverse areas which would require travel. It would have been impossible for this job to be completed without direct interface as per the job description itself states.**

We are submitting the results of an abnormal sleep study where the physician's found that Ms. Rutherford suffers from a reduced sleep efficiency of 74% and an absence of STAGE III and STAGE IV sleep. The electroencephalogram showed alpha intrusion with alpha-delta sleep as well as an increase in sleep spindles and an absence of STAGE III and STAGE IV sleep. **This is an abnormal sleep study.**

Enclosed are the results of Ms. Rutherford's Epstein Barr Virus tests, which she contracted in August of 2001. The test results specifically state, **"Positive results suggest recent or chronic-active infection. Anti-EA becomes undetectable weeks to months after onset".**

Enclosed are the results of abnormal blood tests from Ms. Rutherford's recent visit to the Emergency Room where she was treated for chronic pain and an allergic reaction to Demerol. Note the high white blood count and low Lymph % indicative of an active infection combined with a weakened immune system per the Emergency Room staff. The ER physician's report will be forthcoming.

December 14, 2001

<u>**SENT CERTIFIED MAIL**</u>
<u>**Item 70011940 0002 3416 4510**</u>

Appeals Review Unit
Prudential Insurance Company of America
Disability Management Services
P.O. Box 13840
Philadelphia, PA 19101

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

APPEAL OF DISABILITY CLAIM DECISION

This letter shall serve to formally notify Prudential Insurance Company of Ms. Dawn Rutherford's appeal of their long term disability claim decision.

Ms. Rutherford is presently seeking the guidance of an attorney who will address the numerous inaccuracies in Dr. Brachman's report and shall provide additional medical evidence to support Ms. Rutherford's complete and total disability.

Enclosed within please find office visit notes from 12-12-01 from Dr. Mandel where he reported that he observed a severe lack of mobility due to her requirement for a cane to walk, swelling in the joints of her fingers causing a 50% lack of dexterity and severe pain in her tender points and lower back. This caused him to give her an injection of Demarol. Ms. Rutherford experienced a severe allergic reaction to the injection causing her to have full body convulsions, a dystonic reaction and inability to breathe. She was given a 50 mg. shot of Benadryl and oxygen was administered. After about an hour and a half, she was well enough to be released from the doctor's office.

In addition, please find documentation from Ms. Rutherford's recent visit 12/13/01 to the emergency room where she was treated for severe pain, tremors and dystonic reaction. The ER doctors indicated that the blood work was indicative of an active infection [Epstein Barr], and a compromised immune system [Epstein Barr and / or Fibromyalgia]. The ER physician's report will be forthcoming.

We reserve the right to provide additional information as we receive it from health care providers and other sources as necessary, to prove the complete and total disability of Ms. Rutherford.

Please provide us with detailed written information about our contact within the Appeals Unit, the timelines for the processing of the appeal and any other restrictions or requirements of the appeal process, within five [5] business days of receipt of this letter.

If you should have any questions, contact us at 707-766-6674.

Daniel Keegan                    Dawn Rutherford

Cc: California Department of Insurance

PRUR00648

**SENT VIA FAX & CERTIFIED LETTER**

December 3, 2001

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA 19101
ATT: Rachel Evans- Sweeney

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

Dear Ms. Evans- Sweeney,

Attached please find a letter from Patricia Grinnell, Family Nurse Practitioner, from the offices of Dr. Park and Dr. Finzen.

Upon initially reviewing my chart notes last week related to my office visit at Dr. Park and Finzen's of October 19, 2001. I noticed a very serious discrepancy. The purpose of the attached letter is to correct this error.

I contacted the offices of Dr. Park and Finzen, and they generated the attached letter which is being sent via fax and certified mail to your attention.

**It is imperative that this information is included as part of my updated medical history.**

If you should have any questions, please do not hesitate to contact the offices of Dr. Park and Finzen at 707-765-1070.

Thank you for your attention to this matter.

Dawn Rutherford



RUTHERFORD
65 Alta Drive
Petaluma, CA 94954

RETURN RECEIPT
REQUESTED

7001 0320 0003 2116 2080

CERTIFIED MAIL

UNITED STATES
POSTAL SERVICE

0000

U.S. POSTAGE
PETALUMA, CA
DEC 03'99 01
AMOUNT
$3.94
0090671-12

PRUDENTIAL INSURANCE COMPANY
DISABILITY MANAGEMENT SVCS.
P.O. Box 13480
PHILADELPHIA, PA 17101

19101+3480

PRUR00671

**Patricia Grinnell, FNP**
141 Lynch Creek Way, Suite C
Petaluma, CA  94954
Phone 707-765-1070
Fax: 707-765-0238

<u>**SENT VIA FAX & CERTIFIED LETTER**</u>

December 3, 2001

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA  19101
ATT: Rachel Evans- Sweeney

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

Dear Ms. Sweeney,

The purpose of this letter is to correct an error on the chart notes of Ms. Dawn Rutherford dated October 19, 2001 from the offices of Dr Park and Dr. Finzen.

During our intake conversation, Ms Rutherford discussed recent events in her life including a change of employment in late May of 2001   When I transcribed Ms. Rutherford's comments onto her chart, there was a miscommunication, which caused a discrepancy in her chart notes   The resulting error in Ms. Rutherford's chart notes stated that she began experiencing symptoms of Fibromyalgia in May of 2001.  This in fact was not the case, and was actually an error in my transcription.

<u>**It is important to note that Ms. Rutherford did not report the experience of any symptoms of Fibromyalgia or other illnesses prior to August of 2001.**</u>

This fact is also supported by documentation from Ms Rutherford's other health care providers as well as her previous medical insurance carrier and pharmacy records

We apologize for the confusion regarding this matter   If you should have any questions, please do not hesitate to contact our office

Patricia Grinnell FNP

Patricia Grinnell, F.N.P.

PRUR00672

FROM :                              FAX NO. :                    Nov. 27 2001 02:33PM  P1

**URGENT:  SENT VIA FAX**

**Patricia Grinnell, FNP**
141 Lynch Creek Way, Suite C
Petaluma, CA  94954
Phone 707-765-1070
Fax: 707-765-0238

November 27, 2001

Dear Pat,

As we discussed yesterday, after reviewing my chart at your office for the first time I
noticed a serious discrepancy related to your notes of October 29, 2001.  I am very
concerned about this because I am on the process of dealing with disability case issues
and this incorrect data could have a seriously detrimental affect on my case.

**I did not report nor experience any illness whatsoever during the month of
May – June 2001.  In fact, I was completely healthy for the entire year having
not even visited a physician or taken a prescription medication until I became
ill at the beginning of August 2001.**

It is imperative that this miscommunication be corrected as we discussed and the
updated, correct information be faxed over to the insurance company as promised
today.  Please include the following claim information on your correspondence to them.
Please be as clear as possible in regard to the miscommunication which resulted in the
error in your notes.

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA  19101
ATT: Rachel Evans- Sweeney

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

If you should have any questions, please do not hesitate to contact me at 707-766-
6674.

Thank you for your prompt attention to this matter.

Dawn Rutherford

PRUR00689

**SENT VIA CERTIFIED MAIL & FAX**

November 24, 2001

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA  19101
ATT: Rachel Evans- Sweeney

Patient: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim #10421380

Dear Rachel,

We received your letter today dated November 13, postmarked [over one week later] November 21. 2001.  We found this extreme delay in the mailing of a business letter rather unusual.  It could not be attributed to any holiday delays because Thanksgiving fell on November 22.

Furthermore, we are quite confused by the statements in your letter related to delays in Prudential's ability to make a decision caused by lack of clinical data related to Ms. Rutherford's complete and total disability as of November 13. 2001.  All of Dawn's health care providers have supplied Prudential with extensive clinical documentation as requested, in a timely manner, which detailed the extent of Dawn's complete and total disability as well as the extreme pain she is experiencing on a daily basis as a result of this illness.

Daniel has had many conversations with you since you took over the management of this case.  You stated to him in a telephone conversation that as of November 13, 2001. Prudential had received all of the supplemental data it had requested from health care providers, previous insurance company and pharmacy related to Dawn's case which we have also previously confirmed in writing.

THIS BEARS REPEATING:

We are baffled as to why Prudential continues to be unable to make a decision in lieu of the extensive medical documentation, which has been supplied, from numerous health care providers, specialists, lab tests, hospital tests and doctor's reports documenting the complete and total disability of Dawn Rutherford.    We cannot understand how there could be any question whatsoever regarding Dawn's disability considering the amount of clinical data that Prudential has been provided.

1

PRUR00695

November 24, 2001
Page 2 of 2

At this time, we would like a summary written report of the overall findings, which Prudential deems questionable as it pertains to [Prudential's] inability to make a decision regarding Dawn's case in order for us to review with Dawn's primary care specialist and a rheumatologist.

We expect that since Prudential has a substantial amount of information from six [6] credentialed, medical professionals detailing the overall nature and extent of Dawn's complete and total disability that Prudential will continue to pay on this claim [as per the State of California Department of Insurance regulations] while it continues its lengthy review of Dawn's case.

Please advise immediately if this is not the situation. We await the receipt of your summary findings report.

Thank you.


Daniel Keegan                                    Dawn Rutherford
65 Alta Drive
Petaluma, CA  94954

PRUR00696

FROM :                         FAX NO :                      Nov  19 2001  02:52PM  P1

**Jeffrey A. Mandel, M.D.**
22429 Hesperian Blvd. Suite C
Hayward, CA 94541
510-782-7111

november 19, 2001

SENT VIA FAX : 877-889-4885

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA 19101
ATT: Rachel Evans- Sweeney

Patient: Dawn Rutherford
SS# 156-625412
Group Policy # 076787
Claim #10421380

The purpose of this report is to provide a comprehensive follow up document which details the disabilities of Dawn Rutherford causing her extreme physical pain, fatigue, lack of mobility, and inability to work. This summary report is based on input from Ms. Rutherford's health care providers, laboratory tests, x-rays, MRI's, clinical observations and physical examination during her office visits.

SYMPTOMS:

- Tender pain points through out body cause moderate to extreme pain when pressure applied. Limit mobility and normal activity.

- Most severe tender points are hip joints, knees, shoulders, lower back and neck.

- Severe back, neck, shoulder and muscle spasms causing extreme pain. Lower, middle and upper back pain both muscular and skeletal. Extreme pain in right shoulder accompanied by spasms. Constant pain is experienced in one or more of these areas.

- Extremely fatigued even after a full night of sleep. Any amount of exertion causes extreme fatigue forcing bed rest for hours during the day. Lack of energy – non-restorative sleep.

- Stiffness and pain in joints of feet and ankles when walking or standing.

- Severe back pain in lower vertebrae and vertebrae of neck manifested in hot flashes of pain.

- Soft tissue pain in lumbrosacral and cervical areas

- Tension and disabling migraine headaches. Very sensitive to sounds, light and odors.

1

PRUR00698

- At times patient experiences difficulty concentrating because she cannot focus her eyes on nearby objects. She also experiences itchy and dry eyes.

- Flu like symptoms. Lethargic, stiff feeling and severe muscles aches in arms and legs especially in the morning. Very limited mobility. Cannot walk very far without intense pain in sciatic nerve, hips, knees and legs.

- Cannot sit for any longer than 10 minutes without numbness in legs and pain in lower back accompanied by shooting pains down legs to the knee.

- Cannot stand upright for more than 5 – 10 minutes without increasing pain in lower back, sciatic nerve, hips and legs. Cannot stand for more than 5 – 10 minutes without experiencing numbness in right leg.

- Feelings of nausea come and go through out the day. Limited appetite due to stomach cramping and gas problems. Severe case of irritable bowel syndrome alternating between diarrhea and constipation.

- Unable to sleep without the aid of a prescription sleep medicine. Sleep pattern interrupted – often wakes three to five times per night. Extreme anxiety over health conditions contributes to terrible bouts of insomnia.

- Limited use of right hand. Swollen joints in right hand.

- At times patient has difficulty swallowing and chokes when she attempts to swallow.

- Patient has noticed recently unexplained bruises on arms and legs.


It is my diagnosis that Ms. Rutherford is suffering from the onset of Fibromyalgia [729.1] and the onset of Chronic Fatigue Syndrome [780.71]. Recommended treatment is a combination of prescribed medicines, rest, and continued medical care.

It should be noted that Ms. Rutherford's has developed new symptoms since the onset of her illness in August of 2001. In early October, Ms. Rutherford began to experience limited use of her right hand accompanied by joint pain. Within the past two weeks, she has experienced difficulty with swallowing and has noticed unexplained bruises on her arms and legs.

It is my professional opinion that Ms. Rutherford is completely disabled and unable to work. It is my recommendation that Ms. Rutherford be placed on disability for a minimum period of six months to one year where she will be under my care, subject to regular review based on her progress or lack thereof.

If you should have any questions, or require further information about Ms. Rutherford's condition or disabilities, please do not hesitate to contact me.

Jeffrey A. Mandel M.D.

PRUR00699

FROM : Barbara Badham,Ph.D.          FAX NO. : 7077781189          Nov. 01 2001 04:56PM P2



**BARBARA J. C. BADHAM, PH.D.**
*Clinical & Educational Psychology*
*Psychotherapy • Assessment • Consultation*
*Services in English and Spanish*

320 Western Avenue • Petaluma, CA 94952 • (707) 778 1189

November 1, 2001

Licensed
Psychologist
#12860

Licensed
Educational
Psychologist
#275

Marriage,
Family,
& Child
Counselor
#9473

Bilingual
Crosscultural
Certificate of
Assessment
Competence
#SA32885

Prudential Disability Management Services
P.O Box 13480
Philadelphia, PA 19101

Attention.     Rachel Evans-Sweeney

Patient:     Dawn Rutherford
             SS #156-625412
             Group Policy #076787
             Claim #10421380

Dear Ms. Sweeney,

It has come to my attention that the purposes of my counseling sessions with Ms. Dawn Rutherford has come into question.

Please allow me to clarify that Ms. Rutherford is not currently seeking any vocational rehabilitation at this time due to her disabilities from fibromyalgia, cervical and lumbosacral degenerative disc disease, degenerative joint disease, and chronic fatigue syndrome.

Since Ms. Rutherford was diagnosed, our focus has been on her significant anxiety and depression regarding her condition  The session notes I provided substantiate the fact that we have been discussing the difficulties and challenges of obtaining quality medical care for her disabilities. Ms Rutherford cannot participate in any type of vocational rehabilitation at this time due to the physical limitations of her ongoing disability and her concommitant psychological condition.

Please feel free to contact me if you should require further information on this matter.

Sincerely,

Barbara J.C Badham, Ph.D.

BJCB:eb

PRUR00726

EMERGENCY DEPARTMENT COURSE: I was satisfied that there were no undisclosed ingestants, that this was an accidental, not intentional, minor overdose. I felt that the nausea could be explained by the combination of the Tylenol and codeine and the wine and the lightheadedness and sleepiness due a combination of Tylenol and codeine, Xanax and wine. I reassured the patient and her husband that she would be safe to go home and not require further diagnostic testing. She was given a 15-cc dose of Maalox in case the nausea was related to any gastritis-type symptoms and a 25 mg tablet of Phenergan was dispensed to take home with her, if the nausea was not resolved following the Maalox, then she may take one dose of Phenergan 25 mg and rest tonight. Return to the emergency department if her symptoms are not clearing tomorrow. She is reminded not to take alcohol with her Xanax or Tylenol with codeine pills and follow up next week with Dr. James Leoni.

DIAGNOSES:
1.    Accidental overdose of Xanax combined with Tylenol and codeine and ethanol.
2.    Nausea secondary to No.1.
3.    Drowsiness and dizziness secondary to No 1

                                                    Maury Schulkin, MD

D  09/15/2001  T: 09/21/2001 11:33 A  ot
Job 077399 Doc 122969

cc:     James Leoni, MD

EMERGENCY ROOM REPORT                        PATIENT NAME Rutherford, Dawn
                                                      MR# PM0216-34-86
                                                      ID# PV0033494998
                                                      Maury Schulkin MD
                                                      Page 2 of 2

                    COPY TO:  James Leoni, MD

PRUR00763

**Petaluma Valley Hospital**
A Sister of St. Joseph of Orange Corporation
400 North McDowell
Petaluma, CA 94952
Tel (707) 778-2725  Fax (707) 778-2648

Rutherford, Dawn
MR# PM0216-34-86
ID# PV0035494998
Maury Schulkin, MD

DATE OF EMERGENCY ROOM VISIT: 09/14/2001

DATE OF BIRTH: 02/18/1962  AGE: 39      PT TYPE: ER

CHIEF COMPLAINT. Possible medication overdose.

HISTORY: This 39-year-old woman normally takes Xanax 0.25 mg t.i.d. for anxiety and has been on that for approximately one month and has a recent prescription for a pain pill that she is pretty sure is Tylenol and codeine (not Vicodin, Darvocet or Tramadol) for her low back pain. She states that today she didn't take her Xanax earlier in the day, but she was feeling sleepy this evening. She took Xanax and apparently woke up, took another one, and woke up and took another one, thinking that she hadn't taken it yet. She took all together three of the Xanax 0.25 mg tablets and she also took three instead of two Tylenol with codeine, also by accident. She had also had a glass of wine this evening. She felt sleepy, dizzy and nauseous and was brought in by her husband, who was concerned about overdose. She did throw up twice.

PAST MEDICAL HISTORY: Anxiety, low back pain.

SOCIAL HISTORY: She did not take any other medication. She does not use recreational drugs with the exception of occasional marijuana, the last time being two or three days previously.

REVIEW OF SYSTEMS: CONSTITUTIONAL: Feels lightheaded and sleepy. EYES: No diplopia or visual change. ENT: No tinnitus or vertigo. CARDIAC: No chest pain. RESPIRATORY: No shortness of breath.  GASTROINTESTINAL: No abdominal pain, but nausea present. GENITOURINARY: Last menstrual period less than one month ago. Had a pregnancy test since then and no sexual intercourse since her negative pregnancy test. NEUROLOGIC: No localized numbness or weakness.

PHYSICAL EXAMINATIONS.
VITAL SIGNS: Temperature 37.0, respirations 23, blood pressure 112/76, heart rate 84, oximetry 97% on room air.
GENERAL: She appears sleepy, but is awake and able to answer questions appropriately.
HEENT: Pupils equal, round, reactive to light. No nystagmus.
LUNGS: Clear
HEART: Regular rhythm, no murmur.
ABDOMEN: Nontender.
NEUROLOGIC: Cranial nerves normal. Motor strength normal. Gait no ataxia and normal.

---

EMERGENCY ROOM REPORT

Rutherford, Dawn
MR# PM0216-34-86
ID# PV0035494998
Maury Schulkin, MD
Page 1 of 2

COPY TO: James Leoni, MD

PRUR00764

ROBERT PARK, M.D. F.A.C.P.
BARBARA FINZEN  M D
141 LYNCH CREEK WAY, SUITE C
PETALUMA, CALIFORNIA 94954

PATIENT'S NAME _____ Rutherford, Dawn _____

ADDRESS _____ INSURANCE _____
TEL NO _____ REFERRED BY _____ OCCUPATION _____ AGE ___ SEX ___ S M

| DATE | Prob. No. or Letter | SUBSEQUENT VISITS AND FINDINGS |
|------|------|------|
| 2001 OCT 19 2001 | | 189 lbs c̄ shoes   5' 4" |
| | (S) | 39 yo ♀ new to practice, pt Dr Finzen, here to est'blsh care, prior |
| | | James Leoni |
| | | #1 fibromyalgia — mild sx's starting ⊕ job layoff 5/01, over next |
| | | 3 months, significant generalized tender points, fatigue, heaviness to |
| | | extremities ✓ some days unable, has difficulty getting OOB. Also |
| | | sx's c̄ IBS ↑ nausea. Numerous lab studies & x-rays — never g___ |
| | | official dx until c̄ saw ortho Michael Kurtz in Sinai/Sacto — |
| | | on disability (temporary), seeing Barbara Buthrum PhD for |
| | | counseling 1-2x/wk. Aggressive ⊕ massage tx for slight effect. |
| | | Currently going PT in Robert Park 2x/wk → equ___ s__ |
| | | improvement in some c̄ HS prn). Xanax 0.25m ⊞ ⊞ HS |
| | | prn) — most useful ⊞ tried ↓ into adverse reaction Effexor, Traz___ |
| | | #2 DDD — cervical — lumbar spine.   O.T. as above. Takes No |
| | | T10 → O10 but still some breakthrough pain. Ground up___ |
| | | from family member + noted markedly pain relief "lasted al___ |
| | | longer" while Darvocet totally but stopped, deny effic. |
| | | #3 "Sleep disorder" — sleep study pending.   ⊕ effect from Ambi___ |
| | | controlled effects from Trazodone ⊕ currently Elavil ___ |
| | | e ⊞ for improvement |
| | PmHx — | Good health   Gc Po |
| | | Surg — Lipoma removal (RT) upper back |
| | | Meds — a/ above |
| | | Allergies — PCN, Effexor, Trazodone |
| | | Habits — Tobacco ∅, ETOH ∅, Illicit ∅ |
| | | Tests — Labs,  pap ⊕/00, TB '16 |
| | FHx — | Dad ? Enteric.d.   Pm — osteoarthritis |
| | | Mom 57 Amy |
| | | Siblings c̄ HIV ✓ ↓ 25 Suicide |
| | Social — | B+R New Jersey, Calif '93, Married x 4 yrs |
| | | Prior work as software project manager, Dict — Balance |
| | | Overall Exercise — in PT. Hobbies — has 3 dogs |
| | | reading, gardening. |

PRUR00773

| DATE | Prob No or Letter | SUBSEQUENT VISITS AND FINDINGS |
|------|------|------|
| 10-15-01 | (cont.) | ROS — wt ↑ Baseline 15:-it: 185  Dry eye syndrome, Restasil gp |
| | | for effect. ⊕ Tension / migraine H/A  L hip sciatica ē OOI |
| | ⓐ | Pleasant, organized, slightly anxious manner. |
| | | Ht  wt as noted.   BP 120/80  ○ 72 |
| | | Skin — ⊖ atypical lesions |
| | | HEENT — normocephalic, n.l Tm's clear ⊕ sinus tenderness, oropharynx |
| | | clear, neck supple. |
| | | Cor — reg rate / rhythm |
| | | Lungs — clear T≥ |
| | | Abd — soft, mildly tender bil ↓ quadrants (currently on menses) |
| | | Ext — ⊕ edema, humerus tender points neck, upper back |
| | | shoulder, hips. DTR's brisk @ knees. |
| | | urine dip ⊖ |
| | Ⓐ/Ⓟ | Fibromyalgia |
| | | DDD Cervical + Lumbar Spine |
| | | Sleep Disorder |
| | | • will ∆ from Norco → Lortab — Q10 prn pain, however advise |
| | | in long run will be better if limits use narcotics, ↑ Xanax |
| | | to 0.5 q TID prn, pt has appt ē fibromyalgia "specialist" Dr |
| | | Mandel @ Haywood on 10/24/01 → enc to keep appt. If need |
| | | might consider referral to Dr Johnson for pain management, cont |
| | | PT.  will review records brought in by pt, also pt to sign |
| | | for release of records.  f/u ½ mo. |
| | | PMD FP |
| 10-22-01 | T | Past 2 days ↑↑ pain in hands R > L, lasts all day concern |
| | | will √ ESR.  PH |

PRUR00774

# Physiotherapy
# Associates
## of ROHNERT PARK

## INITIAL BACK EVALUATION

Patient _Dawn Rutherford_ Therapist _____

Dx _C + LS disc disease_ Date _08/01_ Age _39_

_fibromyalgia_ M.D. _Dr. Michael Kim_

Occupation _disabled - working in high school_

Currently Working ☐ Yes ☒ No  D.O.I. _7/13/01_

Precautions: _____

Cause: _____
_diagnosed 9/26/01 c fibromyalgia_

History (Subjective)/Prior level of function: _____

1. Chief Complaints:  a) _____
   c) _____

2. Are you now:  ( ☐ Better / ☐ Worse / ☒ Same) since onset

3. a. SPS (0-10) _4-10; 6 now_ b. Frequency _Constant_.

4. Aggravates Sx: _____

5. Eases Sx: _reclining, vicodin - separate mattress_

6. Describe Pain: _hot sometimes crisp_

7. Pain with: ☐ Cough / ☐ Sneeze / ☐ Strain

8. Day Cycle: _____

9. a. Meds: _Xanax, ambien, hydrocodone, multivit._
   b. Relief: ☐ Yes ☐ No

10. Home Remedies: _____

11. Disturbed Sleep?: ☒ Yes ☐ No   Pain: ☒ Yes ☐ No

12. Sleeping Posture: ☐ Prone / ☐ Supine / ☐ Side - ☐ Right ☐ Left

13. Surface: ☐ Firm / ☐ Soft / ☐ Sagging / ☐ Waterbed / ☐ Futon

15. Bladder/Bowel Symptoms: ☐ Yes ☒ No  _IBS - since August_

16. Previous History: _died last ma c fibromyalgia_
   _no previous hx of C sp / L sp injuries / pain_

   14 b.

17. Previous Treatment: _Acupuncture - helped_
    Relief: ☐ Yes ☐ No _____

18. X-Rays / MRI / Scans:  Results _C sp L sp disc disease_

19. Hospitalized: Y / N  Dates: _____  20. Surgery: Y / N  Dates: _____

21. General Health _____  22. Wt. Loss / Gain: Y N _12#_

23. Any Dizziness: Y / N  When. _____  24. Fainting: Y / N

25. Regular Exercise?: _walks, bicycles, gardening_  Frequency: _____

26. Pt's Goals: _____

27. Is there anything else to tell me? _sit tol. ~1/2 hr.; stand 5-10"_

**BACK PAIN**

No Pain ————————————————— Worst Possible Pain

**LEG PAIN**

PRUR00794

**INITIAL BACK EVALUATION - Page 1**

Patient _Rutherford Jawn_                     Date _10|8|01_

**OBJECTIVE:**

**BODY TYPE:**  Mesomorphic _____ Endo _X_ Ecto _____

**POSTURE (Overall Look):** _Thor kyphosis — ___ L spine_

**SITTING:** _____  Lordosis _____  Scoliosis _____

**STANDING:** _____  Lateral Shift _____  Leg Length _____

| MOVEMENT LOSS: | unable Maj | 50% Mod | 25% Min | W.N.L. Nil | Comments | ↑↓ Pain Rep. Mo. |
|---|---|---|---|---|---|---|
| Flexion |  | X |  |  | pn hips ES @ ~ Sg |  |
| Extension |  | X |  |  | pn @ sacrum + ESR |  |
| S. Glide (R) |  |  |  |  |  |  |
| S. Glide (L) |  |  |  |  |  |  |
| Rotation (R) |  | X |  |  | m. |  |
| Rotation (L) |  | X |  |  | m typical |  |
| Side Bend (R) |  | X |  |  | pn m@ - hip ER |  |
| Side Bend (L) |  | X |  |  | pn bilat - hip ERs |  |

**QUADRANT TEST:**  Right _____  Left _____  Comment: ____

**NEUROLOGICAL:**  Sensation ____

Reflex:    Knee - right _____ left _____    Achilles - right _____ left _____

**M.M.T. 0-5/5**

| | Right | Left |
|---|---|---|
| L1-2  Psos | 5|5 g m | 5|5 |
| L3  Quads | 5|5 | 5|5 |
| L4  Tib. Ant. |  |  |
| L5  E.H.L. |  |  |
| S1  F.H.L. / Pero. |  |  |
| S2  Hamstrings |  |  |

**DURAL SIGNS:**

SLR:    Right _-30°_  Left _+ 30_

Neck Flexion ____

Lasague:  Right ____  Left ____

Faber:  Right ____  Left ____

Abdominal Str: ____  Back ____

SI Jt: ____

Torsion: ____

P.K.F. ____

**PALPATION:**



**P.I.V.M.'s** _____

**GAIT:** _____        PRUR00795

**COMMENTS:** _____

OCT-17-01 02:22 PM  PHYSIOTHERAPY RP          707 5844814                    P.10

Page Thr

**Patient Name** _Rutherford, Dawn_

# PLAN OF CARE:

■ **ASSESSMENT** _Hx Cerv + Lsp disc disease, Fibromyalgia — Pt c/o pain_
_weakness. R'd tone iliopsoas, hip FR's bilat._

■ **PROBLEM LIST**

| | | | |
|---|---|---|---|
| ☒ Pain | 4 - 10 | ☒ ROM Deficits | Lsp, hips, Csp |
| ☐ Strength Deficits | | ☒ Function | Prior tolerance faxled |
| ☒ Poor Posture / Body Mechanics | | ☐ Other | |

# ■ GOALS

| | STG | LTG |
|---|---|---|
| ☒ Decrease Pain | ↓ pain to 3-7 | ↓ pain to 1-4 |
| ☐ Increase Stability | | |
| ☒ Increase ROM | ↑ Rom to w/n wdr. | ↑ Rom Csp, Lsp, hips tw |
| ☒ Improve Postural Awareness | | Good postural habits |
| ☒ Function | ↑ed tol for ED | Able total tol to work Fun |
| ☐ Other: | | |

# ■ REHABILITATION POTENTIAL:   ☒ Excellent   ☐ Good   ☐ Fair   ☐ Poor

# ■ TREATMENT PLAN

Patient will be seen __2__ times per week for __6__ weeks for the following treatment.

| | | |
|---|---|---|
| ☒ Home Program Instruction | ☐ Gait Training | **Modalities as indicated** |
| ☒ Strengthening | ☐ Balance/Proprioceptive Re-education | ☐ Mechanical Traction |
| ☐ Stretching | ☒ Posture / Body Mechanics Education | ☐ Electrical Stimulation |
| ☐ Stabilization Program | ☐ Joint Mobilization | ☒ Ultrasound |
| ☐ Manual Traction | ☒ Soft Tissue Mobilization/Myofascial Release | ☐ Ice / Heat |
| ☐ Repetitive Strain Program | ☐ McKenzie Spinal Rehabilitation | |
| ☐ Nerve Mobilization | ☐ Other: _Ione_ | |

Other Considerations (e.g., medical, psycho-social, environmental) _____

☒ Patient's condition, prognosis and treatment plan were discussed. Patient participated in setting function
  goals and consented to evaluation and treatment plan.

PRUR00796

# page 3

### ■ Social Service Screening Form

To provide high-quality service to our patients during their rehabilitation, a social worker is available for consultation. Please answer the following questions below to help us better meet your needs

1. Do you need assistance with any of the following:

|                          |              |         |
|--------------------------|--------------|---------|
| Transportation           | ☒ YES        | ☐ NO    |
| Shopping / errands       | ☒ YES        | ☐ NO    |
| Domestic Chores          | ☒ YES        | ☐ NO    |
| Meals                    | ☐ YES        | ☒ NO    |
| Personal Care            | ☐ YES        | ☒ NO    |
| Other:_____    | ☐ YES        | ☒ NO    |

2. Do you have someone to assist you with household or daily tasks?   ☒ YES   ☐ NO

3. Has your injury, illness or disability caused any of the following:

|                          |              |         |
|--------------------------|--------------|---------|
| Financial Problems/Stress| ☒ YES        | ☐ NO    |
| Family Problems          | ☒ YES        | ☐ NO    |
| Anger                    | ☒ YES        | ☐ NO    |
| Sadness                  | ☒ YES        | ☐ NO    |
| Anxiety                  | ☒ YES        | ☐ NO    |
| Frustration              | ☒ YES        | ☐ NO    |
| Other:_____    | ☐ YES        | ☐ NO    |

4. Are you having difficulty coping with pain?   ☒ YES   ☐ NO

5. Have you ever had physical therapy before?   ☐ YES   ☒ NO

6. Are you a Medicare patient?   ☐ YES   ☒ NO

*Our Social Worker offers a variety of resources to our patients. Based on your answers above, please check one of the following boxes below:*

_____ YES, I would like more information on services available to meet my needs noted above.

☒ NO, I do not have a need for information on additional services.

_____                          10-8-01
Patient Signature                                           Date

PRUR00797



**page 2**

■ Please indicate the areas where you are experiencing pain/symptoms.

Use the symbols in the table below to describe your pain/symptoms.

| //// Pain |
|---|
| xxxx Burning |
| 0000 Pins and Needles |
| ==== Numbness |

■ Other Complaints:

NECK, MID, LOW-BACK PAIN, SCIATIC PAIN, NUMBNESS IN R LEG, HEADACHES FATIGUE PAIN IN LEFT FOOT

■ If you are having pain, rate the severity on a scale of 0-10, where 0 is no pain and 10 is the most severe pain:



At Best:       0  1  2  3  (4)  5  6  7  8  9  10      (circle one number)
At Worst:      0  1  2  3  4  5  6  7  8  9  (10)      (circle one number)
At This Time:  0  1  2  3  4  5  (6)  7  8  9  10      (circle one number)

| | | |
|---|---|---|
| Was your injury illness related to an automobile accident? | ☐ YES | ☒ NO |
| Was your accident job-related? | ☐ YES | ☒ NO |
| Are you receiving therapy due to a long-term illness? | ☒ YES | ☐ NO |
| If so, how long have you been out of work? | — 8-13-01 | |
| Are you receiving any public assistance or disability benefits? | ☒ YES | ☐ NO |
| Are you or your family having difficulty adjusting to your illness? | ☒ YES | ☐ NO |
| Are you experiencing personal problems (marital, relationship, parenting)? | ☐ YES | ☐ NO |
| Are your therapy services to be paid by a government agency (i.e., research grant)? | ☐ YES | ☒ NO |
| Have you received a kidney? | ☐ YES | ☒ NO |
| | If yes, date _____ | |
| Have you received maintenance dialysis treatment? | ☐ YES | ☒ NO |
| Are you entitled to Black Lung Medical Benefits? | ☐ YES | ☒ NO |

September 20, 2001

Dear Dr Badham,

I have been trying to reach you since yesterday afternoon. I did page you once last night and twice this morning but did not receive any response. **I am in crisis mode.** This is thanks to Dr Leoni and his office.

The problem started when a letter that I wrote to Dr. Leoni which I marked "**confidential**" was faxed over to the Prudential Insurance Company yesterday. This was a serious breach of confidentiality. I am in a state of shock over this matter because the letter contained details of my therapy sessions with you. I learned of this when Prudential contacted me yesterday morning to tell me that the information [re.extension of my disability] sent over to them was inadequate. Indeed they [Dr. Leoni's office] faxed over four lines of information re : the extension, provided no details about my condition, the tests I have taken, or lab work. That is when they requested session notes and more data from you because they read my personal letter. I am not pleased at all by this. Since Prudential is not my medical insurance carrier, I had not discussed my counseling sessions with them.

I called Dr Leoni's office to discuss this matter and the issue of the three month disability extension with him. Dr Leoni stated that it was **you** who suggested the month by month disability [instead of the three month period] and that during your conversation with him "**You said nothing to him which would indicate that I could not return to my former profession**". I find this incredulous considering that the very first day I met with you I recall you stating [after our initial conversation] that you would have no problem writing a letter right there and then stating I should not return to technology and it was not suited for me.

I have clearly told both Dr Leoni and yourself that after being laid off from six technology jobs in the past several years, I am completely physically, mentally and emotionally incapable of performing the duties of and returning to my previous occupation / career field at any time. I am trying to seek vocational rehabilitation. Doesn't anyone listen to me or care? How many times do I have to ask for help?

I am frustrated by the thought that I will have to waste my session today on the details of this very disturbing conversation that I had with Dr Leoni but I am seeking your immediate attention on this issue. Since I am seeing him today prior to our appointment and he is expecting an answer, I have been very anxious to speak with you re how I am supposed to handle this situation with him. **I am on meltdown.** I did leave messages with Elizabeth and paged you.

After what could only be considered a torturous conversation, he stated that he would agree to a three month extension of my disability if you would provide him a letter stating that

1.  I cannot return to my former profession
2.  I am seeking vocational testing/ counseling through your office
3.  You support a three month disability period •

**<u>PLEASE support the disability period through Monday, 1/7/02 so I will not have to go through any more ordeals with the insurance companies over the holidays</u>**

In desperation, I have drafted a letter which I believe will satisfy Dr Leoni's requirements and allow me to be on a three month disability extension

**Please review and if it meets your approval sign and fax over to Dr. Leoni's office at 707-762-2145 prior to my appointment.** I will see you at 4 30.

Thank you  Dawn Rutherford
707-766-6674

PRUR00807

9 19 01

Dear Dr. Badham-

After receiving rather upsetting news today, Prudential has put my claim on hold due to lack of information. I am writing this in regard to my request for information to be sent to Prudential Insurance company from your office immediately regarding my disability. I have reviewed my session notes with you for the following dates. I would feel comfortable having the following information shared with and written on your letterhead and faxed forwarded to the Prudential insurance agency in regard to my case. Please include the case number and group policy information. This appears to be the format that they are seeking.

As you know there is personal information related to my family history which I would not feel comfortable having on file with any insurance carrier.

In addition I have contacted Dr. Leoni's office in regard to his month to month decision which is causing too much stress. I cannot sleep at night. I cannot try to progress forward or make any plans when I have this on my mind constantly. I cannot deal with a monthly ordeal such as this with the insurance company to insure my ongoing disability coverage. After my termination from my previous position, I am certain they are seeking a reason to discontinue my disability coverage. I cannot make ends meet without these funds. It is simply not fair to ask someone in my condition to undergo this extreme amount of anxiety and stress on a monthly basis especially during the holidays when it can simply be handled in a manner more patient friendly.

Please support me on this with Dr. Leoni. I am asking for three month increments of disability. I do not think it is unreasonable. I would greatly appreciate it if you could speak with him today. 415-781-6926

Thank you-
Dawn Rutherford

August 28, 2001  first visit
Subsequent visits - September 6, 10, 12, 17

Initial consultation prompted due to depression over being ill and unable to work, anxiety related to workplace and industry instability issues [CEO resign, problems on job, rumors of bankruptcy, technology not working,lack of communication with management] Lack of future in high tech after numerous layoffs

Follow up sessions

Discussed severe depression and anxiety issues  headaches, anxiety attacks

Depression over instable future in the technology industry due to high corporate failure rate, loss of start up funding lack of leadership  failures of new technologies which causing personal anxiety over financial and marital issues

Anxiety attacks over termination of employment  lack of future for career  failures in industry and economy  no self esteem, no self confidence after so many bad career experiences  Anxiety attacks over personal matters related to finances, disability issues, need for rehabilitation, extreme fear of future, extreme fear of people  Severe anxiety and depression over personal plans for the future  outside influences of war - bad economy  Fear of jeopardizing marriage due to ongoing illnesses, depression and anxiety

Fear of illness – don't know what is wrong with me  don t ever feel healthy or well enough to function  Extreme and overwhelming fatigue must stay in bed most of day unable to function day to day activities

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA 19101

Patient: Dawn Rutherford
SS# 156-625412
Group Policy # 076787
Claim #10421380

PRUR00808



**BARBARA J. C. BADHAM, PH.D.**

*Clinical & Educational Psychology*
*Psychotherapy • Assessment • Consultation*
*Services in English and Spanish*

320 Western Avenue • Petaluma, CA 94952 • (707) 778-1189

September 20, 2001

Licensed
Psychologist
#12860

Licensed
Educational
Psychologist
#1275

Marriage,
Family,
& Child
Counselor
#18173

Bilingual,
Crosscultural
Certificate of
Assessment
Competence
#SA32885

Re    Dawn Rutherford
      SS# 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
      Group Policy #076787
      Claim #10421380

TO WHOM IT MAY CONCERN

The above patient began seeing me on August 28, 2001 and is currently having sessions with me twice a week for individual psychotherapy  We have had a total of five sessions thus far, in which I am treating her for acute anxiety and depression

I have also been in touch with her medical doctor, Dr James Leoni, about her condition,  and we are coordinating her care

Sincerely,

Barbara J C  Badham, Ph D

BJCB eb

PRUR00813



**BARBARA J. C. BADHAM, PH.D.**

*Clinical & Educational Psychology*
*Psychotherapy • Assessment • Consultation*
*Services in English and Spanish*

320 Western Avenue • Petaluma, CA 94952 • (707) 778-1189

September 20, 2001

Licensed
Psychologist
#12860

James Leoni, M D.
1116 B Street
Petaluma, CA 94952

Licensed
Educational
Psychologist
#1275

Dear Dr Leoni,

After speaking with Dawn Rutherford, she indicated that you were requesting clarification on several issues related to her disability.

Marriage,
Family,
& Child
Counselor
#18173

Due to the physical demands (10-12 hour days), ongoing stress and demonstrated instability in the field of technology, it is my determination that it is not a suitable career path for Ms Rutherford  It is my recommendation that she complete a career assessment evaluation test and seek training for an alternative employment opportunity

Bilingual,
Crosscultural
Certificate of
Assessment
Competence
#SA32885

Due to the nature of Ms. Rutherford's continued disability, I support a three month extension period through January 7, 2002 (in consideration of the holiday season) where she will be under my care for psychological counseling

If you should require any additional information, please contact me at 707-778/1189

Sincerely,

*Barbara J C Badham*

Barbara J C Badham, Ph D

PRUR00814

September 14 2001

Dr. James Leom
1116 B Street
Petaluma, CA 94952

Rec'd
9/17/01

Dear Dr Leom,

I am writing this note for several reasons. I am wanted to apprise you of my current physical, emotional and psychological condition to this date. I am concerned that my disability period is due to expire on September 20, 2001.

My physical symptoms have not improved in the last month. These symptoms include: extreme fatigue, inability to focus and concentrate, chronic lower back pain with shooting pain down my right leg, numbness in my right leg, chronic pain in my neck vertebrae, nausea, stomach cramps, irritable bowels [symptoms have returned], loss of appetite, debilitating tension headaches and migraine headaches, occasional low grade fevers as well as chronic sore throat. In addition, I have muscle aches and pains in my legs, shoulders and arms. These are all symptoms that I have previously reported to you during our visits.

On September 18, I have the abdominal cat scan and MRI scheduled at Petaluma Valley. This delay was partially caused by their busy schedule. They informed me that they only have the MRI machine twice a week and I was trying to coordinate the two appointments.

I continue to experience chronic anxiety attacks, previously they happened primarily in the evenings but with the events of this week I feel very anxious whenever I have to go out. It is somewhat relieved by Xanax. At this time I have not felt any relief from the Celexa or Ambien. At my visit next week I would like to discuss this.

To make matters worse, I was contacted Wednesday by my employer who informed me that my position has been completely eliminated. Simply put, I no longer have a job. This certainly does not help my condition.

As I have previously said, I am also under the care of Dr Barbara Badham. Please feel free to contact Dr Badham in Petaluma for additional information on my condition. Her contact information is 320 Western Avenue, Petaluma, CA 707-778-1189.

I am attending twice weekly psychological counseling sessions. I need ongoing bi weekly counseling assistance from Dr. Badham in order to put my psychological health on the right track and deal with this new set back. After losing six jobs now in the past several years I can assure you that I am completely physically, mentally and emotionally incapable of performing the duties of and returning to my previous occupation. I desperately need vocational rehabilitation. I am beginning to discuss vocational rehabilitation options with Dr.Badham.

Due to the combined above circumstances, I am respectfully requesting that my disability is extended to the maximum time allowable until I have had the opportunity to restore my physical, psychological and emotional health and complete a vocational rehabilitation program.

Thank you for your time and attention. Your help will be greatly appreciated.

Dawn Rutherford
65 Alta Drive, Petaluma, CA 94954

707-766-6674

*Kindly consider the contents of this letter to be confidential*

PRUR00815



**BARBARA J. C. BADHAM, PH.D.**

*Clinical & Educational Psychology*
*Psychotherapy • Assessment • Consultation*
*Services in English and Spanish*

320 Western Avenue • Petaluma, CA 94952 • (707) 778-1189

Licensed
Psychologist
#12860

Licensed
Educational
Psychologist
#1275

Marriage
Family
& Child
Counselor
#18173

Bilingual
Crosscultural
Certificate of
Assessment
Competence
#SA 32885

DATE 8-24-01    SOC SEC # 156 62 5412    HOME ( )    -    WORK ( )    -

PATIENT Dawn Rutherford    DATE OF BIRTH 2-15-6:

ADDRESS 65 Alta Drive Petaluma zip 94754 AGE 3

SEX F MARITAL STATUS M    SPOUSE'S NAME Daniel

(Name & phone number of friend or relative at different address)

OCCUPATION Producer

EMPLOYED BY Skene "7    ADDRESS 877 Nortica San Rafael c

PLEASE LIST THOSE WHO LIVE IN YOUR HOME

NAME Daniel    D.O.B 7-22-64 AGE 37 RELATIONSHIP Husban

NAME_____ D.O.B._____ AGE_____ RELATIONSHIP_____

NAME_____ D.O.B_____ AGE_____ RELATIONSHIP_____

NAME_____ D.O.B._____ AGE_____ RELATIONSHIP_____

NAME_____ D.O.B_____ AGE_____ RELATIONSHIP_____

RESPONSIBLE PARTY_____
(Patient or legally responsible adult-Relationship)

CONSENT FOR TREATMENT_____
(Signature of patient or legally responsible adult)

DO YOU REQUIRE STATEMENTS TO SUBMIT FOR INSURANCE REIMBURSEMENT?_____

MEDICAL PROBLEMS Fatigue, lower back & neck pain
headaches, nausea, constant hyper concentra
+ severe allergies, girator (left, acute 3 hr
(Include recent hospitalization, surgery and date)

CURRENT MEDICATIONS Celexa, Xanax, r stromrapion

NAME OF PRIVATE PHYSICIAN OR CLINIC Dr. James Leoni

ADDRESS 1116 B St. Petaluma    PHONE_____

REFERRED BY_____

**PRUR00820**

October 12, 2001


<u>SENT VIA FAX</u>


The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA 19101
ATT: Aneesha Fain
Fax # 877-889-4885

**Patient: Dawn Rutherford**
**SS# 156-625412**
**Group Policy # 076787**
**Claim #10421380**


The purpose of this letter is to provide a follow up diagnosis for Dawn Rutherford from Dr. Michael Kurtz, Orthopedic Specialist, based on physical examination and office visit of 10/11/01.

The second page of this fax is the <u>Duty Status Report</u> resulting from physical examination and office visit of 10/11/01. Dr. Kurtz has provided the multiple diagnosis of cervical and lumbrosacral degenerative disease and degenerative joint disease [codes 722.4 and 722.52] as well as fibromyalgia [729.1].

Please do not hesitate to contact the office of Dr. Kurtz if further information should be required. Please find Dr. Kurtz's office contact information below.


**Dr. Michael Kurtz [Orthopedic Surgery]**
750 Las Gallinas Avenue
San Rafael, CA  94903
415-479-6212 phone


Sincerely,

Daniel Keegan
65 Alta Drive
Petaluma, CA  94954                                      Dawn Rutherford


Page 1 of 2


PRUR00822

10 12 01  17:26 FAX 415 352 3377    FORTAL PUBLICATIONS    ☒002

MICHAEL A. KURTZ, M D
A MEDICAL CORPORATION
ORTHOPEDIC SURGERY
NORTHGATE MEDICAL CENTER
750 LAS GALLINAS AVENUE
SAN RAFAEL CALIFORNIA 94903
TELEPHONE (415) 479-8212

## DUTY STATUS REPORT

Today's date:  10/11/01      GRP. POLICY # 0076787
                             CLAIM # 1042 1.350

Patient:   Dawn Rutherford   SS # 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

DX:   cervical and lumbosacral degenerative disc

       disease & degenerative joint disease (722.4,

       722.52); fibromyalgia (729.1)

Fit for duty:

  ☐ Yes, as of

  ☑ No, off work from  10/11/01 _ to  12/3/01

  ☐ Modified

Further treatment required:

  ☑ Yes      Return appointment:  12/3/01

  ☐ No

_Michael G. Kurtz M.D._
Michael A. Kurtz, M.D.

PAGE  2  OF  2

PRUR00823

James F. Leoni, MD
1116 B Street
Petaluma, CA 94952
Phone: 707-781-6926
Fax. 707-762-2145

September 20, 2001

RE: Dawn Rutherford
SS# 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
Group Policy # 076787
Claim # 10421380

To Whom It May Concern

Dawn Rutherford continues to be disabled. She has multiple problems including back pain, abdominal pain, neck pain, depression and severe anxiety.

Because of these problems I am extending her disability to January 7, 2002.

Medical records have been faxed to the attention of Aweesah Fain at Prudential. Please contact my office if you require additional information

PATIENT'S NAME _Rutherford, Dawn_

ADDRESS _____  INSURANCE _____

TEL. NO. _____  REFERRED BY _____  OCCUPATION _____  AGE ___ SEX ___

| DATE | Prob. No. or Letter | SUBSEQUENT VISITS AND FINDINGS |
|------|---------|-----|
| AUG 1 | 2001 | CC: Pt. c/o suffering from exhaustion, severe |
| Ht. 192# | | x 2-3 weeks c/o malaise upon wakening, can't |
| BP 140/100 | | forgetfulness, hot flashes mid-day.  ⟶ SK |
| P 89 | | **Head:** ✓ |
| A PO: fin | | **Eyes:** ✓ |
| | | **ENT** ✓ |
| | | **Thyroid & Neck:** ⊖ ∆ masses nc ✓ symmetrically ⊖ Bruit |
| | | **Lungs:** clear |
| | | **Heart:** Rg ∆ m✓ |
| | | **Breasts:** |
| | | **Abdomen:** ⊖ fl nc untender nonacs |
| | | **Genitalia:** |
| 2 foli – blasts | | **Rectal:** − 1st refused |
| | | **Prostate:** |
| smell – Q | | **Musculoskeletal:** no eclema no masses normal appea |
| | | **Back:** straight |
| | | **Peripheral Circulation:** ⊖ ✓ |
| 3 – ✓ | | **Neuro:** ⊖ CN II ⟶ XII intact ms 5/5 light touch cue |
| J – ✓ | | **Skin:** Babinski Cerebellar nl |
| G | | **Diagnoses:** Skin clear |
| E ✓ | | Complaints of exhaustion can't get up in AM |
| A – ✓ | | Feels tired, ✓ for four symptoms severe for 1 |
| P | | lost 2 ⟶ 8 lbs. Patient is feeling nauseated ! |
| | | this AM.  Not able to concentrate. |
| | | 2 colds w/ loss over 3 → 4 months.  Has ster |
| | | cramps when she eats out. |
| | | BM's soft. 4-5/d. – Brown, formed ⟶ lo |
| | | social work for sick uan development causin |
| | | occasional. Pain in Rt shoulder blade |
| | | area. mild lower backache. |
| LMP | | Sharp to normal (go to bed a 1000) takes 1 hr to g |
| GAUGO | | back to sleep. |
| Cipher – 1 – 25 D | | (+) ✓ n/w |
| ✓ taper/dg. | | 1. ✓ fatigued                 PC check lab. |
| | | 2. Snoring Sleep Apnea      2. ✓ nausea |
| | | 3. Raised                   3. F/u in 3 wks |

 **Prudential**

**Group Disability Insurance**
**EMPLOYEE STATEMENT**

### SECTION A: Employee Information

Employee Name: DAWN A. RUTHERFORD
Social Security Number: 156625412
Home Phone Number: 415 786 3307

Mailing Address: 65 ALTA DRIVE
City: PETALUMA
State: CA
Zip Code: 94954

Employer Name: SCENE 7 INC / GOOD HOME
Employer Control Number: 76787

Occupation: SOFTWARE PRODUCER
Work Phone Number: 415 446 5343
Date of Birth: 2,18,62    Sex: ☐ M ☒ F

Date First Treated for this Condition: 8,14,01
Date Last Worked: 8,13,01
Date Disability Began: 8,14,01
Date Expected to Return to Work: 9,20,01

Primary Physician Name: JAMES LEONI
Street Address: 1116 B STREET
City: PETALUMA
State: CA
Zip Code: 94952
Phone Number: 707 781 692

If treated for this condition in the past, complete the following:    Physician Name _____

Specialty _____    Phone Number (___)_____    Treated from _____ to _____

Describe when and where the accident occurred, or describe the nature of your illness. If pregnant, what is your estimated delivery date?
EXTREME FATIGUE, NAUSEA, HEADACHES, LOWER BACK PAIN, FEVERISH, MUSCLE AND JOINT PAIN

Is this condition work related? Yes☐ No☒ If yes, explain:_____

Have you filed a Workers' Compensation claim? Yes☐ No☒ Do you intend to file a Workers' Compensation claim? Yes☐ No☒

Have you been hospitalized for this condition? Yes☐ No☒ If yes, give dates: From_____ to_____ ☐ In-patient ☐ Out-patient

Supervisor Name: PAM SOGGE
Phone Number: 415 446 5331

What other income are you entitled to receive as a result of your disability? (Examples: Social Security Disability or Retirement Benefits, Workers' Compensation, State Disability, Pension Disability or Retirement, No-Fault Auto Insurance, Salary Continuance, Group Life or Disability Plan, Health or Welfare Plan.)

| Source | Amount | Frequency | Date Filed for Benefit | Date Benefit Begins | Date Benefit Ends |
|---|---|---|---|---|---|
| STATE DISABILITY | $336 | per WEEK | 8,14,01 | 8,23,01 | 8,23,02 |
|  | $ | per |  /  / |  /  / |  /  / |
|  | $ | per |  /  / |  /  / |  /  / |

### Complete This Section Only if Disability is Expected to Continue Beyond 8 Weeks

Name of Your Health Insurance Company: UNITED HEALTHCARE    Phone Number(___)_____

Marital status: ☐Single ☒Married ☐Divorced ☐Widowed Spouse's Date of Birth 7/22/64 Is spouse employed? Yes☒ No☐

List names and dates of birth for all children. Check box if child is enrolled in school and/or disabled.

| Name | Date of Birth | School | Disabled | Name | Date of Birth | School | Disabled |
|---|---|---|---|---|---|---|---|
|  |  /  / | ☐ | ☐ |  |  /  / | ☐ | ☐ |
|  |  /  / | ☐ | ☐ |  |  /  / | ☐ | ☐ |

Notice to all parties completing this form: Any person who knowingly and with intent to defraud an insurance company or other person, files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. Criminal and/or civil penalties can result from such acts. (Please see state specific fraud warnings on page 2.) *This warning does not apply to Virginia Residents.

Date 8,23,01    I certify that the above statements are true.    Employee Signature

(detach here)

PRUR00865

 **Prudential**

**Group Disability Insuranc**
**EMPLOYER STATEMEN**

The Prudential Insurance Company of America
Disability Management Services
PO Box 2300, Parsippany, NJ 07054
Voice: 1-800-842-1718
Facsimile: 1-973-285-8800

**Scene 7, Inc.**
Employer Name

**76787**
Control Number

**Dawn Rutherford**
Employee Name

**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**
Social Security Number

**415 786 330**
Branch Number / Home Phone Number

**65 Alta Drive, Petaluma, CA  94954**
Employee Mailing Address

## SECTION A: Eligibility and Earnings Information

**07/16/01**
Date Hired

**08/01/01**
STD Coverage Effective Date

**08/01/01**
LTD Coverage Effective Date

Coverage in force when absence began? ☒Yes ☐No

**8, 13, 01**
Date Last Worked

**8, 14, 01**
Date First Absent

**N/A**
If Recovered, When?

**N/A**
Date Work Was Resumed

Normal Earnings Prior To This Absence
(exclude bonus, overtime, etc.) $ **85,000**   ☐Hourly ☐Monthly ☒Annually ☐Other_____

Year To Date Total Taxable Wages $ **7,192.38**   Employment Status: ☒Salary ☐Hourly ☐Other_____

STD Coverage Selected: ☒Core ☐Option _____   LTD Coverage Selected: ☒Core ☐Option_____

Does the plan contribution rate vary by employee? ☐Yes ☒No  If variable, indicate percentage for this employee:_____%

Is the employee's scheduled work week Monday through Friday? ☒Yes ☐No

If no, check days worked: ☐Varies ☐Monday ☐Tuesday ☐Wednesday ☐Thursday ☐Friday ☐Saturday ☐Sunday

Is employee covered under a Group Life insurance policy issued by Prudential? ☒Yes ☐No

If yes, Effective Date **8/1/01** Policy No. **76787** Basic Amount $ **150,000** Optional Amount $ _____

Is absence due to work related injury or illness? ☐Yes ☒No  Has a Workers' Compensation claim been filed? ☐Yes ☐No

## SECTION B: Occupation Information

Occupation/Title **Software Product Producer**     **PRUR00867**

How much weight and with what frequency must the employee:

Lift ___ Pounds / Frequency   Carry ___ Pounds / Frequency   Pull ___ Pounds / Frequency   Push ___ Pounds / Frequency   **H/g**

How many hours per work day does the employee: Sit **7** Stand **5** Walk **5** Bend ___

Supervisor Name **Pam Sogge**     Supervisor Phone Number ( **415** ) **446** **5331**

## SECTION C: Deduction and Offset Information

Please indicate any applicable deductions, such as Local Tax, State Income Tax, Unemployment, Medical, Dental, Life, 401K, that should be withheld from the employee's benefits if approved. Please also indicate if the employee is receiving or is eligible to receive benefits from any other sources because of this absence, such as Salary Continuance, Workers' Compensation, Social Security Disability or Retirement Benefits, Statutory Benefits, No Fault/Auto Insurance, Retirement or Pension Plan

| Type | Amount | Payment Frequency | Date Begin | Date End |
|---|---|---|---|---|
| | | | / / | / / |
| | | | / / | / / |
| | | | / / | / / |
| | | | / / | / / |

Notice to all parties completing this form: It is fraudulent to fill out this form with information you know to be false or to omit important facts. Criminal and/or civil penalties can result from such acts.

Date **8/21/01** Authorized Signature **Pam Boga** ___ Phone Number ( **415** , **446** **534**

06/21/01   17:19 FAX 415 472 6092          SCI-NET.COM          DAWN RUTHERFORD

**4. ICD-9 Diagnosis**

| | DSM Diagnosis |
|---|---|
| Fatigue - 780.79 | Axis I Clinical |
| 1.300.00 | Axis II Developmental & Personality |
| 724.2 | Axis III Physical Conditions |
| | Axis IV Psychosocial Stressors |
| Pregnancy EDC __/__/__ | Axis V Global Functioning |

Objective Findings (Clinical, X-ray, EKG, LAB, Tests): _____

**5. Psychosocial:**

a. Describe any significant events in the employee's past or recent history (including when): _____
   none

b. What are the employee's current supports?   family, doctor

c. What are the employee's current activities?   House bound mostly 7th to bed
   rest, fatigue

d. Is the spouse employed?  ☑ Yes  ☐ No        Spouse's Occupation  Graphic designer
   Has the illness interfered?  ☑ Yes  ☐ No     If yes, please describe:
   Too Fatigued to work, Back pain severe  inhibits
                                             ambulation

e. Has the employee lost contact with friends or family?  ☐ Yes  ☑ No

**6. Treatment:**

First Visit: 08/11/01   Last Visit: 08/27/01   Frequency  wkly
List all medications:  Celexa, Ativan, Aciphex
Has patient been hospital confined?  ☐ Yes  ☑ No        Confined from __/__/__ through __/__/__
If yes, give name and address of hospital: _____

**7. Prognosis:**

Has the employee made significant progress? If no, explain: _____
   too soon to tell

What changes do you expect in the near future?  anxiety controlled, fatigue
resolved, Back pain relieved

**8. Return to Work Plan:**

What work duties can employee perform?  Usual
What duties can employee not perform?  ROM
What changes would allow employee to work:
Own job?  Time for recovery                    When?  1 month
Job Modification?  None needed                 When?
Trial Work?  none needed                       When?
Part-time?  none needed                        When?
Any other job? – Type of work  none needed     When?
What steps has the employee taken to return to work?  initiated investigation; auto diagn
Could the employee work while receiving treatment? If no, why not?  employee needs to be away
from work for at least 1 month

Names of other treating Physicians/Consultants      Specialty      Address                    Phone No.
James F Leoni                                       F.P.           1116 B St Petaluma CA      707-7

Do you feel the patient is competent to endorse checks and direct the use of the proceeds?  ☑ Yes  ☐ No

Physician's Name  JAMES F LEONI                    Board Certified/Eligible  Family Practice
                  (please type or print)
Office Address  1116 B St Petaluma, CA.            Phone Number (707) 781-6926
Physician's Signature  _____             Date Completed  08/26/01

PRUR00870

## DCMS

# S O A P   Note

12/27/2007

**Claim Number:    10421380**

---

**SOAP Date - 12/04/2001**

| | |
|---|---|
| **Claim Manager:** | **Evans_Sweeney, Rachael** |
| **Category:** | Claim Mgmt. |
| **Reason:** | FR |

asonable degree of medical certainty, ee not physically impaired from performing essential functions of o/o.

Whether anxiety/depression has caused neurocognitive impairment or inability to deal with stresses in a work place should be evaluated by speci
alist in psychiatric/psychological disorders.

## ANALYSIS:

FR indicated ee not td o/o from various physical conditions.

FR recommends review of psychiatric condition.

## PLAN:

Review file with clinical team.



PRUR00887

**DCMS**

# S O A P   Note

12/27/2007

**Claim Number:     10421380**

---

**SOAP Date - 12/07/2001**

**Claim Manager:**   **Malysz RN, Josephine**
**Category:**              Triage
**Reason:**               medical review

## OBJECTIVE:

*Reviewed Summary of ovn by Dr. Badham 8/28/01 through 11/26/01:
-Anxiety 2nd to medical condition
-Depression 2nd to medical condition
-anxiety/confusion re;diagnosis
-Focus: ongoing medical tx/condition and disability claim
-no panic attacks, no si
gnificant consistent cognitive deficits or vegetative sxs of depression noted.
*Reviewed MSE completed by Dr Badham dated 11/1/01:
-oow due to physical illness and acute stress
-poor concentration, crying jags, panic attacks
-Partial Work: possibly te
lephone calls but unable to return to workplace for this
-MSE: casual, neatly dressed, cooperative, extremely distressed, flight of ideas, mental confusion, poor concentration, memory
intact
GAF:35
*Reviewed Dr Brachman's letter dated 12/3/01; reviews
all medical records:
Depression/Anxiety:
-depression and passive coping strategies are associated w/increased pain perception
-describes data on co-existing sxs of fibromyalgia and depression
-cites studies investigating co-morbidity of fibromyalgia a
nd psychiatric disorders
-clmt dx/tx for depression/anxiety
-majority of self reported sxs/concerns are related to work/personal-family issues
-anxiety/depression has caused sleep disturbance/enhanced perception of pain
-fatigue/concentration difficul
ties both well recognized sxs of depression
-neurocognitive functioning as reflected in her written letters appears to be much better than expected for individual w/GAF: 35
*Reviewed Letters of 9/25/01 and 11/1/01 from Dr Badham:
In 9/25/01 letter; af
ter 7 sessions determines clmt will be unable to rtw in field of technology due to physical demands/level of stress/instability
-clearly recommends "occupational rehabilitation in order to obtain an alternative employment opportunity"
-In letter of 11/1
/01 "clarifies" previous statement stating due to physical limitations of her ongoing disability and concomitant psychological
condition cannot participate in any type of vocational rehab at this time.

## ANALYSIS:

39yo F, Software Product Producer oow since 8/14/01. Dx: Depression/Anxiety in addition to numerous medical conditions.
Documentation indicates throughout psychotherapy notes the focus of tx was on coping w/medical condition and frustrations of
ongoing di
sability claim. Although the MSE form indicates poor concentration/mental confusion and panic attacks, these sxs were not
indicated in therapy note summaries. Although the clmt may be experiencing secondary depression/anxiety due to her perceived
medical

---

*Page*      15



PRUR00888

## DCMS

# S O A P  Note

12/27/2007

**Claim Number:    10421380**

**SOAP Date - 12/07/2001**

| | |
|---|---|
| Claim Manager: | **Malysz RN, Josephine** |
| Category: | Triage |
| Reason: | medical review |

condition the symptomatology for a mental impairment does not reach severity to support a TD. There are no significant consistent cognitive deficits, no significant disabling panic attacks, no consistent significant sxs of a disabling depression. In Dr. B rachman's review she documents clmt's neurocognitive functioning reflected in her written letters appears to be much better than expected for individual w/GAF of 35. Based on above reviews, documentation does not support a mental impairment that would pre
vent ee from performing essential duties of her job, and there is no documentation to support symptomatology that meets required level of severity to prevent ee from performing occupational duties.

## PLAN:

Return to DCM to set Plan.



PRUR00889

**DCMS**

## S O A P  Note                                                    12/27/2007

**Claim Number:     10421380**

*SOAP Date - 06/18/2004*       Claim Manager:     Gonnella, Gerard
                               Category:          Appeals Plan
                               Reason:            recon-1

### ANALYSIS:

EE OOW 8/14/01 due to fatigue, nausea, back pain and anxiety.  LTD paid through MN/SRS/GO date.

Med info revealed EE had PTSD due to death of her sister in 8/01, her brother'd recent Dx of AIDS and her best friend being killed in WTC attack.

EE als
o became diagnosed w/CFS and fibro.  In addition, it was noted that EE stopped working within 1m of beginning employment w/ER.

Medical info obtained and it did not reveal tx during pre-x period, however prudent pre-x applies to claim as a nurse practit ioner note in 8/01(1st month of coverage) revealed EE had the symptoms consistent with CFS and fibro for 2-3weeks prior to the OV.  In addition, OV note 10/19/01 stated the EE's symptoms began after a layoff in 5/01, and continued for 3 months after that. Sx reported included exhaustion, difficulty sleeping, forgetfulness, weight loss(hallmark signs of fibro and CFS, as well as depression and possibly her sleep disorder).

Dr. Gerson noted depression was disabling and there was no evidence that prudentp
re-x would apply to the depression.  As such, benefits paid through MN limit and claim terminated.

In 9/03, we rec'd a letter noting EE's primary Dx is Fibro and this should be considered a physical disability.  It is also noted that among other sympto
ms, EE has a sleep disorder with an 83% reduced sleep efficiency.

Letter from Dr. Lehman notes that EE's symptoms have not improved.  She indicates EE suffers from pain, decreased strength and flexibility, the use of a cane for ambulation, diffuse tend
erness throughout the body, and parasthesia of hands and feet.  AP notes that prolonged static positions aggravate symptoms, and EE has significant symptoms around the TMJ which makes speech difficult at times.  Ap also notes that EE has some difficulty type rforming ADL's such as walking, speaking and self-care(cooking and bathing).  AP further notes that mental state is compromised due to pain, med's for the pain, and insomnia.  Psychiatric condition is also disabling per Dr. Lehman.

We then received a
letter requesting a complete copy of the claim file. We suspending our handling to allow the Attyto review file and provie any additional info.

We recently received a letter from Atty indicating we should begin review based on info in file.

The EE'
s disability is based on primarily self reported symptoms of pain and fatigue, as well as her psychiatric illness.  Her primary diagnoses is Fibro and we previously determined this condition was excluded due to prudent pre-x provision.  We also noted CFS was subject to pre-x, and quite possibly EE's sleep disorder as she reported ongoing sleep prob's in 8/01.  EE has rec'd all ben's payable for psychiatric condition as well.

Will have Dr. Lehman document what conditions account for EE's symptoms. If co



PRUR00906

**DCMS**

## S O A P  Note

12/27/2007

Claim Number:     10421380

**SOAP Date - 06/18/2004**

Claim Manager:     Gonnella, Gerard
Category:          Appeals Plan
Reason:            recon-1

nfirmed that disability is due to CFS, fibro, depression and sleep disorder, would uphold based on prudent pre-x, and SRS/MN limit. If other conditions are noted, would confirm the verifiable medical evidence to support that they would prevent the performance of sedentary work.

**PLAN:**

AP info as above.

*Page*     34

SOAP Note
Claimid = 10421380



PRUR00907

## DCMS

# S O A P  Note

12/27/2007

**Claim Number:    10421380**

**SOAP Date - 07/26/2004**

Claim Manager:  **Gonnella, Gerard**
Category:  **Decision**
Reason:  **recon-1-uphold**

### ANALYSIS:

EE OOW 8/14/01 due to fatigue, nausea, back pain and anxiety.  LTD paid through MN/SRS/GO date.

Med info revealed EE had PTSD due to death of her sister in 8/01, her brother'd recent Dx of AIDS and her best friend being killed in WTC attack.

EE als
o became diagnosed w/CFS and fibro.  In addition, it was noted that EE stopped working within 1m of beginning employment w/ER.

We determined prudent pre-x applied to CFS/Fibro and EE was disabled due to MN condition.  24m's ben's paid and claim termina ted.

In 9/03, we rec'd appeal noting EE's primary Dx is Fibro and this should be considered a physical disability.  It is also noted that among other symptoms, EE has a sleep disorder with an 83% reduced sleep efficiency.

Letter from Dr. Lehman note
d that EE's symptoms have not improved.  She indicates EE suffers from pain, decreased strength and flexibility, the use of a cane for ambulation, diffuse tenderness throughout the body, and parasthesia of hands and feet.  AP notes that prolonged static p ositions aggravate symptoms, and EE has significant symptoms around the TMJ which makes speech difficult at times.  Ap also notes that EE has some difficulty performing ADL's such as walking, speaking and self-care(cooking and bathing).  AP further notes
that mental state is compromised due to pain, med's for the pain, and insomnia.  Psychiatric condition is also disabling per Dr. Lehman.

We then received a letter requesting a complete copy of the claim file.  We suspending our handling to allow the A
tty to review file and provide any additional info.

We recently received a letter from Atty indicating we should begin review based on info in file.

The EE's disability is based on primarily self reported symptoms of pain and fatigue, as well as her psychiatric illness.  Her primary diagnoses is Fibro and we previously determined this condition was excluded due to prudent pre-x provision.  We also noted CFS was subject to pre-x, and quite possibly EE's sleep disorder as she reported ongoing sleep pr ob's in 8/01.  EE has rec'd all ben's payable for psychiatric condition as well.

We contacted Dr. Lehman to determine what condition prevent EE from working and AP noted EE has not been seen since 9/03 and we should contact Dr. Leoni.  Dr. Leoni noted that EE has not been seen since 11/01 and had no further info to provide.

We have no medical evidence to support an impairment(not subject to the benefit limitation or prudent pre-x exclusion) that prevents EE from performing a gainful occ.  Suggest up
hold of termination.

### PLAN:

*Page*    35

SOAP Note
ClaimId = 10421380

# Prudential Financial

PRUR00908

_**DCMS**_

# S O A P  Note

12/27/2007

**Claim Number:**     10421380

**SOAP Date - 07/26/2004**

| | |
|---|---|
| **Claim Manager:** | **Gonnella, Gerard** |
| **Category:** | Decision |
| **Reason:** | recon-1-uphold |

Suggest uphold.

_Page_    36

SOAP Note
ClaimId = 10421380



**Prudential Financial**

PRUR00909

**DCMS**

# S O A P  Note

12/27/2007

**Claim Number:    10421380**

| **SOAP Date - 07/16/2007** | **Claim Manager:** | Schwartzkopf, Gregg |
|---|---|---|
| | **Category:** | Vocational Rehab |
| | **Reason:** | 001-Internal Employability Assessment |

## OBJECTIVE:

VR was requested to complete an assessment of employability within EE's current R&L's.  EE is 45 yr old Project Director oow 08/14/01 with multiple conditions.

## ANALYSIS:

The Independant Medical Review by Dr. Kimelman imaged on 09/18/06 and 11/01/06 indicates that EE is capable of working in an occupation with the following restrictions: no heavy lifting, no prolonged static neck posturing and no overhead reaching.

EE
is a college graduate with 15+ years of work experience in Technical Project Management, Hardware Analysis and Systems Analysis.  Employment history as described is most consistent with the following DOT Codes: 189.117-030, 033.167-010 & 030.167-014.


A transferable skills analysis (TSA) was performed utilizing the OASYS Software program considering skills demonstrated in prior occupations and current restrictions as outlined. The positions with which EE has direct experience (Project Director, Hardwa re Analyst and Systems Analyst) are all Sedentary PDL occupations that are primarily performed seated and involve occasional to frequent reaching and handling and frequent fingering due to keyboard use. Her skill set is also highly transferable to Departm ent Manager (189.167-022), a Sedentary PDL occupation involving occasional reaching/ handling/ fingering. Median salaries in the San Francisco, CA labor market per the Economic Research Institute data for 04/01/07 are:
Systems Analyst $36.63/hr
Hardware
 Analyst $45.15/hr
Department Manager $49.46/hr
Project Manager, Systems $51.80/hr

## PLAN:

Provide Employability Assessment to claims area.

Gregg Schwartzkopf, MA, MS, CRC, CDMS
Vocational Rehabilitation Specialist

SOAP Note
ClaimId = 10421380



**PRUR00933**

We maintain that medical information contained in Ms. Rutherford's file does not support an impairment that would prevent her from performing the duties of her regular occupation. Additionally, Ms. Rutherford's experience and education provide her with the transferable skills to perform other occupations as well as. Furthermore, her self-reported symptoms are subject to the 24 month Benefit Limitation noted above. In addition, Ms. Rutherford has already received 24 months of benefits for her mental illness and no further benefits are payable for this condition.

There is no medical evidence of a condition not subject to the Group Policy Exclusion or 24 month Benefit limitation, that would prevent Ms. Rutherford from working. Therefore, we are upholding our decision to terminate her claim effective November 11, 2003.

This decision is final and cannot be appealed further to Prudential. If you still disagree with the above decision, you may file a lawsuit under the Employee Retirement Income Security Act (ERISA). ERISA allows you to file suit for policy benefits and reasonable attorney's fees.

You may have the matter reviewed by the California Department of Insurance if you believe you have been wrongfully denied or terminated. They may be reached at California Department of Insurance, Consumer Services Division, 300 S. Spring Street, Los Angeles, CA 90013. The telephone number is 1-800-927-4357 or 213-897-8921.

**Overpayment**

As previously explained in our letter dated November 25, 2003, an overpayment in the amount of $21,018.75 has occurred on her Disability claim. Through the application of Ms. Rutherford's LTD benefits through November 11, 2003, that amount has been reduced to $10,455.56.

To date, we have not received payment toward the overpayment on the claim. Therefore, this letter is a formal demand for reimbursement of the overpayment in the amount of $10,455.56, which is the current balance of the overpayment on the claim. Please have Ms. Rutherford make immediate repayment of this amount by sending a personal check or money order for the full amount in the enclosed envelope. If Ms. Rutherford is unable to reimburse the full amount at this time, please contact us to discuss setting up a repayment plan.

Please be advised that Prudential stands firm on its position that the overpayment is owed and stands willing to take appropriate action in order to protect its interest if the overpayment is not resolved by voluntary reimbursement.

If you have any questions, please contact me at (800) 842-1718, extension 7423.

Sincerely,

*James E Furman*

James E Furman
Sr. Appeals Analyst

# Prudential  Financial

James E Furman
Sr. Appeals Analyst

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia, PA 19176

Phone: (800) 842-1718  Ext: 7423
Fax: (866) 285-8569
Hours: 07:00 AM  03:00 PM

November 3, 2006

Richard Johnston
Attorney at Law
131-A Stony Circle, Suite 500
Santa Rosa, CA  95401

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Date of Birth: 02/18/1962

Dear Mr. Johnston:

We have completed our review of Ms. Dawn Rutherford's second request for reconsideration of our decision to terminate her claim for Long Term Disability (LTD) benefits under the Group Policy #76787 issued to Scene7, Inc. We have determined that our decision was appropriate and have upheld our decision to terminate her claim for LTD benefits, effective November 12, 2003. This letter outlines the reasons for this determination.

**Group Policy Requirements**

In order to receive benefits under Group Policy #76787, covered employees must meet all contractual requirements including the following definition of "Disability":

"You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim."

In addition, the following benefit limitation applies:

PRUR01015

"Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

The limited pay period for self reported symptoms and mental illness combined is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Prudential will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Prudential will send payments during that additional confinement period and for one additional recovery period up to 90 more days.

2. In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine."

"Self-reported symptoms means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness or loss of energy."

"Your plan does not cover a disability which:

- begins within 12 months of the date coverage under the plan becomes effective; and
- is due to a pre-existing condition.

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medications, or followed treatment recommendation the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or

- you had symptoms for which an ordinarily prudent person would have consulted a heath care provider in the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available."

Nowhere in the report does he explain why Ms. Rutherford needs to walk with a cane. There is no evidence of a physical examination having been conducted on her lower extremities to determine whether or not there was weakness or loss of sensation or atrophy involving her extremities.

The file review indicates that the remainder of the records follow a similar sort of a presentation in that the doctors state that Ms. Rutherford has severe fibromyalgia, fatigue, and a sleep disorder and she has very poor tolerance of activity. However, the file review indicates that there simply is not a detailed and well-performed physical examination done of Ms. Rutherford anywhere in the records that could be found. Nor is there any evidence in the records of a functional capacity evaluation having been performed on Ms. Rutherford to ascertain exactly what she is capable of doing on a physical level.

The file review indicates that the only thing that appears clear from Ms. Rutherford's medical records is that she has significant mental illness that has precluded her from returning to work and that it is interesting that the time that she initially presented to her physician complaining of back pain and other assorted complaints corresponds to the time period when, apparently, there were some tragedies associated with her family.

The file reviewer does not provide any opinion with regards to functional impairment (s) from November 12, 2003, forward because the records are woefully lacking in a well-detailed physical examination of Ms. Rutherford. The file reviewer indicates that statements are made about Ms. Rutherford's capacity or inability to do certain things such as activities of daily living, but nowhere is it actually documented that this has been observed. Also, the physical examinations have not supported, for instance, the use of a cane. The file review indicates that it is noted in the medical records that Ms. Rutherford does use, apparently, a single-point cane to ambulate, however, there is no evidence in the record to indicate that Ms. Rutherford is suffering from an affliction of her lower extremities that would preclude her from walking without this device. The physician who reviewed Ms. Rutherford's file indicates that she should be referred to a physician, preferably a Physical Medicine and Rehabilitation physician, for a complete and detailed physical examination that documents her functional abilities and also recommends that Ms. Rutherford have a functional capacity evaluation as well.

The physician who reviewed Ms. Rutherford's claim file indicates that she cannot provide restrictions because the documentation is incomplete. There is simply not enough documentation to justify any particular restrictions or limitations on this individual.

The medical records indicate that a number of physicians consider Ms. Rutherford disabled from gainful employment. However, they do not back these statements up with any type of findings in their physical examinations, and, in fact, in the records, most of the physical examinations are incomplete. Statements made about Ms. Rutherford's abilities or inabilities are simply not supported by any findings, and it is not clear whether or not the examinations were done and the findings were simply left out of the reports or whether full and complete physical examinations were never performed on Ms. Rutherford.

The file review indicates that Ms. Rutherford's records seem to be a hodgepodge, kind of crazy-quilt of information regarding her with not one good, detailed, extensive physical examination having been done. There are several records where, apparently, Ms. Rutherford actually typed up a report indicating all of her various complaints and impairments and then had her physician sign this report. As such, the file review indicates that there is insufficient evidence to support a significant impairment, however, it appears that the appropriate physical examinations and testing had not been performed in order to make that determination.

Ms. Rutherford appeared in the emergency room at least twice with unusual symptoms that were attributed to the taking of medication. It does appear then that she may have suffered some adverse side effects to medications on at least one occasion.

On the second occasion mentioned in the records, there appears to have been some overuse of her medications on a non-prescribed basis by Ms. Rutherford.

The file review indicates that the diagnosis of fibromyalgia is self-reported because it is based entirely on Ms. Rutherford's complaints of tenderness at various points along her body. The only possible finding regarding her diagnosis of fibromyalgia is the sleep study that was performed that showed some alpha wave intrusion and a decrease in her stage 3 and 4 sleep. However, these findings are not specific to fibromyalgia and can actually be found in normal individuals as well as in dysthymic, i.e., depressed individuals, and those who have experienced viral illnesses. So, the physician who reviewed Ms. Rutherford's file indicates that she would hesitate to make a diagnosis of fibromyalgia based entirely on a sleep study. The diagnosis of chronic fatigue syndrome appears to be based entirely on Ms. Rutherford's complaints of fatigue in association with an Epstein-Barr viral antibody that indicated an acute or recent exposure to the Epstein-Barr virus. The file reviewer indicates that while it is certainly possible that Ms. Rutherford was exposed to mononucleosis and she did experience that disorder, it is highly unlikely that her condition at this point can be directly attributable to Epstein-Barr virus.

The physician who reviewed Ms. Rutherford's claim file indicates that we are now almost five years out from her initial symptoms, and she does not think that Ms. Rutherford's current complaints of fatigue are of any relation to that at this point and are more likely related to psychiatric issues.

The file review indicates that whether or not Ms. Rutherford has treated for these 2 conditions, the fibromyalgia and the chronic fatigue syndrome, from May 1, 2001, to July 31, 2001, is not known, since the records do not precede that period of time. Apparently, she had given a history to a nurse practitioner that she had treated for a problem that could possibly have been related to fibromyalgia and chronic fatigue syndrome, but the nurse practitioner amended her report and apparently stated that she had misquoted or mistranscribed this information in her report.

Based on the above report Ms. Rutherford was referred for an Independent Medical Examination (IME) with a physician who specializes in Physical Medicine and Rehabilitation (PM&R).

Ms. Rutherford attended the IME on July 12, 2006, August 02, 2006 and August 23, 2006.

The PM&R indicates that Ms. Rutherford attended the IME with a cane to assist her gait. Nonetheless, her weight bearing was symmetrical in both legs, although her stride length was reduced. Ms. Rutherford's heel strike was normal bilaterally, and her foot flat was intact bilaterally. Abnormal Trendelenburg signs were absent, although her toe push off was reduced. The PM&R indicates that the reduced toe push off was more likely due Ms. Rutherford's complaints of pain than neurological deficits. Neurological deficits or musculoskeletal deficits that suggest a basis for the use of Ms. Rutherford's cane are absent in light of her preservation of gait characteristics and in light of her retained neurological findings.

The PM&R indicates that the basis for Ms. Rutherford's pain cannot be determined from her gait, the need for a slow steady gait is not dependent upon abnormal neurological deficits or arthropathy. In fact, the PM&R indicates the need for Mr. Rutherford holding onto her spouse and walking with a cane at the same time cannot be discerned from any objective findings outside of tenderness to palpation found throughout her body. Ms. Rutherford's frequent loud outbursts and at times swearing are consistent with her abnormally high Waddell score.

A September 18, 2001 MRI of Ms. Rutherford's lumbosacral spine revealed that she has mild facet joint degenerative changes bilaterally from her L3 through S1 and no evidence of significant disc bulging or herniation. Such findings are mild and might be associated with increased pain with prolonged weight bearing either when sitting or standing or with very heavy lifting.

She showed significant variance between the range of motion that she allowed on the formal aspect of the examination performed on an examination table and the range of motion she exhibited when sitting on a table. She also shows delayed responses to all examination requests and a near maximal Waddell score. Her Jamar testing is not consistent with her ability to hold onto her spouse and a cane to assist with ambulation, the absent evidence of any joint arthropathy in her hands, joint contractures or loss of muscle bulk.

The PM&R indicates that Ms. Rutherford meets the Center for Disease Control criteria for chronic fatigue syndrome (CFS). When the CFS criteria are met, the Center for Disease Control recommends that health professionals should exclude other illnesses before a diagnosis can be confirmed. Because there is no diagnostic lab test for CFS, it is a diagnosis of exclusion. Clinical evaluation of patients with a fatiguing illness recommends Urinalysis, total protein, glucose, c-reactive protein, phosphorus, electrolytes, complete blood count with leukocyte differential, alkaline phosphates, creatinine, blood urea nitrogen, albumin, ANA and rheumatoid factor, globulin, calcium, alanine aminotransferase or aspartate transaminase serum level, thyroid function tests.

The PM&R indicates that if these tests were not performed, then he recommends such.

Treatment for chronic pain with minimal diagnostic findings has been reasonable. Such treatment often involves prescribed medications, anti-depressant medications, anti-seizure, and analgesic medications and an independent exercise program. Psychiatric treatment is also indicated.

The PM&R indicates that he agrees that treatment for CFS would include treatment for fibromyalgia. Dr. Dadabhoy and Dr. Clauw, Professor of Medicine, the Director of the Chronic Pain and Fatigue Research Center and the Center for Advancement of Clinical Research, and the Assistant Dean for Clinical and Translational Research, published Therapy Insight: fibromyalgia - a different type of pain needing a different type of treatment in Nature Clinical Practice Rheumatology..Insights from research suggest that fibromyalgia and related syndromes require a multi-model management program that is different from the standard used to treat peripheral pain. Instead of the non-steroidal anti-inflammatory drugs and opioids commonly used in the treatment of peripheral pain, the recommended drugs for central pain conditions are neuroreactive compounds that down regulate sensory processing. The most efficacious compounds that are currently available include the tricyclic drugs and mixed reuptake inhibitors that simultaneously increase serotonin and norepinephritne concentrations in the central nervous system. Other compounds that increase levels of single monoamines (serotonin, norepinephrine or dopamine), and anticonvulsants also show efficacy in this condition. In addition to these pharmacologic therapies, which are useful in improving symptoms, non-pharmacologic therapies such as exercise and cognitive behavioral therapy are useful treatments for restoring function to an individual with fibromyalgia.

As such, the PM&R indicates medications that simultaneously increase serotonin and norepinephrine concentrations in the central nervous system such as tricyclic drugs mixed reuptake inhibitors are reasonable. Ms. Rutherford has been prescribed tricyclic and anti-seizure medications. Her current anti-seizure medication is Gabapentin. Antidepressant medication that blocks serotonin and norepinephrine reuptake is also reasonable, although, he finds no mention of such, Cymbalta or Duloxetine for example, in her treatment regimen.

The results of the IME indicates that Ms. Rutherford can sit for up to one hour at a time for six out of eight hours. She can stand up to one half hour at a time for four out of eight hours in a day. She can walk up to one half hour at a time for four out of eight hours in a day. She can lift, carry and pull ten pounds occasionally. Findings to support upper extremity restrictions are absent. Ms. Rutherford exhibited normal range of motion, normal neurological findings, no contractures, and no muscle atrophy. Any basis for basing any disability in regard to her hands was absent.

**Prudential**  **Financial**

Andrew N. DeChristopher
Team Manager

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718 Ext: 5739
Fax: (866) 285-8569

July 27, 2004

Richard Johnston
Attorney at Law
131-A Stony Circle, Suite 500
Santa Rosa, CA 95401

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Date of Birth: 02/18/1962

IlluluilludulululIdul

Dear Mr. Johnston:

We have completed our review of Ms. Dawn Rutherford's first request for reconsideration of the termination of her claim for Long Term Disability (LTD) benefits under Group Policy G-76787 issued to Scene7, Incorporated. We have determined our decision was appropriate. This letter will outline the basis of our determination.

In order to receive benefits under Group Policy G-76787, covered employees must meet all contractual requirements including the following definition of "Disability":

"You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often at it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim."

In addition, the following benefit limitation applies:

"Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

PRUR01060

The limited pay period for self reported symptoms and mental illness combined is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Prudential will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Prudential will send payments during that additional confinement period and for one additional recovery period up to 90 more days.

2. In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine."

"Self-reported symptoms means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine.   Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness or loss of energy."

Ms. Rutherford's LTD claim was approved effective November 12, 2001 based on her mental illness.  She received 24 months of benefits for her mental illness and her claim was terminated effective November 12, 2003 based on the Group Policy Benefit Limitation noted above.  Please refer to our prior letter for a detailed explanation of our decision.

We received Ms. Rutherford's first request for appeal in September 2003.  This appeal indicated her primary diagnoses is fibromyalgia and this should be considered a physical disability.  Her appeal also noted that among other symptoms, Ms. Rutherford has a sleep disorder with an 83% reduced sleep efficiency.

A letter from Dr. Lehman was provided which noted that Ms. Rutherford's symptoms have not improved.  She indicated Ms. Rutherford suffers from pain, decreased strength and flexibility, needs a cane for ambulation, has diffuse tenderness throughout the body, and parasthesia of her hands and feet.  Dr. Lehman also noted that prolonged static positions aggravate Ms. Rutherford's symptoms, and she has significant symptoms around the TMJ which makes speech difficult at times.  Dr. Lehman further noted that Ms. Rutherford has some difficulty performing activities of daily living such as walking, speaking and self-care.  She states that Ms. Rutherford's mental state is compromised due to pain, medications for her pain, and insomnia.  Ms. Rutherford's psychiatric condition is also disabling according to Dr. Lehman.

PRUR01061

You were provided with a copy of Ms. Rutherford's claim file and informed our office to begin our evaluation based on the medical evidence in file.

Ms. Rutherford became covered for LTD under the Group Policy on August 1, 2001. She stopped working on August 14, 2001. Group LTD Policy G-76787 includes the following Policy Exclusion:

"Your plan does not cover a disability which:

- begins within 12 months of the date coverage under the plan becomes effective; and
- is due to a pre-existing condition.

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medications, or followed treatment recommendation the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or

- you had symptoms for which an ordinarily prudent person would have consulted a heath care provider in the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available."

Since Ms. Rutherford went out of work within one year of your coverage effective date, a pre-existing investigation was completed for the period of May 1, 2001 through July 31, 2001.

Medical information contained in Ms. Rutherford's file did not reveal any office visits during the 3 month period noted above, however she was seen by a nurse practitioner in August 2001. This evaluation revealed Ms. Rutherford was reporting symptoms consistent with chronic fatigue syndrome and fibromyalgia for 2-3 weeks prior to this visit. In addition, Ms. Rutherford was seen on October 19, 2001 and reported that her symptoms began after her layoff in May 2001. She also noted that continued for 3 months after her layoff. Her symptoms included exhaustion, difficulty sleeping, forgetfulness, and weight loss.

Since the records reveal that Ms. Rutherford had symptoms for which an ordinarily prudent person would have sought treatment in the 3 month period May 1, 2001 through July 31, 2001, the pre-existing Policy Exclusion would apply to her self-reported symptoms and conditions of chronic fatigue syndrome, fibromyalgia and sleep disorder. Furthermore, her self-reported symptoms would be subject to the 24 month Benefit Limitation noted above.

In addition, Ms. Rutherford has already received 24 months of benefits for her mental illness and no further benefits are payable for this condition.

We attempted to contact Dr. Lehman to determine the specific basis for Ms. Rutherford's absence from work. Dr. Lehman advised that Ms. Rutherford was last seen in September 2003 and would not address our request for information. We were advised to contact Dr. Leoni.

Dr. Leoni's office indicated that Ms. Rutherford was last seen in November 2001, and they had no information to provide regarding her disability.

There is no medical evidence of a condition not subject to the Group Policy Exclusion or 24 month Benefit limitation, that would prevent Ms. Rutherford from working. Therefore, we are upholding our decision to terminate her claim effective November 11, 2003.

PRUR01062

Ms. Rutherford may again appeal this decision. If she elects to do so, the appeal must be made in writing by her or her authorized representative. The appeal may identify the issues and provide other comments or additional evidence she may wish considered, as well as any pertinent documents she may wish to examine. The written appeal should be submitted to:

Manager, Appeals Review Unit
Prudential Disability Management Services
GLDI Main
PO Box 13480
Philadelphia, PA 19101

Ms. Rutherford may have this matter reviewed by the California Department of Insurance if she believes she has been wrongfully denied or terminated. They may be reached at:

California Department of Insurance
Consumer Services Division
300 South Spring Street
Los Angeles, CA 90013
The telephone number is (800) 927-4357

If you have any questions, please contact me or Gerard Gonnella at (800) 842-1718, extension 7654.

Sincerely,

*Andrew N. DeChristopher*

Andrew N. DeChristopher
Team Manager

**Prudential Financial**

Patricia Daugherty
Sr. Disability Consultant

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718 Ext: 7875
Fax (877) 889-4885
Hours: 07:00 AM 03:00 PM

October 17, 2003

Richard Johnston                          Claimant: Dawn A Rutherford
Attorney at Law                           Control #/Br: 76787 / 00001
131 - A Stony Circle, Suite 500           Claim #: 10421380
Santa Rosa, CA 95401                      Date of Birth: 02/18/1962

llhlanhlalahlllnnnllnnlll

Dear Mr. Johnston:

We are in receipt of your letter regarding Dawn A Rutherford's request for reconsideration of the termination of her claim for Long Term Disability (LTD) benefits under the Group Policy G-76787.

On September 8, 2003, we received an appeal request from Ms Rutherford. We were in the process of assessing the claim for a 1st appeal decision. Since receiving your letter of intent, we have ceased the handling of her 1st appeal, at this time.

You have requested a complete and unabridged copy of Ms Rutherford's administrative claim record. Please find the materials enclosed.

The policy may be obtained from Ms Rutherford's employer. The contact information is:

Scene7, Inc.
Attn: Lori Beaudoin
Three Hamilton Landing, Suite 280
Novato CA 94949

Telephone # 415-506-6000

We are considering your letter an intent to appeal. If you wish to submit additional medical documentation, please forward it to our office. When the appeal is complete, please notify this office and the review of the 1st appeal will begin.

If you have any questions, please contact me at (800) 842-1718, extension 7875.

Sincerely,

*Patricia Daugherty*

Patricia Daugherty
Sr. Disability Consultant

cc:    Scene7, Inc. , Ms. Lori Beaudoin

**Prudential**  **Financial**

Charmaine Cadette
Disability Claim Manager

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718 Ext: 5735
Fax: (877) 889-4885
Hours: 08:00 AM 04:30 PM

August 26, 2003

Dawn A Rutherford
65 Alta Drive
Petaluma, CA 94954

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Date of Birth: 02/18/1962

||..|.||.|..|.|.|.|.||.|.|

Dear Ms. Rutherford:

We have completed our review of your claim for Long Term Disability (LTD) benefits under the Group Policy #76787 issued to Scene7, Inc..

In order to receive benefits under Group Policy #76787, covered employees must meet all contractual requirements including the following definition of "Disability":

"You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often at it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim."

In addition, the following benefit limitation applies:

"Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

**PRUR01074**

The limited pay period for self reported symptoms and mental illness combined is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1.  If you are confined to a hospital or institution at the end of the 24 month period, Prudential will continue to send you payments during your confinement.

    If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

    If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Prudential will send payments during that additional confinement period and for one additional recovery period up to 90 more days.

2.  In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

Your benefits have been authorized through November 11, 2003 based on your mental illness. This will complete 24 months of benefits. As such, no further benefits are payable for your mental illness due to the above noted benefits limitation.

In addition, medical records indicate that you complained of joint and muscle pain, however no objective medical records including x-rays or MRI reports are in file which reflect abnormal joint nor spine findings which would prevent you from performing a gainful occupation. Also, medical information in file does not indicate that you had any intensive treatment for a physical condition.

After a thorough evaluation of the above information, we have determined that as of November 12, 2003, you no longer meet the definition of disability from a physical standpoint and have been paid through the benefit limitation for a psychological condition. Therefore, we have terminated your claim effective November 12, 2003.

You have a right to appeal our decision. If you elect to do so, the appeal must be made in writing by you or your authorized representative. The appeal may identify the issues and provide other comments or additional evidence you wish considered, as well as any pertinent documents you may wish to examine. The written appeal should be submitted to:

Appeals Review Unit
The Prudential Insurance Company Of America
Disability Management Services
PO Box 2300
Parsippany, NJ  07054

If you have any questions, please contact me at (800) 842-1718, extension 5735.

Sincerely,

*Charmaine Cadette*

Charmaine Cadette
Disability Claim Manager

# Prudential 🔵 Financial

Charmaine Cadette
Disability Claim Manager

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718 Ext: 5735
Fax: (877) 889-4885
Hours: 08:00 AM  04:30 PM

April 03, 2003

Dawn A Rutherford
65 Alta Drive
Petaluma, CA 94954

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Date of Birth: 02/18/1962

||l|u|l||l||u|||l||l|l||l|l|

Dear Ms. Rutherford:

We are writing in regard to your claim application for Long Term Disability (LTD) benefits under
the Group G-76787 issued to Scene7, Inc..

Under the Scene7, Inc., Group Policy #76787, "Total Disability" exists when Prudential
determines that all of these conditions are met:

(1) Due to sickness or accidental injury, both of these are true:

    (a) You are not able to perform, for wage or profit, the material and substantial
        duties of your occupation.

    (b) After the Initial Duration of a period of Total Disability, You are not able to
        perform, for wage or profit, the material and substantial duties of any job for
        which you are reasonably fitted by your education, training, or experience.
        The initial duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor.

In addition, since your Disability, as determined by Prudential, is caused at least in part by a
mental, psychoneurotic or personality disorder. In that case, benefits are not payable for your
Total Disability for more than 24 months. There are these exceptions if you are Totally Disabled
at the end of the 24 months for which benefits are payable:

(1) If you are Confined in a Hospital for one or more of the disorders above at the end of the 24
months, the following will apply. While you remain Totally Disabled, benefits are payable for
the duration of the Confinement and, unless (2) below applies, for up to three additional months
after your Confinement ends.

(2) If, after the 24 months, you become Confined in a Hospital for one or more of the disorders
above for at least 14 consecutive days, the following will apply. While you remain Totally
Disabled, benefits are payable for the remaining duration of the Confinement and for up to
three additional months after your Confinement ends.

**PRUR01080**

But, benefits are not payable for more than the Maximum Benefit Duration.

"Confined" or "Confinement" as used in this section means a Hospital stay of at least 8 hours per day.

"Hospital" means an institution that meets either of these two tests:

(1) It is accredited as a hospital under the Hospital Accreditation Program of the Joint Commission on Accreditation of Healthcare Organizations.

(2) It is legally operated, has 24 hour a day supervision by a staff of Doctors, has 24 hour a day nursing service by a registered graduate nurse and complies with (a) or (b):

    (a) It mainly provides general inpatient medical care and treatment of sick and injured persons by the use of medical, diagnostic and major surgical facilities. All such facilities are in it or under its control.

    (b) It mainly provides specialized inpatient medical care and treatment of sick or injured persons by the use of medical and diagnostic facilities (including x- ray and laboratory). All such facilities are in it, under its control, or available to it under a written agreement with a Hospital (as defined above) or with a specialized provider of those facilities.

But Hospital does not include a nursing home. Neither does it include an institution, or part of one, which: (i) is used mainly as a place for convalescence, rest, nursing care for the aged; or (ii) furnishes mainly homelike or custodial care, or training in the routines of daily living; or (iii) is mainly a school.

This initial 24 month period of disability will end as of November 11, 2003. The current medical documentation on file pertains to the above policy guidelines, therefore, your claim will most likely terminate effective November 12, 2003.

In addition, please complete the enclosed form in order for Prudential to obtain the status of your social security disability benefits application.

If you have any questions, please contact me at (800) 842-1718, extension 5735.


Sincerely,

*Charmaine Cadette*

Charmaine Cadette
Disability Claim Manager

PRUR01081

# Prudential  Financial

**Jennifer Nowicki**
Disability Consultant

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718  Ext: 7661
Fax: (866) 285-8569

May 22, 2002

‖l‖ll‖lll‖lllll
Richard Johnston
Attorney at Law
131 A. Stony Circle, Suite 500
Santa Rosa, CA  95401

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Date of Birth: 02/18/1962

Dear Mr. Johnston:

We have completed our review of Ms. Dawn Rutherford's appeal for Long Term Disability (LTD) benefits under Group LTD Policy #76787 issued to Scene7, Inc.  Ms. Rutherford's Long Term Disability claim has been approved effective November 12, 2001. This letter will outline the reasons for our determination.

Monthly benefits are calculated as follows:

| | |
|---|---|
| Monthly Salary: | $7,083.33 |
| Scheduled Benefit (66.70% of salary): | $4,724.58 |
| Less California State Disability through August 20, 2002 | $2,123.33 |

Group Policy #76787 provides benefits to covered employees who meet all contractual provisions, including the definition of disability.  According to the Group Policy, you are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice.  Prudential will pay for these examinations.  We can require examinations as often as it is reasonable to do so.  We may also require you to be interviewed by an authorized Prudential Representative.  Refusal to be examined or interviewed may result in denial or termination of your claim."

We have reviewed the medical information provided by your treating physician and have determined that you are currently totally disabled from your regular occupation as required by the definition provided above.

In addition, the following benefit limitation applies:

"Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

The limited pay period for self reported symptoms 12 months and mental illness is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Prudential will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Prudential will send payments during that additional confinement period and for one additional recovery period up to 90 more days.

2. In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

You have a pre-existing condition if:

1. You received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medicines, or followed treatment recommendations in the 3 months
2. just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or
3. You had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months prior to your effective date of coverage or the date an increase in benefits would otherwise be available."

Ms. Rutherford ceased working as a software product producer on August 14, 2001 due to symptoms of nausea, back pain, fatigue and anxiety. LTD benefits were denied, as we determined that Ms. Rutherford was capable of performing the duties of her own occupation. Please refer to our letter dated December 10, 2001 for a complete explanation of this determination.

PRUR01084

The information in Ms. Rutherford's file indicates that her last day at work was August 13, 2001. Ms. Rutherford's effective date of coverage for LTD was August 1, 2001. Since Ms. Rutherford went out of work within one year of her coverage effective date, a pre-existing investigation was completed for the period of May 1, 2001 through July 31, 2001.

Documentation from Ms. Rutherford's August 1, 2001 office visit with Dr. Leoni indicates that she presented with complaints of severe exhaustion which she reported experiencing for about two or three weeks. Ms. Rutherford also reported nausea, forgetfulness, hot flashes, difficulty sleeping, and a twenty pound weight loss. Notes from Ms. Rutherford's September 26, 2001 visit with Dr. Kurtz (Orthopedic) indicate that Ms. Rutherford has a history of sciatica in both legs. On October 19, 2001, Dr. Finzen (Primary Care Physician), notes that mild symptoms started after Ms. Rutheford's May 2001 layoff. Dr. Finzen notes that Ms. Rutherford reported symptoms of generalized tender points, fatigue, and heaviness to the upper extremities in the three months after May 2001.

Under the terms of the Group Policy, you have a pre-existing condition if you had symptoms for which an ordinarily prudent person would have consulted a health care provider in the three months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available. As an ordinarily prudent person would have consulted a health care provider for symptoms of severe exhaustion, nausea, forgetfulness, flashes, generalized tender points, heaviness to the upper extremities, and difficulty sleeping, we have determined that the prudent person pre-existing policy provision would apply to Ms. Rutherford's claim based on symptoms of severe exhaustion, nausea, forgetfulness, hot flashes, difficulty sleeping, sciatic in both legs, generalized tender points, and heaviness to the upper extremities.

A review of information in file from Dr. Badham and Dr. Trahms reveals evidence of an impairment based on Ms. Rutherford's condition of depression. We have therefore approved Ms. Rutherford's LTD benefits based on this condition.

We will be in regular contact with Ms. Rutherford and Dr. Trahms regarding Ms. Rutherford's condition and treatment plan.

At this time we request that Ms. Rutherford apply for Social Security Disability Benefits (SSDB) immediately if she has not already done so. Under the terms of the LTD contract, you are required to make "timely and diligent pursuit" of SSDB through the Administrative Law Judge Level. Therefore, Prudential must receive written proof of Ms. Rutherford's Social Security application within 90 days of the date of this letter. Ms. Rutherford's LTD benefits may be reduced by an estimated SSDB amount.

Prudential will not reduce Ms. Rutherford's LTD benefit while her application and appeals are pending if she signs Prudential's Reimbursement Agreement and makes timely and diligent pursuit of SSDB.

After Ms. Rutherford has received a decision notice regarding her application for SSDB, she must submit a copy of the award certificate or denial notice to Prudential, at which time we will make any necessary adjustment to her LTD benefit.

Please have Ms. Rutherford sign the enclosed Reimbursement Agreement and return it in the envelope provided. If Prudential finds that Ms. Rutherford is not pursuing SSDB as required by the policy, her LTD benefit will be reduced by the estimated SSDB amount as mentioned above.

Prudential Group Insurance is pleased to offer Electronic Funds Transfer (EFT) as our standard method of payment for disability benefits. EFT allows benefit checks to be electronically deposited into the checking or savings account of Ms. Rutherford's choice. Please have Ms.

Rutherford complete the enclosed Electronic Funds Transfer Authorization form, and attach a voided check from the bank account in which she wishes to have her benefit check deposited. Return the authorization form and Ms. Rutherford's voided check to us in the enclosed (postage paid) envelope. Ms. Rutherford's request will be processed upon receipt of the authorization form and voided check.

If you have any questions, please contact us at (800) 842-1718, extension 7661.

Sincerely,


Jennifer Nowicki
Disability Consultant
Appeals Review Unit

CC: Craig J. Collins, California Department of Insurance (CSB-5567878)

PRUR01086

-4-

**Summary**

Physical exam findings indicate you have mild DJD and DDD. You had no abnormalities identified other than pain on straight leg raising. There is no evidence on clinical exams or laboratory findings that you have an inflammatory process. Medical records do not support that your physical condition prevents you from performing material and substantial duties of your own occupation.

A review of your psychiatric records indicated that there are no significant consistent cognitive deficits, no significant disabling panic attacks and no consistent significant symptoms of a disabling depression. An mental status examination (MSE) completed by Dr. Badham indicates you have poor concentration, mental confusion and panic attacks. However, these symptoms were not indicated in therapy note summaries. Letters to your doctors and to Prudential were written with sophisticated vocabulary and grammatical constructs. Your ability to process information, formulate plans and express yourself in a cogent manner appeared to be excellent. Neurocognitive functioning as reflected in your written letters appears to be much better than expected for individual with a Global Assessment of Functioning of 35 as noted in an MSE from Dr. Badham. Although you may be experiencing secondary depression and anxiety due to your perceived medical condition, the symptomatology for a mental impairment does not reach the level of severity to support a Total Disability.

Although you experience symptoms that may require medical treatment, information regarding your medical condition indicates you are able to perform the material and substantial duties of your own occupation. Therefore, we are unable to pay benefits under the terms of the Group Policy.

You have the right to appeal our decision. If you elect to do so, the appeal must be made in writing by you or your authorized representative. The appeal may identify the issues and provide other comments or additional evidence you wish considered, as well as any pertinent documents you may wish to examine. The written appeal should be submitted to:

Appeals Review Unit
Prudential Insurance Company of America
Disability Management Services
PO Box 13840
Philadelphia, PA 19101

In addition, you may have this matter reviewed by the California Department of Insurance:

1 (800) 927-4357 or (213) 897-8921
California Department of Insurance
Consumer Services Division
300 S. Spring Street
Los Angeles, CA 90013

If you have any questions, please contact me at (800) 842-1718, extension 8794.

Sincerely,

Rachael Evans- Sweeney
Disability Consultant

PRUR01113

**Prudential**  **Financial**

Rachael Evans- Sweeney
Disability Consultant

The Prudential Insurance Company Of America
Disability Management Services
Po Box 13480
Philadelphia, PA 19101

Phone: (800) 842-1718 Ext: 8794
Fax: (866) 285-8569
Hours: 07:00 AM 03:30 PM

November 13, 2001

Illuslululdlulululdlulul
Dawn A Rutherford
65 Alta Drive
Petaluma, CA 94954

Claimant: Dawn A Rutherford
Control #/Br: 76787 / 00001
Claim #: 10421380
Social Security #: 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
Date of Birth: 02/18/1962

Dear Ms. Rutherford:

We are continuing our review of your claim for Long Term Disability (LTD) benefits under
Group Policy #76787 issued to Scene7, Inc..

We are currently in the process of obtaining additional medical records from your treating
physicians in order to gain a clearer understanding of your condition.    We will be in contact with
you regarding the status of your claim by December 13, 2001.

If you have any questions, please contact me at (800) 842-1718, extension 8794.

Sincerely,

Rachael Evans- Sweeney
Disability Consultant

cc:   Scene7, Inc. , Ms. Kathleen Boggs, Hr Mgr.

PRUR01122

# Long Term Disability Coverage

## BENEFIT INFORMATION

### How Does Prudential Define Disability?

You are disabled when Prudential determines that:

- you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and

- you have a 20% or more loss in your *indexed monthly earnings* due to that *sickness* or *injury*.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any *gainful occupation* for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

*Material and substantial duties* means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

*Regular occupation* means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

*Gainful occupation* means an occupation, including self employment, that is or can be expected to provide you with an income equal to at least the benefit percent of your indexed monthly earnings within 12 months of your return to work. The benefit percent is shown in the Benefit Highlights.

*Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.

*Injury* means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

## What Happens If You Receive a Lump Sum Payment?

If you receive a lump sum payment from any deductible source of income, the lump sum will be pro-rated on a monthly basis over the time period for which the sum was given. If no time period is stated, we will use a reasonable one.

## How Long Will Prudential Continue to Send You Payments?

Prudential will send you a payment each month up to the *maximum period of payment*. Your maximum period of payment is shown in the Benefit Highlights.

We will stop sending you payments and your claim will end on the earliest of the following:

1.  During the first 24 months of payments, when you are able to work in your regular occupation on a *part-time basis* but you choose not to; after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to.

2.  The end of the maximum period of payment.

3.  The date you are no longer disabled under the terms of the plan.

4.  The date you fail to submit proof of continuing disability satisfactory to Prudential.

5.  The date your disability earnings exceed the amount allowable under the plan.

6.  The date you die.

*Maximum period of payment* means the longest period of time Prudential will make payments to you for any one period of disability.

*Part-time basis* means the ability to work and earn 20% or more of your indexed monthly earnings.

## What Disabilities Have a Limited Pay Period Under Your Plan?

Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on *self-reported symptoms* have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to *mental illness* also have a limited pay period during your lifetime.

The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1.  If you are *confined* to a *hospital or institution* at the end of the 24 month period, Prudential will continue to send you payments during your *confinement*.

    If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Prudential will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2.  In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

*Self-reported symptoms* means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

*Mental illness* means a psychiatric or psychological condition regardless of cause.  Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions.  These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

*Confined or confinement* for this section means a hospital stay of at least 8 hours per day.

*Hospital or institution* means an accredited facility licensed to provide care and treatment for the condition causing your disability.

## What Disabilities Are Not Covered Under Your Plan?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries;
- active participation in a riot; or
- commission of a crime for which you have been convicted under state or federal law.

Your plan does not cover a disability which:

- begins within 12 months of the date your coverage under the plan becomes effective; and

- is due to a pre-existing condition.

Your plan does not cover a disability due to war, declared or undeclared, or any act of war.

Prudential will not make a payment for any period of disability during which you are incarcerated as a result of a conviction.

## What Is a Pre-Existing Condition?

You have a pre-existing condition if:

1. You received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medicines, or followed treatment recommendation in the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or

2. You had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available.

## How Does a Pre-Existing Condition Affect an Increase in Your Benefits?

If there is an increase in your benefits due to an amendment of the plan; or your enrollment in another plan option, a benefit limit will apply if your disability is due to a pre-existing condition.

You will be limited to the benefits you had on the day before the increase if your disability begins during the 12 month period starting with the date the increase in benefits would have been effective. The increase will not take effect until your disability ends.

## How Does the Pre-Existing Condition Work If You Were Covered Under Your Employer's Prior Plan?

Special rules apply to pre-existing conditions, if this long term disability plan replaces your Employer's prior plan and:

- you were covered by that plan on the day before this plan became effective; and

- you became covered under this plan within thirty-one days of its effective date.

The special rules are:

1. If the Employer's prior plan did not have a pre-existing condition exclusion or limitation, then a pre-existing condition will not be excluded or limited under this plan.

2. If the Employer's prior plan did have a pre-existing condition exclusion or limitation, then the limited time does not end after the first 12 months of coverage. Instead it will end on the date any equivalent limit would have ended under the Employer's prior plan.

3. If the change from your Employer's prior plan to this plan of coverage would result in an increase in your amount of benefits, the benefits for your disability that is due to a pre-existing sickness or injury will not increase. Instead the benefits are limited to the amount you had on the day before the plan change.

PRUR 01149

PRUR 01168

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**

# Group Insurance Contract

### Contract Holder: PRUVALUE℠ INSURANCE TRUST NO. 3

### Group Contract No.: PVIB - 03

Prudential will provide or pay the benefits described in the Group Insurance Certificate(s) listed in the Schedule of Plans of the Group Contract, subject to the Group Contract's terms. This promise is based on the Contract Holder's application and payment of the required premiums.

All of the provisions of the Group Insurance Certificate(s), attached to and made a part of the Group Contract, apply to the Group Contract as if fully set forth in the Group Contract.

The Group Contract takes effect on the Contract Date, if it is duly attested under the Group Contract Schedule. It continues as long as the required premiums are paid, unless it ends as described in its General Rules. Dividends are apportioned each year.

The Group Contract is delivered in and is governed by the laws of the Governing Jurisdiction.

Secretary                                                    Chairman of the Board

83500
COV 1004                                                    (PVIB - 03)

PRUR 01169

# Included Employers

## A. BECOMING AN INCLUDED EMPLOYER.

**Application and Approval:**  An employer may become an Included Employer under the Group Contract if all these conditions are met.

(1)  The employer has applied to Prudential for a PruValue$^{SM}$ Insurance Benefits Program insurance plan.  That plan will provide the benefits of one or more Coverages to the employer's Employees.

(2)  The employer's application has been approved by Prudential.

(3)  The conditions listed in the Rules for Inclusion below are met.

(4)  The employer has been accepted by the Contract Holder as a subscriber to the **Contract Holder Trust**.

An employer will be an Included Employer on the employer's Plan Effective Date.  Prudential will determine the Plan Effective Date and will let the employer know that date.

An employer's Associated Companies, if any, are considered Included Employers under the Group Contract.  Associated Companies are the employer's subsidiaries or affiliates named in the employer's application.

The employer must let Prudential know, in writing, when a company named as an Associated Company is no longer one of its subsidiaries or affiliates.

**Coverage:**  Coverage of Employees of Included Employers is determined by these Included Employer provisions.  But that Coverage is subject to the following:

(1)  The Schedule of Benefits or Benefit Highlights in the Group Insurance Certificate lists the available Coverages and their benefits.

(2)  For Coverages other than Disability Coverage, the Who is Eligible To Become Insured and When You Become Insured sections of the Group Insurance Certificates describe who is eligible for Employee Insurance and how they become insured for Employee Insurance.  For Disability Coverages, the General Provisions section of the Group Insurance Certificates describe who is eligible for Employee Insurance and how they become insured for Employee Insurance.

(3)  For purposes of the Group Contract, Employees of an employer's Associated Companies are considered Employees of the employer.  On any date when a company ceases to be an Associated Company, the Group Contract will be considered to end for Employees of that company.  This applies to all of those Employees except those who, on the next day, are still within the Covered Classes of the Schedule of Plans of the Group Contract as Employees of an Included Employer.

(4)  An Employee of more than one Included Employer will be considered as an Employee of only one of those employers for the purpose of the Group Contract.  The Employee's service with all other Included Employers will be treated as service with that one.

(4)   If there are only two Eligible Employees of the Included Employer, each must have a separate residence and neither may be a member of the same family.  If an Included Employer has three Eligible Employees, no more than two of those Eligible Employees may be members of the same family.  If an Included Employer has at least four Eligible Employees, no more than three of those Eligible Employees may be members of the same family.

(5)   The business of the Included Employer must not be operated out of the residence of the Included Employer.

(6)   An Included Employer must have been in the business in which it currently operates for at least 12 months.

(7)   An employer may not become an Included Employer if the employer's plan of benefits has been underwritten by more than two insurance carriers in the three years immediately preceding the employer's application for inclusion under the Group Contract.

(8)   If an Included Employer requires Employee contributions, the amount required of an Employee cannot exceed 75% of the cost of the benefits for which the Employee is insured.

(9)   The first premium for the Included Employer must have been received by Prudential.

## B. EMPLOYER TRANSFERRED FROM ANOTHER GROUP CONTRACT OR GROUP POLICY.

If a group contract or group policy (called "group contract" below) issued by Prudential to another Employee Benefits Program Insurance Trust ends, or, if insurance with respect to an Included Employer under another group contract issued by Prudential to another Employee Benefits Program Insurance Trust ends in order that it be replaced by insurance under this Group Contract, an Included Employer included under that other group contract will be automatically included under this Group Contract if the Contract Holder notifies Prudential.  In that case, the following will apply to that Included Employer's insurance:

(1)   The Coverages and benefits for the Included Employer's Employees will be those that most closely resemble the Coverages and benefits of the Included Employer's insurance plan under the other group contract.  Prudential will decide which Coverages and benefits they are.  This will apply until the Included Employer changes its plan.

(2)   Prudential's right to change premium rates for the Included Employer under this Group Contract will be the same as if the Included Employer had continued to be included under the other group contract.  This will apply until the first date Prudential could have changed the rates under the other group contract.

If a person was a covered person under the other group contract when it ended and would have continued to be a covered person had the other group contract not ended as to the Included Employer, the following will apply:

(1)   Each such person will become a Covered Person under the Group Contract when the other group contract ends as to the Included Employer.  Each person will be covered in the same capacity as they were under the other group contract, either as an Employee or as a Qualified Dependent.

83500
GCS 1027