1  Richard Johnston - SBN 124524
   131-A Stony Circle, Suite 500
2  Santa Rosa, California 95401
   Telephone (707) 577-7422
3  Facsimile (707) 837-9532

4  Attorney for Plaintiff
   Dawn Rutherford

5

6

7
                    **UNITED STATES DISTRICT COURT**
8
                    **NORTHERN DISTRICT OF CALIFORNIA**
9

10  Dawn Rutherford,                          )  Case No. C 07-6426 WHA
                                              )
11          Plaintiff,                        )  **RUTHERFORD'S OPPOSITION TO**
                                              )  **PRUDENTIAL'S SUMMARY JUDGMENT**
12          vs.                               )  **MOTION AND SUGGESTION OF** *SUA*
                                              )  *SPONTE* **ENTRY OF PARTIAL**
13  Scene 7, Inc. Long Term Disability Plan,  )  **JUDGMENT FOR RUTHERFORD**
    Prudential Insurance Company of America,  )
14                                            )  **Date:**        July 10, 2008
                                              )  **Time:**        8:00 a.m.
15          Defendants.                       )  **Courtroom:**   9, 19th Floor
    _____ )
16
                                                 Hon. William H. Alsup
17

18

19

20

21

22

23

24

25

26

27

28
    _____
    OPPOSITION TO PRUDENTIAL'S
    SUMMARY JUDGMENT MOTION

**Table of Contents**

I.   Opposition to Prudential's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   *De Novo* Adjudication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Pertinent Provisions of the Prudential Policy . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Ms. Rutherford's Physical Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.   Degenerative joint disease; fibromyalgia; sleep disorder . . . . . . . . . . . . 3

        2.   Medication effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.   Prudential's invocations of the "self-reported symptoms" limitation . . . . . . . . 7

    E.   Legal Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.   Fibromyalgia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.   Sleep Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        3.   Medication effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        4.   Mental Illness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    F.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


II.  Suggestion of *Sua Sponte* Entry of Partial Judgment for Ms. Rutherford . . . . . . . . . . 20

    A.   Additional Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.   The vocational analysis did not take into account restrictions on fingering and keyboard use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.   Ms. Rutherford is not reasonably fitted for the Department Manager occupation by education, training or experience . . . . . . . . . . . . . . . . . 23

1

2                                    **Table of Authorities**

3

4    <u>*Cases*</u>

5    *Brenner v. Hartford Life & Acc. Ins. Co.,* 2001 WL 224826 (D.Md.) . . . . . . . . . . . . . . . . . . . . 4

6    *Brosnahan v. Barnhart,* 336 F.3d 671 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

7    *Burger v. Astrue,* 536 F.Supp.2d 1182 (C.D.Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8    *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 15, 16, 18

9    *Com. v. Gaboriault,* 2001 WL 410345 (Mass.Super.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10   *Eastman v. Prudential Ins. Co. of America,* 2008 WL 250597 (D. Minn. 2008) . . . . . . . 11, 20

11   *Guity v. Ercole,* 2007 WL 3284694 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12   *Hairston v. Loctite Corp.*, 2006 WL 568326 (E.D.Ark.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

13   *Hamall-Desai v. Fortis Benefits Ins. Co.,* 370 F.Supp.2d 1283 (N.D.Ga. 2004) . . . . . . . . . . . 6

14   *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914 (7th Cir. 2003) . 16, 18,
                                                                                                22
15
     *Hyatt v. Sullivan,* 899 F.2d 329 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
16
     *In re Entropin, Inc. Securities Litigation,* 487 F.Supp.2d 1141 (C.D.Cal. 2007) . . . . . . . . . . 19
17
     *Johnson v. Metro. Life Ins. Co.,* 437 F.3d 809 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 16
18
     *Jordan v. Northrupp Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869 (9th Cir. 2003) . . 14,
19                                                                                                         15

20   *Kassbaum v. Steppenwolf Productions, Inc.,* 236 F.3d 487 (9th Cir. 2000) . . . . . . . . . . . . . 20

21   *Klein v. BetzDearborn, Inc. Long Term Disability Plan,* 2002 WL 32348334 (E.D.Pa.) . . . . . 18

22   *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . 18

23   *Luna v. Bowen,* 663 F.Supp. 109 (D.Colo. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24   *Miller v. State*, 2005 WL 825762 (Tex.App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

25   *Pistorius v. Prudential Ins. Co. of America,* 123 Cal.App.3d 541 (1981) . . . . . . . . . . . . . . . 25

26   *Russell v. UNUM Life Ins. Co. of America,* 40 F.Supp.2d 747 (D.S.C. 1999) . . . . . . . . . 16, 18

27   *Sabatino v. Liberty Life Assurance Co.,* 286 F.Supp.2d 1222 (N.D.Cal. 2003) . . . . . . . . . . 17

28   _____

1 | *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382 (9th Cir. 1994) . . . . . . . . . . . . . . . 18

2 | *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y. 2005) . . . . . . . . . . . . 20

3 | *Slupinski v. First Unum Life Ins. Co.,* 2005 WL 2385852 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . 22

4 | *State v. Bucci*, 2001 WL 1355667 (Conn.Super.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 | *State v. Wade,* 942 A.2d 1085 (Conn.App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6 | *Thomas v. Apfel*, 202 F.Supp.2d 996 (S.D. Iowa 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7 | *Utter v. UNUM Life Ins. Co. of America,* 404 F.Supp.2d 1204 (C.D.Cal. 2005) . . . . . . . . . . . 6

8 | *Welch v. UNUM Life Ins. Co. of America,* 2007 WL 4374219 (D.Kan.) . . . . . . . . . . . . . 16, 18

9 | *Wilson v. Bowen,* 1989 WL 47062 (D. Kan.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Statutes and Regulations*

Employee Retirement Income Security Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Rules*

Fed.R.Civ.P. 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 25

1    Plaintiff Dawn Rutherford opposes the summary judgment motion filed by defendants

2    Prudential Insurance Company of America and Scene 7, Inc. Long Term Disability Plan.[1]  She

3    also respectfully suggests the court consider entering partial judgment in her favor *sua sponte*.

4    As Prudential explains in its Defendants' The Prudential Insurance Company of

5    America and Scene 7 Inc. Long Term Disability Plan's Memorandum of Points and Authorities

6    in Support of Motion for Summary Judgment (June 5, 2008) ("Prudential Motion"), this is an

7    action under the Employee Retirement Income Security Act for recovery of long term disability

8    (LTD) insurance benefits.  Prudential Motion at 1:3-7.

9    Prudential's motion is premised on the assertion that Ms. Rutherford's LTD claim is

10    subject to two contractual limitations which preclude payment of benefits to her even assuming

11    she is disabled.  These provisions limit benefit payments to 24 months for disabilities based

12    on, respectively, mental illness and "self-reported symptoms."

13    Ms. Rutherford does not contest the application of the "mental illness" limitation to her

14    mental illness, and so she does not argue that further benefits are owed on that score.  She

15    remains disabled independently of mental illness, however, by physical maladies including

16    fibromyalgia, degenerative disc disease, and sleep disorder, and for that benefits remain

17    payable unless the "self-reported symptoms" provision precludes them.  Contrary to

18    Prudential's argument, it does not.

19    The outcome of that issue will resolve Prudential's motion.[2]  Ms. Rutherford will go

20    further, however, and demonstrate as a matter of law that she is entitled to benefits under the

21    Prudential policy.  Based on that she will suggest the court consider *sua sponte* entry of partial

22    judgment in her favor.  Failing that, she should be allowed to conduct discovery, as requested

23    _____

24    [1]We refer to the moving parties collectively as "Prudential," except where the context indicates otherwise.

25    [2]In any case the most the court could do for Prudential here is to order *partial* summary

26    judgment, as Prudential's motion utterly fails to address Ms. Rutherford's second cause of action for injunctive relief, based on Prudential's persistent failure to respond to requests for legally required

27    documentation.  *See* Complaint (December 20, 2007) at 7:3-16.  By the same token, Ms. Rutherford suggests only that the court consider *sua sponte* entry of partial judgment in her favor.

28    _____

in her accompanying motion under Rule 56(f) of the Federal Rules of Civil Procedure, and to

prosecute a formal summary judgment motion of her own.

I.    Opposition to Prudential's Motion

    A.    *De Novo* Adjudication

    Prudential has "stipulated" to a *de novo* adjudication by the court in this matter.

Prudential Motion at 1:8-9.  Therefore the court need not concern itself with any multi-layered

conflict-of-interest analysis, and may proceed directly to decide whether Ms. Rutherford's

benefits were incorrectly terminated.  *See* Prudential Motion at 12:23 - 13:2.

    B.    Pertinent Provisions of the Prudential Policy

    The underlying Prudential insurance policy, 1131 - 1188,[3] provides benefits for

disability, which is defined in pertinent part as:

> •    you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**....
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.
> \*                \*                \*
>
> **Sickness** means any disorder of your body or mind, but not an injury....

1140 (emphasis in original).  Elsewhere, in a section entitled "**What Disabilities Have a**

**Limited Pay Period Under Your Plan?**" (emphasis in original), the policy provides:

> Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on **self-reported symptoms** have a limited pay period during your lifetime.
>
> Disabilities which, as determined by Prudential, are due in whole or in part to **mental illness** also have a limited pay period during your lifetime.
>
> The limited pay period for self-reported symptoms and mental illness combined is 24

---

[3]Unlabeled page citations such as this are to the Bates-stamped page numbers on the documents filed by Prudential along with its Notice of Manual Filing of Administrative Record (June 5, 2008).  The numbers on the documents include the designation "PRUR"; that designation is omitted in the citations in the text.

months during your lifetime.

1147 (emphasis in original).

> **Self-reported symptoms** means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

> **Mental illness** means a psychiatric or psychological condition regardless of cause....

1148 (emphasis in original).

### C.    Ms. Rutherford's Physical Conditions

The claim file in this matter is quite voluminous.  What follows, therefore, is necessarily truncated relative to an exhaustive factual account, but we endeavor to address the facts pertinent to the issues material to this motion.

Ms. Rutherford was diagnosed with a mental illness, *see* Prudential Motion at 16:18-24, and Prudential provided associated benefits.  We do not anticipate any legal disputes about that, *see infra* Section I(E)(4), and we need not belabor the underlying facts here.  The ensuing discussion therefore focuses on Ms. Rutherford's physical difficulties – the ones Prudential claims are subject to the "self-reported symptoms" limitation.

### 1.    Degenerative joint disease; fibromyalgia; sleep disorder

As Prudential notes, Ms. Rutherford became ill in August 2001.  *See* Prudential Motion at 3:6-10.  MRIs in September 2001 confirmed mild facet joint degenerative changes bilaterally at L5 through S1, as well as a transitional vertebra at S1.  732 - 733.[4]  One of Ms. Rutherford's physicians, Michael Kurtz, M.D., diagnosed her with cervical and lumbrosacral degenerative disc disease, and fibromyalgia.  827, 823.

---

[4]A transitional vertebra is a congenital anomaly which creates excessive wear on the intervertebral disc and paravertebral and intervertebral structures, resulting in pain; muscle spasms; arthritis; anthrosis; and neuropathy.  *Wilson v. Bowen,* 1989 WL 47062, at *4 (D. Kan.).  It predisposes one to back pain.  *Luna v. Bowen,* 663 F.Supp. 109, 111 (D.Colo. 1987).

OPPOSITION TO PRUDENTIAL'S
SUMMARY JUDGMENT MOTION                3

On December 3, 2001, Dr. Kurtz endorsed a letter Ms. Rutherford had prepared and asked him to review and sign provided he agreed with its contents.  666 - 668.[5]  This he did, adding his handwritten notes that "The above letter was prepared by Dawn Rutherford.  I feel it is a good summary of her condition," 667, and "The above letter was prepared by Dawn Rutherford.  I agree with its content."  668.  The letters in question indicated Dr. Kurtz had found such things as "[t]ender pain points throughout body"; "severe tender points are hip joints, shoulders, lower back and neck"; "[s]evere back, neck and muscle spasms causing extreme pain"; and "[s]wollen joints in right hand" and "[m]oderate swelling in joints of left hand."  666 - 667.  He confirmed the diagnoses of fibromyalgia and cervical and lumbrosacral degenerative disc disease, and that Ms. Rutherford was disabled.  667.

Ms. Rutherford also treated with L. Sloane Polillo, M.D.  On January 8, 2002, Dr. Polillo authored a letter in which she discussed Ms. Rutherford's condition and medical course, and conveyed the results of a comprehensive examination she had performed:

> Upon my examination of Ms. Rutherford on December 20, 2001, I observed the patient to be sitting extremely still, making few movements due to the degree of pain she was experiencing.  Examination of her extremities revealed significantly decreased range of motion throughout secondary to pain and tenderness to palpation in the thigh, knee, and calf areas.  Both hands revealed slight erythema and edema over the proximal interphalangeal and metacarpal-phalangeal joints, with limited range of motion at these joints secondary to pain.  Her grip strength was decreased bilaterally. ... On examination of her back, she was exquisitely tender to even light palpation throughout the cervical and lumbrosacral spine and musculature.  She also had positive tender points in the anterior

---

[5]Prudential considers Ms. Rutherford's "preparing her own reports on her condition and symptoms, and thereafter [having] them signed by her various physicians," to be a "questionable practice."  Prudential Motion at 19:18-20.  Ms. Rutherford's attempt to ease the administrative burden imposed on her physicians by Prudential's demands for documentation is quite understandable; it is certainly no secret how difficult it can be to get a busy physician to participate in an insurance company's paper chase.  *See, e.g., Brenner v. Hartford Life & Acc. Ins. Co.,* 2001 WL 224826, at *5, n.10 (D.Md.) (physician failed to respond to insurance company letter; "lack of response could as likely be a result of inadvertence or inattention due to other pressing demands in a physician's schedule").  In any case that is an interesting criticism considering disability insurers routinely use a very similar approach when one of their captive physician consultants communicates with a treating physician.  *See, e.g., Hairston v. Loctite Corp.,* 2006 WL 568326, at *6 (E.D.Ark.).  Here, there is no indication that any of Ms. Rutherford's physicians ever agreed to anything with which they did not concur, and the cited document contains affirmative handwritten addendums by Dr. Kurtz conveying his agreement.  Moreover, these diagnoses are confirmed elsewhere in office visit notes completely in Dr. Kurtz' own handwriting.  *See* 776 - 778.  Otherwise, to assuage Prudential's concerns, we cite in the text only records which bear indicia of the respective physician's original work product.

chest wall, occiput, cervical and sacroiliac spine consistent with fibromyalgia. Her gait is very slow and she cannot walk without the use of a cane.

520 - 521. In a March 28, 2002, letter, Dr. Polillo reiterated her previous observations and added:

> On December 4, 2001 she had a sleep study performed by Dr. John Sassin which revealed a 74% reduced sleep efficiency with absence of Stage III and IV sleep. An electroencephalogram done at that time also revealed alpha wave intrusion. These sleep disturbances can be consistent with Fibromyalgia and can certainly lead to disabling fatigue and may also contribute to Ms. Rutherford's degree of pain.

446 - 447. Indeed, Dr. Sassin's December 13, 2001 report indicated "alpha intrusion with alpha-delta sleep as well as an increase in sleep spindles and an absence of Stage III and IV sleep." 534 - 535. In a January 18, 2002 letter, Dr. Sassin explained these findings were "highly compatible with the diagnosis of fibromyalgia syndrome and associated with non-restorative sleep"; he characterized Ms. Rutherford's condition as "a severe disorder of sleep initiation and maintenance related to fibromyalgia syndrome." 513.

Several other physicians also examined Ms. Rutherford and concurred in these diagnoses and their disabling effects. *See* 429 (Audra Lehman, M.D.); 526 - 531 (Jeffrey A. Mandel, M.D.); 566 (Gary P. McCarthy, M.D.); 516 (Peter H. Stein, M.D.); 512 (Jack Waxman, M.D.).

In September 2002, Dr. Lehman referred Ms. Rutherford to J. Yusef Q. Erskine, D.O. 440 - 441. Dr. Erskine examined Ms. Rutherford:

> Osteopathic structural examination revealed that the left hip was significantly higher than the right. The right shoulder and the right ear were raised. There is a flattening of the mid-thoracic kyphosis. There was a restriction in range of motion symmetrically. There appeared to be functional guarding in the upper and lower extremities. There is a positive standing and sitting flexion test, and she had multiple tender points elicited throughout the thoracic, cervicals, cranium, and upper and lower extremities.

441. Included in Dr. Erskine's assessment was:

> Fibromyalgia, myofascial pain syndrome with sleep disorder, anxiety disorder, and depression. Numerous somatic dysfunctions found throughout the musculoskeletal system and a hyper sympathetic tonus in the thoracic regions and a hyposympathetic tonus in the cervicals.

*Id.* Ms. Rutherford continued to see Dr. Erskine for some time; the record reflects many

1  examinations and treatments with him through March of 2005.  *See* 282 - 348.

2

3  2.    Medication effects

4  As a function of her condition, Ms. Rutherford undertook a very significant medication

5  regimen.  For instance, on October 9, 2001,she advised Prudential's Gabrielle Woodward that

6  she was taking Xanax, hydrocodone, ambien and trazadone.  939.  Dr. Polillo, in her January

7  8, 2002 letter, 519 - 520, described Ms. Rutherford's medications and their effects:

8  Ms. Rutherford's current medical problems are being managed with several medications,
   including two benzodiazepines, Xanax and Klonopin, two narcotic pain medications,
9  Norco and Morphine, and a muscle relaxer, Soma.  All of these medications can cause
   drowsiness and decreased mental clarity preventing Ms. Rutherford from functioning at a
10 normal level.

11 520.  Ms. Rutherford's psychiatrist, Nancy A. Trahms, M.D., wrote on February 12, 2002:

12 She was tried on many medications including Effexor, Paxil, Celexa, Elavil, Trazadone
   and currently Prozac.  In addition she has been on multiple pain medications, the Fentanyl
13 patch, morphine, hydrocodone, Soma, Klonapin and Xanax.  Neurontin was recently
   added to help with the pain control and sleep.

14 463.  Later, on March 26, 2002, Dr. Trahms explained to Prudential that Ms. Rutherford was

15

16 taking "a great deal of pain medications," including morphine, hydrocodone, soma, Klonopin,

   Neurontin, and Prozac.  971 -972.

17 By September 2002, according to Dr. Erksine, Ms. Rutherford was on a regimen including

18 daily doses of Prozac, morphine, Xanax, Neurontin, Soma, and Celebrex.  440 - 441.  In April

19 2003, Dr. Lehman wrote:

20 She continues her medical regimen of multiple medicines for pain including narcotic
21 analgesics MS Contin and Norco, as well as celebrex, neurontin, trileptal and Soma;
   benzodiazepines for insomnia, muscle spasm and anxiety; psychiatric medicines
22 including seroquel, wellbutrin.

23 429.  These medications cause significant side effects.[6]  And, indeed, Ms. Rutherford

24

25 [6]*See, e.g., Burger v. Astrue,* 536 F.Supp.2d 1182, 1189 n.9 (C.D.Cal. 2008) (Xanax); *Hamall-Desai v. Fortis Benefits Ins. Co.,* 370 F.Supp.2d 1283, 1303 (N.D.Ga. 2004) (Hydrocodone); *Com. v.*
26 *Gaboriault,* 2001 WL 410345, at *18 (Mass.Super.) (Trazadone); *Guity v. Ercole,* 2007 WL 3284694, at *3 (S.D.N.Y.) (Klonopin); *State v. Bucci,* 2001 WL 1355667, at *3 (Conn.Super.) (Norco); *Miller v.*
27 *State,* 2005 WL 825762, at *1 (Tex.App.) (Soma); *State v. Wade,* 942 A.2d 1085, 1091 (Conn.App. 2008) (Fentanyl); *Utter v. UNUM Life Ins. Co. of America,* 404 F.Supp.2d 1204, 1209 (C.D.Cal. 2005)

28

1    exhibited precisely such side effects.  *See, e.g.*, 520 (Dr. Polillo: "All of these medications can

2    cause drowsiness and decreased mental clarity preventing Ms. Rutherford from functioning at

3    a normal level"); 530 (Dr.  Mandel: "The side effects of these drugs include drowsiness,

4    dizziness, decreased ability to function, and overall lack of mental clarity prevent [sic] Ms.

5    Rutherford from functioning at a normal level or performing the normal and customary

6    functions of any occupation").

7

8        D.    Prudential's invocations of the "self-reported symptoms" limitation

9        As described by Prudential, *see* Prudential Motion at 3:4 - 12:5, Ms. Rutherford's claim

10   went through several levels of administrative appeal.  Prudential, however, did not invoke the

11   "self-reported symptoms" limitation consistently throughout those appeals.

12

13       **1.**  Prudential's Rachael Evans-Sweeney authored Prudential's initial denial letter, on

14   December 10, 2001.   1110 - 1113.  After reciting some policy provisions, 1110 - 1112,

15   warning Ms. Rutherford that an exclusion for pre-existing conditions may apply, 1111 - 1112,

16   and parroting the views of two Prudential medical reviewers, 1112, Ms. Evans-Sweeney

17   advised "Medical records do not support that your physical condition prevents you from

18   performing material and substantial duties of your own occupation"; "the symptomatology for a

19   mental impairment does not reach the level of severity to support a Total Disability"; and "you

20   are able to perform the material and substantial duties of your own occupation."  1113.  Ms.

21   Evans-Sweeney, even though the fibromyalgia diagnosis was by that time known to

22   Prudential, did not discuss the "self-reported symptoms" limitation.

23

24       **2.**  Ms. Rutherford appealed the denial, and Prudential referred her file to Stephen

25   Gerson, M.D., for review.  Prudential Motion at 7:14.  On April 16, 2002, Dr. Gerson generated

26

27   (Neurontin).

28
     OPPOSITION TO PRUDENTIAL'S
     SUMMARY JUDGMENT MOTION              7

his report.  476 - 485.[7]  It contained an extensive overview of the medical records Prudential

had assembled by that time, including references to such clinical findings as:

- • The sleep study which was "thought to be consistent with fibromyalgia."  476, 482.
- • Decreased range of motion.  476, 483.
- • Grip strength decreased bilaterally.  476.
- • Positive tender points.  476, 481.
- • MRI findings of mild facet joint degenerative changes.  477.
- • Positive C reactive protein test for Epstein-Barr virus.  480.
- • Loss of muscle strength.  482, 483.

Dr. Gerson concluded that Ms. Rutherford met the "criteria for a diagnosis of fibromyalgia and

chronic fatigue syndrome with concomitant severe depression."  485.  He also concluded she

was indeed impaired psychologically.  *Id.*

On May 22, 2002, Prudential's Jennifer Nowicki wrote to Ms. Rutherford's counsel,

1083 - 1086, and advised benefits would be provided, but only for psychological impairment,

as the physical difficulties were deemed to be pre-existing.  1085.  Ms. Nowicki did not discuss

the "self-reported symptoms" limitation.

On April 3, 2003, Prudential's Charmaine Cadette wrote to Ms. Rutherford, reminding

her that her benefits were scheduled to terminate in November 2003 because of the 24-month

"mental illness" limitation.  1080 - 1081.  She wrote again on August 26, 2003, confirming her

benefits would indeed be terminated in November 2003.  1074 - 1076.  She explained that

was when the 24-month "mental illness" period expired, 1075, and went on to explain that

Prudential had determined her physical difficulties were simply not disabling:

> In addition, medical records indicate that you complained of joint and muscle pain, however no objective medical records including x-rays or MRI reports are in file which reflect abnormal joint nor spine findings which would prevent you from performing a gainful occupation.  Also, medical information in file does not indicate that you have had any intensive treatment for a physical condition.
>
> After a thorough evaluation of the above information, we have determined that as of November 12, 2003, you no longer meed the definition of disability from a physical standpoint and have been paid through the benefit limitation for a psychological condition.  Therefore, we have terminated your claim effective November 12, 2003.

---

[7]The report is actually comprised of pages 476 through 483 and page 485; page 484 is an out-of-order subsequent addendum by Dr. Gerson.

1    1075.  Ms. Cadette did not discuss the "self-reported symptoms" limitation.

2

3    **3.**  On September 1, 2003, Dan Keegan, Ms. Rutherford's husband, submitted an

4    appeal of the termination of benefits.  430 - 431.  He pointed out that Prudential was wrong

5    about a lack of physical ailments and associated intensive treatment, and he also stressed the

6    significant medication regimen prescribed by Ms. Rutherford's physicians.  430.  He noted as

7    well the sleep study which was confirmatory of the fibromyalgia diagnosis.  431.

8    Prudential's Andrew N. DeChristopher denied the appeal in a July 27, 2004 letter.  1060

9    - 1063.  In his letter, Mr. DeChristopher quoted the "self-reported symptom" limitation, 1060 -

10   1061, and the "pre-existing condition" exclusion.  1062.  He invoked both; this, therefore, was

11   the first time Prudential raised the "self-reported symptom" limitation, although his explanation

12   about it was quite uninformative:

13         Since the records reveal that Ms. Rutherford had symptoms for which an ordinarily
           prudent person would have sought treatment in the 3 month period May 1, 2001 through
14         July 31, 2001, the pre-existing Policy Exclusion would apply to her self-reported
           symptoms and conditions of chronic fatigue syndrome, fibromyalgia and sleep disorder.
15         Furthermore, her self-reported symptoms would be subject to the 24 month Benefit
           Limitation noted above.
16
     1062.
17

18
     **4.**  Both of Mr. DeChristopher's reasons for terminating Ms. Rutherford's benefits were
19
     addressed in her next appeal, submitted July 28, 2005.  367 - 373.  Regarding the "self-
20
     reported symptoms" rationale:
21
22         Ms. Rutherford's disabling condition has been confirmed, over and over, and by
           independent practitioners, precisely by means of "tests, procedures and clinical
23         examinations standardly accepted in the practice of medicine." Indeed, for verification of
           this Prudential need look no further that the report issued by Stephen N. Gerson, M.D.,
24         M.S.M, to whom Prudential sent Ms. Rutherford's file for review in 2002.  In his April
           16, 2002 report, Dr. Gerson noted the following: sleep studies which demonstrated an
25         absence of Stage III and IV sleep, confirmed by an EEG; clinically observed decreases in
           range of motion and grip strength; clinically observed trigger points characteristic of
26         fibromyalgia; laboratory studies confirming C reactive protein, Epstein-Barr virus, and
           acute infection antibodies; and clinically observed swollen joints.  In fact, Dr. Gerson,
27         who was working for Prudential, not Ms. Rutherford, concurred based on this
           constellation of clinical observations and test results that she "meets criteria for a

28   _____

diagnosis of fibromyalgia and chronic fatigue syndrome," and that her severe depression, which Prudential has acknowledged, was itself an "appropriate depressive reaction" to her physical disabilities.  All of Dr. Gerson's observations, of course, are confirmed by reference to source materials in Prudential's files.  Since then, there have been additional indicia, all of it objective and clinically confirmed, of Ms. Rutherford's disability. For example, in September 2002, J. Yusuf W. Erskine, D.O. examined Ms. Rutherford and noted that her left hip was significantly higher than her right hip; her right ear and shoulder were raised; and there was a flattening of her mid-thoracic kyphosis.  In April 2003, Audra Lehman, M.D., reported to Prudential that Ms. Rutherford was exhibiting "significant symptoms around the temporomandibular joint, which was making speech difficult for her" (and I trust your own employees who have had occasion to speak with Ms. Rutherford over the phone have likely observed this symptom firsthand).[8]  In short, Prudential's file is replete with many indicia of positive test results and clinical observations, by many physicians, which demonstrate Ms. Rutherford's disabling condition is manifested by far more than her mere "self-reports."

After several months of assembling information and additional records, in March 2006 Prudential's James Furman fashioned a series of questions to be submitted to a physician in connection with a file review, including an inquiry into adverse side effects from medications, 913, and on March 26, 2006, April D. Campbell, M.D., generated her report of her file review. 208 - 215.

Dr. Campbell reviewed the course of Ms. Rutherford's travails, 209 - 212, including her observation with regard to the December 2001 sleep study that "[t]his particular sleep pattern is common in fibromyalgia patients."  210.   Dr. Campbell noted Ms. Rutherford "was also treated with a variety of opiates for her chronic pain, and there is a report that this resulted in stuttering and facial paralysis."  Id.  She noted that Ms. Rutherford "has been ambulating with a cane that she states she uses because of problems with balance."  211.

Dr. Campbell also asserted "In terms of physical findings by physicians, there appears to be a paucity of abnormalities."  Id.  That would come as a surprise to Prudential's Dr. Gerson, who listed many "abnormal" signs and clinical findings in his April 2002 report, as well as the physicians who issued the many records described supra noting significant "abnormalities."  Dr. Campbell observed at one point "Dr. Kurtz ... observed swelling in the

_____

[8]As indeed they had: On December 12, 2001, Ms. Rutherford left a message for Prudential's Rachael Evans-Sweeney, who noted Ms. Rutherford "sounded as if she were under the influence of some substance – slurred speech."  966.

1   hands and joints of Ms. Rutherford's fingers, and it is not clear what he means by that." *Id.*[9]

2   Dr. Campbell also opined "there simply is not a detailed and well-performed physical done of

3   this individual anywhere in the records that I could find." 212.  Apparently, then, she either

4   overlooked, or considered for reasons unknown to be not "detailed and well-performed," the

5   physical examinations performed and memorialized by Drs. Erskine and Polillo.  *See supra.*

6   Dr. Campbell also offered the opinion that the "diagnosis of fibromyalgia is self-reported

7   because it is based entirely on the subjective complaints of tenderness at various points along

8   the body." 214.  She also noted the findings of the sleep study, which four pages earlier she

9   had described as "common in fibromyalgia patients," to be "not specific to fibromyalgia....  So, I

10  would hesitate to make the diagnosis of fibromyalgia based entirely on a sleep study." *Id.*

11      Upon receipt of Dr. Campbell's report, Mr. Furman determined to arrange for an

12  examination of Ms. Rutherford by a physician to be retained by Prudential.  917.

13  Consequently, on April 28, 2006, an appointment for Ms. Rutherford with Anita Roth, M.D.,

14  was confirmed.  207.  That, however, for reasons which appear nowhere in the record, never

15  happened, and Prudential unilaterally replaced the Roth appointment with one with Alan

16  Kimelman, M.D.  987 - 988.

17      Dr. Kimelman's examination of Ms. Rutherford did not proceed smoothly.  As Ms.

18  Rutherford's counsel explained in an August 18, 2006 letter, 192 - 194, to Mr. Furman:

19      During the initial examination, it became apparent to Ms. Rutherford and her husband,
        who also attended, that Dr. Kimelman had not reviewed any of Ms. Rutherford's medical
20      records prior to the beginning of the examination.  In fact, the vast majority of the allotted
        two-hour appointment was devoted to Dr. Kimelman's review of Ms. Rutherford's chart,
21      as distinguished from an actual examination of Ms. Rutherford.  What examination there
        was consisted of Dr. Kimelman's request that Ms. Rutherford engage in a few range-of-
22      motion exercises and, when she was unable to perform the maneuvers he described, he
        proposed that he move her limbs externally.  At this point, despite earlier reassurances
23      that no pain would be involved in the examination, Dr. Kimelman advised Ms.

24  _____

25      [9]One is tempted to ask "What part of 'swelling in the hands and fingers' do you not understand?"
    In any case the records provided by Prudential tell us little about Dr. Campbell's qualifications (other
26  than the legends "Diplomate, American Board of Internal Medicine" and "Diplomate, American Board
    of Physical Medicine and Rehabilitation," 215).  We do know that she is no stranger to Prudential.  *See*
27  *Eastman v. Prudential Ins. Co. of America,* 2008 WL 250597, at *8 (D. Minn. 2008).

28

Rutherford that most of his manual fibromyalgia exams caused pain to the subject and that she could expect to experience pain for several days after the examination. Upon learning that Ms. Rutherford had not taken her usual pain medications preparatory to the examination, Dr. Kimelman insisted that the examination be rescheduled so that he could examine Ms. Rutherford after she had taken her medications. This, in and of itself, demonstrates that Ms. Rutherford is disabled, as the side effects of her pain medications are themselves disabling, inasmuch as they compromise her ability to concentrate and cause her to be drowsy among other things. Not only is she not fit to work, apparently Dr. Kimelman does not feel she is even fit to be examined by a physician except when she is under the influence of these disabling medications.

At all events, as Dr. Kimelman insisted, Ms. Rutherford appeared for a second two-hour appointment (thus bringing her time to date with Dr. Kimelman to a total of four hours, for what had been represented to her as a 45 minute examination). According to Ms. Rutherford, on this occasion Dr. Kimelman's explanations of the tasks she was to perform as part of the examination were quite vague, and he refused her request that he demonstrate the maneuvers, offering only verbal explanations which were difficult for Ms. Rutherford to understand (that is perhaps not surprising considering she was under the effects of her pain medications during this examination). Moreover, Dr. Kimelman himself suggested that Ms. Rutherford should rest between maneuvers, based as I understand it on the patent effects the examination was having on her. This examination, like the first one, caused Ms. Rutherford a great deal of pain and discomfort, in addition to significant stress and anxiety.

193 - 194.

On September 12, 2006, Dr. Kimelman issued his report. 148 - 188. It is too lengthy to adequately summarize here, but it is feasible to address it in terms of the "self-reported symptoms" question.

Dr. Kimelman himself recorded several clinical findings. For example, he found decreased range of motion in the cervical spine, 168 -169, and thoracic spine. 169. On the fibromyalgia screen, he noted 18 out of 18 tender points. 177. His diagnoses were degenerative disc disease, and fibromyalgia. 181. He limited reaching to shoulder height, based on "examination findings that show painful limitation of range of motion in the shoulder and neck." *Id.* He limited "repetitive or finger motor hand activities" to "one third of the day." 184. He opined "In regard to the diagnosis of degenerative disc disease, the mildly abnormal cervical and lumbar magnetic resonance images, tenderness to palpation along the spine, and painful range of motion all support this," although he differed as to the "severity of disability

claimed." 185.[10]

The next day, September 13, 2006, Dr. Kimelman supplemented his report, 189 - 190, stating "I have since received your fax of September 13, 2006[11] and will clarify my report." 189. The "clarification" involved Dr. Kimelman's opinions that Ms. Rutherford was restricted from grasping, pinching, reaching, handling, fingering, or gripping more than occasionally, 190, i.e., no more than one-third of the day, 189, and could only occasionally pull, push, lift or carry no more than ten pounds. 190. She could walk and stand for up to a half-hour at a time, and sit for up to an hour. 190.

On October 10, 2006, Mr. Furman expressed uncertainty whether Dr. Kimelman was limiting Ms. Rutherford's fine hand activities to one-third of a 24-hour day. 920. Consequently, Dr. Kimelman clarified his opinion yet again, on October 19, 2006, advising "based on objective findings, Dawn Rutherford is not restricted from repetitive finger or hand activities," but that if "subjective criteria is to be used as a basis ... Dawn Rutherford is allowed to use of her hands [sic] for repetitive activities for up to one third of an eight hour work shift." 144.

On November 3, 2006, Mr. Furman denied Ms. Rutherford's appeal. 1015 - 1025. Insofar as the "self-reported symptoms" question is concerned, and despite the fact his own letter discussed several instances of clinical examinations, tests and procedures confirming Ms. Rutherford's diagnosis, he quoted Dr. Campbell: "The file review indicates that the diagnosis of fibromyalgia is self-reported because it is based entirely on Ms. Rutherford's

---

[10]This discussion of Dr. Kimelman's report is intentionally limited to matters pertinent to the "self-reported symptoms" issue. There is much to be said about his report, and particularly his accusation that Ms. Rutherford was exhibiting "symptom magnification." It is an understatement to say Ms. Rutherford believes, and is confident she can demonstrate, his views on that score should not be credited. But such questions go to the severity of her disability, and not to the question whether, disabled or not, her claim is barred by the "self-reported symptoms" provision.

[11]This fax is nowhere to be found in the records produced by Prudential.

1   complaints of tenderness at various points along her body." 1020.[12]

2       Mr. Furman included in his rationales for denying the appeal "her self-reported

3   symptoms are subject to the 24 month Benefit Limitation noted above." 1024.

4

5       **5.** Ms. Rutherford's counsel submitted one last appeal on May 4, 2007, taking issue

6   primarily with Dr. Kimelman's use of "Waddell signs" to support his accusations of "symptom

7   magnification." 64 - 100. Mr. Furman issued the final denial on July 20, 2007, 1000 - 1003.

8   Neither letter added anything in terms of the "self-reported symptoms" question.

9

10          E.    Legal Analysis

11              1.    Fibromyalgia

12      Prudential maintains Ms. Rutherford's diagnosis of fibromyalgia is necessarily subject to

13  the "self-reported symptoms" limitation because, according to *Jordan v. Northrupp Grumman*

14  *Corp. Welfare Benefit Plan,* 370 F.3d 869 (9th Cir. 2003), "fibromyalgia's cause or causes are

15  unknown, there is no cure, and, **of greatest importance to disability law,** its **symptoms are**

16  **entirely subjective."** Prudential Motion at 17:26-27 (emphasis in original). According to

17  Prudential, *Jordan* holds "symptoms of fibromyalgia consist of the patient's reports of pain and

18  nothing else." *Id.* at 18:1-2. A more complete account of the passage cited by Prudential,

19  however, reveals the *Jordan* court described many other findings, affirmative and negative,

20  which must be clinically established if a diagnosis of fibromyalgia is to be confirmed:

21          The American College of Rheumatology deems the diagnosis appropriate for an
            otherwise unexplained condition in which the patient complains of pain on the left side of

22

23          [12]It also bears noting that, while he otherwise faithfully parroted just about everything Dr.
24  Kimelman had to say, 1020 - 1024, he related only the "clarified" information about fingering
    restrictions, and incompletely at that. Recall Dr. Kimelman ultimately said Ms. Rutherford was not
25  restricted based on so-called "objective findings," but that she was limited to one-third of an eight-hour
    shift based on "subjective criteria." How did Mr. Furman report this in his denial letter? "Physical
26  examinations and diagnostic findings do not support any restrictions from repetitive finger or hand
    activities." 1024. He conspicuously omitted Dr. Kimelman's alternative views if "subjective criteria"
27  were to be considered. This is a quite material consideration, for as Mr. Furman acknowledged, Ms.
    Rutherford's occupational duties included "frequent" fingering. *Id.*

28

the body, above the waist, below the waist, and in the axial skeleton, and in at least 11 of
18 specified points when the examining physician palpates them with his thumb. The
symptoms of fibromyalgia consist of the patient's reports of pain and nothing else.
Objective tests, such as myelograms, rather than proving the existence of fibromyalgia,
are used to rule out alternative explanations for the pain, leaving fibromyalgia as the
remaining label for the collection of symptoms.

*Jordan,* 370 F.3d at 877. Thus, it is not mere "reports of pain, and nothing else" which
warrants a diagnosis, but pain in specified locations, based on clinical examination, and the
narrowing down of differential diagnoses until the fibromyalgia diagnosis can be confirmed. All
this, of course, happens as a result of "tests, procedures and clinical examinations standardly
accepted in the practice of medicine."

As Prudential acknowledges, *see* Prudential Motion at 18:3, the *Jordan* court "did not
reach a decision based upon the plaintiff's symptoms." More to the point, as Prudential also
acknowledges, *id.* at 17:20, the *Jordan* court was not addressing a contractual limitation like
the one in this case, and its extensive foray into medical literature was *dicta. See Jordan*, 370
F.3d at 872-873. The actual holding in *Jordan* was unremarkable, and had nothing to do with
the characterization of fibromyalgia's symptoms or its diagnostic requirements: *Jordan*
essentially held only that "there is nothing arbitrary or capricious in finding inadequate, with the
support of qualified physicians, a claim of disability supported only by a diagnosis of
fibromyalgia with no explanation of why it should amount to a disabling condition." *Id.* at 882.[13]

Other courts, however, *have* addressed the contractual limitation involved – specifically
with respect to fibromyalgia. In *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006), the
court held a limitation for "self-reported symptoms," identical to the one in the Prudential policy
here, to be inapplicable to a fibromyalgia claim:

Under Unum's policy, the key question then becomes whether fibromyalgia is subject to
the policy's self-reported symptoms limitation. By its plain language the limitation
applies only to disabilities that "are primarily based on self-reported symptoms...." Self-
reported symptoms are specifically defined as those that "are not verifiable using tests,
procedures or clinical examinations standardly accepted in the practice of medicine." The

[13]This holding in turn was based on considerations not of the diagnostic criteria for fibromyalgia,
but on such things as the failure of Jordan's physicians to respond to reasonable requests for input by
MetLife, the insurer in that case. *See, e.g.,* 370 F.3d at 877-878.

eighteen point "trigger test" performed by Dr. Lipsmeyer qualifies as a "clinical examination standardly accepted in the practice of medicine," and thus, Chronister's fibromyalgia is not subject to Unum's self-reported symptoms limitations.  Our circuit recently joined the Seventh Circuit in recognizing that trigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease.  *Johnson v. Metro. Life Ins. Co.,* 437 F.3d 809 (8th Cir. 2006).  *See also Brosnahan v. Barnhart,* 336 F.3d 671, 678 (8th Cir. 2003) ("Brosnahan's testimony and reports to the SSA are supported by objective medical evidence of fibromyalgia – consistent trigger point findings ..."); *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 919 (7th Cir. 2003) ("Pain often and in the case of fibromyalgia cannot be detected by laboratory tests.  The disease itself can be diagnosed more or less objectively by the 18-point test...").  Chronister's medical condition consequently does not rest primarily on self-reported symptoms.  The district court did not err in its finding that Unum abused its discretion when it denied Chronister further benefits based solely upon the self-reported symptoms limitation.

442 F.3d at 656.  Similarly, in *Russell v. UNUM Life Ins. Co. of America,* 40 F.Supp.2d 747 (D.S.C. 1999), the court considered an identical contractual limitation, *see id.* at 748, and concluded that it did not apply:

Russell's condition does not fall under the "self-reported symptom" limitation, as defined by the Plan.  Under the Plan, a condition based on "self-reported symptoms" is one where: "[T]he manifestations of your condition which you tell your doctor, that are not verifiable using *tests, procedures or clinical examinations, standardly accepted in the practice of medicine."* [Citation omitted].  Russell's condition does not fit within this definition because her claim is girded with a physician's examination based on objective tests accepted in the medical community.

40 F.Supp.2d at 750 (emphasis in original).  *See also Welch v. UNUM Life Ins. Co. of America,* 2007 WL 4374219 (D.Kan.), at *10 (fibromyalgia disability claim, identical contractual provision; "If there are tests, procedures or examinations that are standardly accepted in the medical community to test the degree or severity of pain as to a certain condition, then even though the pain is 'self-reported' by the patient, it is not a 'self-reported symptom' *as defined by UNUM in the policy."*) (Emphasis in original).

Standard canons of interpretation, applied to the contractual language in question, bolster the case for the inapplicability of the provision.

The Prudential policy generally provides coverage, in pertinent part, if a beneficiary is "unable to perform ... material and substantial duties ... due to ... sickness or injury."  1140 (emphasis omitted).  "Sickness," in turn, is defined generally as "any disorder of your body or

1   mind, but not an injury...." *Id.* As applied to Ms. Rutherford's case, "sickness" clearly

2   encompasses fibromyalgia, as well as her other documented maladies.

3       Seven pages later the policy discusses the "self-reported symptoms" limitation; it

4   provides there in pertinent part that "[d]isabilities due to a sickness ... which ... are primarily

5   based on self-reported symptoms have a limited pay period...." 1147. On the next page

6   Prudential advises the reader what it means by "self-reported symptoms"; in pertinent part that

7   is "the manifestations of your condition, which you tell your doctor, that are not verifiable using

8   tests, procedures and clinical examinations standardly accepted in the practice of medicine.

9   Examples of self-reported symptoms include, but are not limited to, headache, pain, fatigue,

10  stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy." 1148.

11      The reader must first confront the question whether the disability in question or the

12  sickness in question must be "based primarily on self-reported symptoms" if the limitation is to

13  apply. Prudential's definition, which provides that "disabilities based on a sickness which are

14  primarily based on self-reported symptoms" sheds no light whatever on that query.

15      Once that riddle is solved, the reader must then attempt to ascertain how the limitation

16  applies to a situation like Ms. Rutherford's, where a diagnosis has been achieved and

17  confirmed by way of clinical examinations, procedures and testing, as verification by such

18  means is one way, according to the provision itself, the limitation is rendered inapplicable.

19      Here, Ms. Rutherford underwent several clinical examinations, which confirmed the

20  presence of the trigger points which are confirmatory of fibromyalgia. She underwent a sleep

21  study which objectively verified compromised sleep, an additional earmark of fibromyalgia.

22  She underwent physical therapy which involved treatment of her compromised range of

23  motion, yet another fibromyalgia earmark.

24      Against all that the question arises whether the "self-reported symptoms" limitation

25  applies here. It is Prudential's affirmative burden to establish that it does. *See Sabatino v.*

26  *Liberty Life Assurance Co.,* 286 F.Supp.2d 1222, 1232 (N.D.Cal. 2003). In order to do so,

27  Prudential must establish it is much more than merely arguable; it must be inescapable:

28

OPPOSITION TO PRUDENTIAL'S
SUMMARY JUDGMENT MOTION          17

1

2

> Insurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

*Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 540 (9th Cir. 1990). Based on this policy, the Ninth Circuit has adopted the "reasonable expectations" doctrine:

> In general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intentions of the insurer.
>
> &ast;          &ast;          &ast;
>
> [A]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious the relationship to other policy terms, and must bring such provisions to the attention of the insured.

*Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 386 (9th Cir. 1994) (citations omitted). Here, the court need only consult such judicial views as those expressed in *Chronister, Brosnahan, Hawkins, Russell,* and *Welch*, *supra,* to confirm Ms. Rutherford's expectation of coverage is reasonable under the circumstances.[14] Prudential's burden is not merely to demonstrate that its interpretation and application of the provision is reasonable: it must demonstrate that Ms. Rutherford's is not. Unless the court is prepared to conclude all these judges in all these cases, who share Ms. Rutherford's expectations of coverage, were not only incorrect but affirmatively unreasonable, this Prudential cannot do.

---

[14]This is not to suggest there are *no* cases which go the other way. *See, e.g., Klein v. BetzDearborn, Inc. Long Term Disability Plan,* 2002 WL 32348334 (E.D.Pa.). *Klein* merely holds it was not an *abuse of discretion* for Unum to consider fibromyalgia symptoms to be "self-reported," *id.* at *2, and did not profess to undertake the sort of independent judgment this court must render on a *de novo* adjudication. In any case, applying the rules of interpretation discussed in the text, a smattering of contrary authority does not detract from the proposition the views expressed in *Chronister* and kindred cases are, at the very least, *reasonable*.

1

### 2.    Sleep Disorder

Ms. Rutherford's sleep disorder was diagnosed on the basis of the sleep study

conducted by Dr. Sassin.  Inasmuch as the pertinent signs and findings are revealed while the

patient is *asleep*, it is difficult to ascertain how such things can be "self-reported."  Especially

under the principles of interpretation discussed *supra,* the sleep disorder cannot be considered

to be "self-reported."

### 3.    Medication effects

Ms. Rutherford suffered from the debilitating side effects of her significant medication

regimen.  These effects cannot be considered "self-reported," as they too have been verified

using "tests, procedures and clinical examinations standardly accepted in the practice of

medicine."

Expected medication side effects are ascertained through a rigorous and legally

required regimen of testing, studies and clinical trials.  *See In re Entropin, Inc. Securities*

*Litigation,* 487 F.Supp.2d 1141, 1144 n.5 (C.D.Cal. 2007).  Applying the rules of interpretation

discussed above, these measures easily constitute "tests, procedures and clinical

examinations standardly accepted" in medical practice; indeed they are more than accepted,

they are legally mandated.  Ms. Rutherford's experience of these debilitating medication

effects, therefore, was not only "verifiable"[15] but was easily foreseeable by virtue of the

comprehensive investigation required by law.  The medication effects therefore cannot be

considered to be "self reported" as defined in the Prudential policy.

### 4.    Mental Illness

Ms. Rutherford does not quibble with Prudential's application of the "mental illness"

limitation to her mental illness.  *See* Prudential Motion at 16:18 - 17:6.  She notes only that the

---

[15]Verified, in fact, by the observations and clinical impressions of her medical providers, as discussed *supra.*

1    "mental illness" limitation cannot be applied to squelch her entitlement to ongoing benefits for

2    her independently disabling physical condition,[16] and she does not understand Prudential to

3    contend otherwise.

4

5        F.    Conclusion

6        Based on the foregoing, the "self-reported symptoms" provision does not apply and

7    cannot justify the termination of Ms. Rutherford's LTD benefits.  Prudential's motion should

8    therefore be denied.

9

10   II.    Suggestion of *Sua Sponte* Entry of Partial Judgment for Ms. Rutherford

11       "It is generally recognized that a court has the power sua sponte to grant summary

12   judgment to a non-movant when there has been a motion but no cross-motion."  *Kassbaum v.*

13   *Steppenwolf Productions, Inc.*, 236 F.3d 487, 494 (9th Cir. 2000).  Ms. Rutherford maintains

14   entry of judgment in her favor is appropriate on the narrow grounds discussed below, which do

15   not require delving into the full history of this matter or detailed consideration of the entire

16   record.[17]  Failing that she seeks leave of court to conduct discovery (see her accompanying

17   motion under Rule 56(f)), and to prosecute a summary judgment motion generally based on

18   the overall merits of her claim.

19

20

21   _____

22       [16]*See, e.g., Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y. 2005), where the
     MetLife policy limited benefits to two years if a disability "in any way results from, or is caused or

23   contributed to by a mental or nervous disorder."  *Id.* at 263.  Sheehan suffered from coronary artery
     disease, and from cardiac neurosis; the latter was a mental or nervous condition.  *Id.*  The court

24   interpreted the MetLife provision to mean Sheehan would be entitled to benefits if the cardiac condition
     by itself would constitute a total disability.  *Id.* at 264.  *See also Eastman, supra,* 2008 WL 250597, at

25   *15-*16.

26       [17]Ms. Rutherford's arguments, from an evidentiary standpoint, depend on accepting at face value
     the statements of Dr. Kimelman and, as will be seen, Prudential's vocational consultant, on discrete

27   issues.  Certainly additional and substantial arguments are available to her based on the record as a
     whole, but those arguments she saves for a later day should that become necessary.

28   _____

1

2     **A.     Additional Factual Background**

3     Almost a year after Dr. Kimelman had issued his reports (recall he limited fingering to

4     one-third of an eight hour shift based on "subjective criteria"), Prudential commissioned an

5     "assessment of employability within [Ms. Rutherford's] current [restrictions and limitations]."

6     933.  The only restrictions and limitations considered by Prudential's analyst, Gregg

7     Schwartzkopf, were "no heavy lifting, no prolonged static neck posturing and no overhead

8     reaching."  *Id.*  Based on that, on July 17, 2007, Mr. Schwartzkopf concluded in pertinent part:

> The positions with which [employee] has direct experience (Project Director, Hardware
> Analyst and Systems Analyst) are all Sedentary PDL occupations that are primarily
> performed seated and involve occasional to frequent reaching and handling and frequent
> fingering due to keyboard use.  Her skill set is also highly transferable to Department
> Manager (189.167-022), a Sedentary PDL occupation involving occasional
> reaching/handling/fingering.

*Id.*  These conclusions, in turn, formed a basis for Mr. Furman's final denial letter three days

later.  1002.

Prudential's vocational analysis depends on two principles for its efficacy.  First,

regarding the "positions with which [Ms. Rutherford] has direct experience,"  Mr. Schwartzkopf

must have been correct to omit any restrictions on fingering, inasmuch as those occupations

all require "frequent fingering due to keyboard use." Second, as to the Department Manager

occupation, Ms. Rutherford must be reasonably fitted for that occupation by education, training

or experience.

Neither principle withstands scrutiny.


**B.     Discussion**

  **1.     The vocational analysis did not take into account restrictions on fingering
    and keyboard use**

Dr. Kimelman, recall, imposed a restriction on fingering to no more than one-third of an

eight hour shift.  If that restriction is taken into account, according to Mr. Schwartzkopf's own

discussion, Ms. Rutherford is disabled from engaging in the "positions with which [she] had

direct experience."

28

OPPOSITION TO PRUDENTIAL'S
SUMMARY JUDGMENT MOTION     21

1    Dr. Kimelman concurred in the diagnosis of fibromyalgia, and imposed the fingering

2  restriction in his reports of September 12 and 13, 2006.  177, 181, 184, 189 - 190.  Mr.

3  Furman, perhaps recognizing that such a restriction would require Prudential to pay benefits to

4  Ms. Rutherford, inquired on October 10, 2006 if Dr. Kimelman perhaps meant one-third of an

5  24-hour day (which would, of course, equate to allowing Ms. Rutherford to keyboard for eight

6  hours).  920.  Dr. Kimelman responded on October 19, 2006 he had indeed meant one-third of

7  an eight hour work shift "if subjective criteria is to be used," but he did allow that "based on

8  objective findings" there was no restriction at all.  144.  As we have seen, when Mr.

9  Schwartzkopf conducted his analysis the following July, he omitted any restriction at all for

10  fingering.

11    Thus, the question is whether Prudential was allowed to omit the restriction based on

12  "subjective criteria."  It was not.

13    As the court stated in *Hyatt v. Sullivan,* 899 F.2d 329, 337 (4th Cir. 1990):

14    Once an underlying physical or mental impairment that could reasonably be expected to
     cause pain is shown by medically acceptable objective evidence, such as clinical or
15    laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a
     disability claimant's pain, even though its intensity or severity is shown only by
16    subjective evidence.  If an underlying impairment capable of causing pain is shown,
     subjective evidence of the pain, its intensity or degree can, by itself, support a finding of
17    disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations
     of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle
18    spasm, or sensory or motory disruption) if available, should be obtained and considered.
     Because pain is not readily susceptible of objective proof, however, the absence of
19    objective evidence of the intensity, severity, degree or functional effect of pain is not
     determinative.
20

21 *See also Slupinski v. First Unum Life Ins. Co.,* 2005 WL 2385852*,* at *7 (S.D.N.Y.)(applying

   principle to ERISA case). To the same effect is *Hawkins, supra,* 326 F.3d at 919:
22

23    But the gravest problem with Dr. Chou's report is the weight he places on the difference
     between subjective and objective evidence of pain.  Pain often and in the case of
24    fibromyalgia cannot be detected by laboratory tests.  The disease itself can be diagnosed
     more or less objectively by the 18-point test ... but the amount of pain and fatigue that a
25    particular case of it produces cannot be.  It is "subjective" – and Dr. Chou seems to
     believe, erroneously because it would mean fibromyalgia could never be shown to be
26    totally disabling, which the plan does not argue, that because it is subjective Hawkins is
     not disabled.

27 Here, Ms. Rutherford's fibromyalgia was diagnosed by, among other things, the 18-point test.

28

It is a condition which could reasonably be expected to cause pain.  Because an underlying

impairment capable of causing pain is shown, Prudential cannot simply ignore Ms.

Rutherford's "subjective" accounts of her pain when evaluating her occupational abilities.  Dr.

Kimelman opined that, considering those accounts, she cannot engage in fingering (i.e.

keyboarding) more than occasionally.  As Mr. Schwartzkopf has acknowledged, the positions

with which Ms. Rutherford has direct experience all require frequent fingering.  Ms. Rutherford

is therefore disabled, as a matter of law, from engaging in those occupations.


2.    Ms. Rutherford is not reasonably fitted for the Department Manager<br>occupation by education, training or experience

Mr. Schwartzkopf used a definition from the Dictionary of Occupational Titles, 189.167-

022, to describe the Department Manager occupation for which Ms. Rutherford supposedly

has a "highly transferable" skill set.  Adopting, then, the authority Mr. Schwartzkopf has

selected, the complete U.S. Department of Labor definition is:

> 189.167-022 MANAGER, DEPARTMENT (any industry) alternate titles: department
> head; superintendent
>
> Directs and coordinates, through subordinate supervisors, department activities in
> commercial, industrial, or service establishment: Reviews and analyzes reports, records,
> and directives, and confers with supervisors to obtain data required for planning
> department activities, such as new commitments, status of work in progress, and
> problems encountered. Assigns, or delegates responsibility for, specified work or
> functional activities and disseminates policy to supervisors. Gives work directions,
> resolves problems, prepares schedules, and sets deadlines to ensure timely completion of
> work. Coordinates activities of department with related activities of other departments to
> ensure efficiency and economy. Monitors and analyzes costs and prepares budget, using
> computer. Prepares reports and records on department activities for management, using
> computer. Evaluates current procedures and practices for accomplishing department
> objectives to develop and implement improved procedures and practices. May initiate or
> authorize employee hire, promotion, discharge, or transfer. Workers are designated
> according to functions, activities, or type of department managed.
> GOE: 11.05.02 STRENGTH: S GED: R5 M4 L4 SVP: 7 DLU: 89

U.S. Department of Labor website, www.oalj.dol.gov/public/dot/references/dot01f.htm, last

visited June 19, 2008.  The occupation has a specific vocational preparation (SVP) rating of 7.

This indicates the occupation requires two to four years of "lapsed time required by a typical

worker to learn the techniques, acquire the information, and develop the facility needed for

average performance in a specific job-worker situation." *See* Appendix C to the Dictionary of Occupational Titles, www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited June 19, 2008). *See also Thomas v. Apfel*, 202 F.Supp.2d 996, 998 (S.D. Iowa 1998). According to the DOT Appendix:

> This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the specific conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.
>
> Specific vocational training includes training given in any of the following circumstances:
>
> a.    vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);
>
> b.    apprenticeship training (for appreticeable jobs only);
>
> c.    in-plant training (organized classroom study provided by an employer);
>
> d.    on-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);
>
> e.    essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

Therefore, Ms. Rutherford possesses the education, training and experience required to perform the Department Manager occupation only if she has already undergone from two to four years of the types of specific vocational training described above as to that occupation.

She has not. She has had no vocational education in the field. She has had no apprenticeship training in the field. She has had no in-plant training in the field. She has had no on-the-job training in the field. And, she has no essential experience in any other job; her professional experience is heavily weighted toward working on computer applications and not management of departments (recall, according to Mr. Schwartzkopf, the "positions with which [she] has direct experience" all entail frequent keyboarding). Consequently, Prudential's conclusion that Ms. Rutherford currently possesses the education, training and experience which would allow her to successfully execute the identified occupation is demonstrably

1  incorrect.

2       Because Ms. Rutherford's restriction from frequent fingering precludes her from working

3  in any occupation for which she is reasonably fitted, and because she is not reasonably fitted

4  for the only occupation identified by Prudential which could accommodate her fingering

5  restriction, she is disabled according to the terms of the Prudential policy.  *Cf. Pistorius v.*

6  *Prudential Ins. Co. of America,* 123 Cal.App.3d 541, 564 n.4 (1981) (insured not required to

7  attempt to retrain for occupation they otherwise would be physically able to pursue).  Ms.

8  Rutherford respectfully requests the court consider entry of judgment in her favor *sua sponte*.

9       Failing that, as discussed in her accompanying motion under Rule 56(f), she seeks

10  leave to conduct appropriate discovery, and to pursue her own summary judgment motion

11  based on the record in its entirety and such additional evidence as the court may consider in

12  its discretion.

13

14  Dated: June 19, 2008

15

16                                    _____/s/_____
                                        Richard Johnston
17                                     Attorney for Plaintiff
                                        Dawn Rutherford

18

19

20

21

22

23

24

25

26

27

28

_____
OPPOSITION TO PRUDENTIAL'S
SUMMARY JUDGMENT MOTION                 25