IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN RUTHERFORD,<br><br>Plaintiff,<br><br>v.<br><br>SCENE 7 INC. LONG TERM DISABILITY PLAN, PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>Defendants.<br>_____ / | No. C 07-06426 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR FURTHER DISCOVERY** |

**INTRODUCTION**

In this disability-benefits action, plaintiff Dawn Rutherford sued defendants Scene 7, Inc. Long Term Disability Plan, and Prudential Insurance Company of America under the Employment Retirement Income Security Act. Ms. Rutherford claimed that Prudential, the claims administrator for the plan, wrongfully terminated her long-term disability benefits. Defendants now move for summary judgment on the ground that Prudential's termination decision was proper because Ms. Rutherford's claimed disabilities were either primarily self-reported or due to mental illness. For the reasons stated below, defendants' motion is **GRANTED IN PART AND DENIED IN PART**. Ms. Rutherford's request to seek additional discovery is also **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

Ms. Rutherford was hired to work as a software product producer for Scene 7, Inc., on July 16, 2001. She participated in the employee-benefit plan offered by Scene 7, Inc. Prudential was the claims administrator. The Plan provided (PRUR 1147):

> Disabilities due to a sickness or injury which, as determined by Prudential, are *primarily based on self-reported symptoms* have a limited pay period during your lifetime. Disabilities which, as determined by Prudential, are due in whole or part to *mental illness* also have a limited pay period during your lifetime. The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.
>
> \* \* \*
>
> *Self-reported symptoms* means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.
>
> *Mental illness* means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

Appended to the Plan was a section entitled, "This ERISA Statement is not part of the Group Insurance Certificate." The first paragraph stated that "[t]he Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious" (PRUR 1162).

Ms. Rutherford made her first claim for Plan benefits on August 28, 2001, over a month after she began working. When asked to describe the nature of her illness, she wrote, "Extreme fatigue, nausea, headaches, lower back pain, feverish, muscle and joint pains" (PRUR at 865). As a result, she received disability benefits.

In December 2001, Prudential terminated Ms. Rutherford's long-term benefits under the Plan, based on a review by Dr. Gwen Brachman. Dr. Brachman had concluded that, "to a

2

reasonable degree of medical certainty," Ms. Rutherford was "not physically impaired from performing essential functions" of her own occupation (PRUR 887). Plaintiff appealed.

Prudential referred her file to Dr. Stephen Gerson for review. He found that she met the criteria for a diagnosis of fibromyalgia, chronic fatigue syndrome, and severe depression. She also reacted poorly to medication and was frequently bedridden. In his lengthy letter dated April 26, 2002, Dr. Gerson listed the documents he reviewed to arrive at his conclusions. Of interest is a note from Dr. Michael Kurtz, in which he reported on the treatment for Ms. Rutherford's "ongoing disabling condition of fibromyalgia, degenerative cervical and lumbosacral spine disease. He reports multiple trigger points and he has prescribed physical therapy" (PRUR 481).

Accordingly, Prudential reinstated Ms. Rutherford's benefits in May 2002. The letter noted that she had a preexisting condition under the definitions of the Plan. The preexisting symptoms, which emerged after her May 2001 layoff (but before her July 2001 start date). included severe exhaustion, nausea, forgetfulness, flashes, generalized tender points, heaviness to the upper extremities, and difficulty sleeping. The benefits were therefore approved only on the basis of her psychiatric condition.

Over the next year, Ms. Rutherford continued to complain of pain, sleep disorders, side effects due to medication, and mental illness. She took medication, including antidepressants and pain medications. She consulted with numerous physicians, many of whom diagnosed her with, *inter alia*, fibromyalgia. Some of them wrote letters on her behalf, recommending that her disability payment period be extended.

In April 2003, Prudential sent Ms. Rutherford a letter advising her of the mental-illness limitation under the Plan and saying that her benefits were only authorized through November 11, 2003. Because her benefits had been reinstated only on the basis of Ms. Rutherford's mental illness, Prudential would only provide 24 months of benefits. The letter further stated that there were no objective medical records (*e.g.*, x-rays or MRI reports) that supported a claim of physical problems.

Ms. Rutherford made three appeals — in September 2003, July 2005, and May 2007. Each time, she asserted that she continued to suffer from physical and mental disabilities. Prudential would then refer her file to physicians who concluded that nothing in Ms. Rutherford's file justified reinstating disability benefits. Prudential upheld its earlier termination decision in each of the appeals. In July 2007, Prudential notified Ms. Rutherford of its final decision to terminate her long-term disability benefits.

Ms. Rutherford filed suit against defendants on December 20, 2007, alleging that Prudential improperly and wrongfully denied her disability benefits. She sought to recover benefits, reasonable attorney's fees and costs, and injunctive relief pursuant to ERISA, 29 U.S.C. 1132.

**ANALYSIS**

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[1]

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000). When the moving party meets its initial burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

---

[1] Unless indicated otherwise, internal citations are omitted from quoted authorities in this order.

4

Although Prudential is the moving party, Ms. Rutherford argues that the Court should *sua sponte* grant summary judgment in her favor. "It is generally recognized that a court has the power *sua sponte* to grant summary judgment to a non-movant when there has been a motion but no cross-motion." *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487, 494 (9th Cir. 2000). The propriety of granting summary judgment in favor of a non-moving party is, however, a "close question." *Ibid*. "[G]reat care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his [or her] opponent is not entitled to judgment as a matter of law." *Ibid*.

### 1. LEGAL STANDARD.

This order must first determine the applicable standard of review in resolving this ERISA dispute. District courts must review ERISA benefit-denial claims *de novo* unless the plan administrator or fiduciary unambiguously retained the discretion to grant or deny claims. Otherwise the standard is the more lenient abuse of discretion. *Feibusch v. Integrated Device Technology, Inc. Employee Benefit Plan*, 463 F.3d 880, 883 (9th Cir. 2006). If *de novo* review applies, a district court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Ibid*.

Under an appended section entitled, "This ERISA Statement is not part of the Group Insurance Certificate," the Plan stated: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious" (PRUR 1162). This language unambiguously confers discretion to the plan administrator. *See e.g., Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004); *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 294 F.3d 1139, 1142 (9th Cir. 2002).

Facially, abuse of discretion appears to be the appropriate standard. There is, however, a wrinkle. In its moving papers, Prudential "stipulates that the Court's review will be *de novo*" (Br. 13). Plaintiff does not dispute this. As a matter of fact, she states in her opposition

memorandum: "Prudential has 'stipulated' to a *de novo* adjudication by the court in this matter. Therefore the court need not concern itself with any multi-layered conflict-of-interest analysis, and may proceed directly to decide whether Ms. Rutherford's benefits were incorrectly terminated" (Opp. 2). Accordingly, per both parties' wishes, this order will review the ERISA dispute *de novo*.

### 2. CONTRACTUAL LIMITATIONS.

Prudential contends that plaintiff's disability benefits were rightfully terminated. The Plan provided (PRUR 1147) (emphasis added):

> Disabilities due to a sickness or injury which, as determined by Prudential, *are primarily based on self-reported symptoms* have a limited pay period during your lifetime. Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime. The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

Because Ms. Rutherford's claimed disability arose out of mental illness or self-reported symptoms, Prudential says, this contractual limitation applied. Ms. Rutherford claims that she suffered from fibromyalgia, sleep disorder, side effects from medication, and depression. She does not dispute that her claim of mental illness is subject to the 24-month benefits limitation. This order therefore focuses on her other claimed illnesses.

According to Prudential, Ms. Rutherford's claim for fibromyalgia was primarily based on self-reported symptoms. The Plan defined self-reported symptoms as "manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine" (PRUR 1148). In a letter dated March 26, 2006, Dr. April Campbell responded to the question of whether Ms. Rutherford had functional impairments from November 12, 2003, forward: "Actually, I cannot answer that question because the records that I have are woefully lacking in a well-detailed physical exam of Ms. Rutherford" (PRUR 212). She further stated, "The diagnosis of fibromyalgia is self-reported because it is based entirely on the subjective complaints of tenderness at various points along the body. The only possible objective finding regarding the diagnosis of fibromyalgia is the sleep study that was performed that showed some alpha wave intrusion and

6

a decrease in her stage 3 and 4 sleep. However, these findings are not specific to fibromyalgia and can actually be found in normal individuals as well as in dysthymic, *i.e.*, depressed individuals, and those who have experienced viral illnesses. So, I would hesitate to make the diagnosis of fibromyalgia based entirely on a sleep study" (PRUR 214). In summer 2006, Dr. Alan Kimelman observed Ms. Rutherford claiming pain everywhere, talking loudly, using profanity on occasion to express the severity of pain, frequently interrupting the examination to complain of pain, "behaving as though she had never participated in a standard medical examination to assess range of motion," requesting that her husband assist with all activities, and requesting frequent repetitions of examination instructions. These behaviors "all corroborate symptom magnification," he said (PRUR 185).

This evidence, *inter alia*, showed that Ms. Rutherford based her claim of fibromyalgia on self-reported symptoms, Prudential says. In *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004), the plaintiff worked as a senior administrative assistant and described her job as "typing, filing, telephone, sitting, walking, standing, general administrative office procedures." The symptoms included pain in her hands, fingers, lower back, feet, and legs. She consulted with a number of physicians and was diagnosed with fibromyalgia. The plaintiff then claimed that she was totally disabled by fibromyalgia and tried to obtain disability benefits. The plan administrator denied her disability claim on the ground that while fibromyalgia may have limited some of her activities, the condition was not sufficiently severe as to prevent her from working at her sedentary occupation. She appealed the decision and produced letters from her physicians stating that she could not work because of her fibromyalgia. After several unsuccessful appeals, the plaintiff filed suit in district court. The district court granted summary judgment against the plaintiff, holding that the denial of benefits was proper. The Ninth Circuit affirmed; the plan administrator did not act arbitrarily where the plaintiff's treating physicians failed to respond to inquiries for more detailed information.

Although the Ninth Circuit in *Jordan* did not reach its decision on the basis of the plaintiff's symptoms, the court of appeals described fibromyalgia:

> This syndrome, formerly called fibrositis, has traditionally been used for "an ill-defined, poorly understood set of symptoms, consisting of aching pain and stiffness in one or several parts of the body." As we have previously explained, fibromyalgia's cause or causes are unknown, there is no cure, and, *of greatest importance to disability law, its symptoms are entirely subjective*. There are no laboratory tests for the presence or severity of fibromyalgia. "The 'consensus' construct of fibromyalgia identifies the syndrome as associated with generalized pain and multiple painful regions . . . Sleep disturbance, fatigue, and stiffness are the central symptoms," though not all are present in all patients. The only symptom that discriminates between it and other syndromes and diseases is multiple tender spots, which we have said were eighteen fixed locations on the body that when pressed firmly cause the patient to flinch . . . Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia.

*Id.* at 877 (emphasis added). Accordingly, Ms. Rutherford's diagnosis of fibromyalgia is no more than a collection of subjective symptoms that fell under the Plan's 24-month limitation, defendant says.

Not necessarily. Nowhere in *Jordan* — or any other Ninth Circuit decision — did the court of appeals say that a diagnosis of fibromyalgia was not enough to show disability. Moreover, *Jordan* did not deal with a "self-reported symptoms" limitation. Instead, other circuits have ruled that fibromyalgia can be the basis of a valid claim.

The facts of an Eighth Circuit case closely mirror the facts here. In *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006), the plaintiff was diagnosed with fibromyalgia. Her policy also had a 24-month limitation that stated: "Disabilities, due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period up to 24 months." *Id.* at 655. The plan administrator therefore limited the plaintiff's benefits, contending that fibromyalgia was only verifiable through patient self-report.

The Eighth Circuit disagreed. According to the policy, self-reported symptoms were defined as "the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine." *Id.* at 656. In *Chronister*, a physician had diagnosed the patient with fibromyalgia with the use of an eighteen-point "trigger test." The Eighth Circuit held that this test qualified as a clinical examination standardly accepted in medicine, so the plaintiff's fibromyalgia was

1  not subject to the self-reported symptoms limitation.  The Eighth Circuit stated that the district

2  court had correctly remanded the matter to the plan administrator for further proceedings.

3  *See also Post v. Hartford Ins. Co.*, 501 F.3d 154, 173 n. 13 (3d Cir. 2007) ("The 'trigger point'

4  test is recognized in the case law and the medical literature as a prerequisite to a diagnosis of

5  fibromyalgia"); *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996) (discussing the

6  eighteen-point trigger test); and *Stup v. UNUM Life Ins. Co. of America*, 390 F.3d 301, 303

7  (4th Cir. 2004) (discussing how doctors diagnose fibromyalgia based on the tenderness of at

8  least eleven of eighteen standard trigger points on the body).  This order agrees with the

9  reasoning by the other circuits.  Accordingly, as long as Ms. Rutherford's fibromyalgia was

10 diagnosed by a clinical examination standardly accepted in medicine (*e.g.*, the trigger test),

11 her claim did not fall under the self-reported symptoms limitation.

12      In her opposition memorandum, Ms. Rutherford has pointed to the following as

13 evidence of fibromyalgia (Opp. 3–6):

> (1) Dr. Michael Kurtz wrote a one-page letter on September 26, 2001, which stated, "She also has fibromyalgia" (PRUR 827).
>
> (2) On a one-page "duty status report" dated October 11, 2001, Dr. Kurtz diagnosed Ms. Rutherford with fibromyalgia (PRUR 823).
>
> (3) Ms. Rutherford prepared a more detailed letter summarizing her own symptoms on December 3, 2001.  The letter stated that the medical summary was "based on the input from Ms. Rutherford's health care providers, laboratory tests, x-rays, Mir's [sic], clinical observations and physical examination during her office visits." Symptoms included tender pain points throughout her body. The letter concluded that she suffered from fibromyalgia.  At the bottom of the letter, Dr. Kurtz handwrote, "The above letter was prepared by Dawn Rutherford.  I feel [that] it is [a] good summary of her condition" (PRUR 666–67).
>
> (4) Dr. Jack Waxman wrote a brief letter on January 17, 2002, that confirmed a diagnosis of fibromyalgia (PRUR 512).
>
> (5) On December 20, 2001, Dr. Jeffrey Mandel wrote a detailed medical report on Ms. Rutherford.  He reported on the results of a sleep study, which showed that Ms. Rutherford had a 74% reduced sleep efficiency.  Sleep problems were often found in people with fibromyalgia.  He also described his diagnosis of fibromyalgia after he examined Ms. Rutherford.  She experienced widespread pain, tender points, numbness, and limited dexterity.  Specifically, after one exam, he noted that she experienced "widespread pain in the left and right side of the body; pain upon digital palpation of

9

> the occiput, low cervical, trapezius, supraspinatus, second rib, gluteal, greater inronchanter bilateral, posterior to the trochanteric prominence, and knee tender points performed with an approximated exerted force of 4kg. I observed the patient express pain upon digital palpitation of the above tender points" (PRUR 526–31).

(6) On January 8, 2002, Dr. L. Sloane Polillo wrote a letter about Ms. Rutherford's condition. It stated, in relevant part, "Ms. Rutherford has been under my care since December 20, 2001 for several disabling conditions including Fibromyalgia, Epstein Barr infection, Chronic Fatigue Syndrome, Degenerative Disc Disease of the cervical and lumbosacral spine and Degenerative Joint Disease . . . In September 2001, Dr. Michael Kurtz diagnosed her with Fibromyalgia and Degenerative Disc Disease of the cervical and lumbosacral spine and Degenerative Joint Disease, based on her disabling symptoms and X-Ray studies." Dr. Polillo then went on to describe what she observed from her examination of Ms. Rutherford — the patient's pain, decreased range of motion, tender points throughout her body, and the need to walk with the use of a cane (PRUR 519–20).

(7) Dr. Peter Stein wrote on behalf of Ms. Rutherford on January 14, 2002, again confirming that she had fibromyalgia (PRUR 516).

(8) On February 6, 2002, Dr. Gary P. McCarthy said that it seemed she was suffering from a "post-viral infection with ongoing fibromyalgia" (PRUR 566).

(9) On March 28, 2002, Dr. Polillo reiterated the conclusions from her January 2002 letter. She said that "sleep disturbances can be consistent with Fibromyalgia and can certainly lead to disabling fatigue and may also contribute to Ms. Rutherford's degree of pain" (PRUR 446–47). *See also* PRUR 513, 534–35 (results of the sleep study).

(10) Dr. Audra Lehman referred the case to Dr. Erskine. Dr. Erksine examined Ms. Rutherford. In a letter dated September 3, 2002, to Dr. Lehman, Dr. Erskine wrote about her pain and sleep disorder. He diagnosed her with fibromyalgia (PRUR 440–41). Dr. Erskine worked with Ms. Rutherford through March 2005. The record shows that Dr. Erskine found the patient continuing to suffer from pain, depression, and sleep disorder (PRUR 282–48).

(11) Dr. Lehman, who had assumed care of Ms. Rutherford from Dr. Polillo, wrote a letter on April 25, 2003. She said that there was no improvement in Ms. Rutherford's condition and that plaintiff still suffered from pain, decreased mobility, and tenderness (PRUR 429).

This order also takes note that Dr. Kurtz provided a writing where he reported "multiple trigger points" and "prescribed "physical therapy" (PRUR 481). In her memorandum, Ms. Rutherford says that her fibromyalgia was diagnosed by, among other things, the eighteen-point test

10

(Opp. 22). She does not cite to the record, however. This order finds that she has nonetheless provided enough evidence to support denial of summary judgment in Prudential's favor. For example, Dr. Polillo wrote how Dr. Kurtz diagnosed her with the illness "based on her disabling symptoms and X-ray studies." The results of a sleep study showed symptoms consistent with a diagnosis of fibromyalgia. She has provided comments from physicians who noted that she expressed pain when palpated at different points and that she had "multiple trigger points."

This order finds that there is a genuine issue of material fact with respect to the diagnosis and how much Ms. Rutherford suffered. On the one hand, Prudential has provided evidence showing that Ms. Rutherford's disability claim might arise from self-reported symptoms and "symptom magnification." On the other hand, while much of plaintiff's evidence consists of conclusory statements made by physicians writing on her behalf (or by plaintiff herself, with a physician's signature at the end of the letter), there is still evidence that doctors performed clinical exams. Giving the record *de novo* review, this order finds that there is not enough evidence to grant summary judgment in favor of either side. Because summary judgment is denied on these grounds, this order need not reach Ms. Rutherford's other claims of chronic fatigue syndrome, medication side effects, and inability to work in another occupation.[2]

### 3. INJUNCTIVE RELIEF.

In her complaint, Ms. Rutherford makes two claims — one for damages (pursuant to 29 U.S.C. 1132(a)(1)(B)) and another for injunctive relief (pursuant to 29 U.S.C. 1132(a)(3)).

---

[2] Plaintiff argues that the "reasonable expectations" doctrine applies. At oral argument, she argued that, because Prudential did not address this issue, she is entitled to summary judgment on this ground. According to the Ninth Circuit, "[i]n general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386 (9th Cir. 1994). Because Ms. Rutherford's expectation of coverage was reasonable under the circumstances, she says, Prudential should have paid her benefits. This order disagrees. In *Saltarelli*, the court of appeals also stated that "[a]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention fo the insured." *Ibid*. The record shows that Prudential did include exclusionary clauses in its policy. The circumstances of this case do not warrant *sua sponte* summary judgment in plaintiff's favor.

According to 29 U.S.C.1132(a)(1)(B), a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Under 29 U.S.C. 1132(a)(3), a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Ms. Rutherford argues that the most that the Court could do for Prudential would be to order partial summary judgment because Prudential failed to address her second claim for injunctive relief.[3]

This order disagrees. According to *Ford v. MCI Communications Corp. Health & Welfare Plan*, 399 F.3d 1076, 1083 (9th Cir. 2005):

> The Supreme Court has held that "[29 U.S.C. § 1132(a)(3)] is a catchall provision that acts as a safety net, offering appropriate equitable relief for injuries caused by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy." Because [the plaintiff] asserted specific claims under 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(2), she cannot obtain relief under 29 U.S.C. § 1132(a)(3), ERISA's "catchall" provision.

*See also Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). Here, Ms. Rutherford has a straightforward wrongful-termination-of-benefits claim. She seeks an award of benefits under subsection (a)(1)(B) and injunctive relief under subsection (a)(3). Because she has asserted claims under subsection (a)(1)(B), Ms. Rutherford has an adequate remedy and cannot therefore obtain relief under subsection (a)(3).

### 4. REQUEST FOR FURTHER DISCOVERY.

In the event that summary judgment is not entered in her favor, Ms. Rutherford requests that she be granted leave to conduct further discovery under FRCP 56(f). "The requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose

---

[3] The second claim in the complaint is "for injunctive relief, pursuant to 2 U.S.C. §1132(3)." Because there is no such code provision, this order assumes that Ms. Rutherford meant to write, "pursuant to 29 U.S.C. § 1132(a)(3)," which provides for injunctive or other equitable relief.

1 summary judgment." *Family Home and Finance Center, Inc. v. Fed. Home Loan Mtg. Corp.*,
2 525 F.3d 822, 827 (9th Cir. 2008).

3 Plaintiff argues that she should be allowed to augment the record regarding any conflict of interest. She notes that Prudential's stipulation for *de novo* review — rather than the more defense-favorable abuse-of-discretion standard — was based on its eagerness to foreclose such discovery.

7 Prudential disagrees, saying that the scope of review should be limited to the administrative record. The Ninth Circuit adopted "a scope of review that permits the district court *in its discretion* to allow evidence that was not before the plan administrator." *Mongeluzo v. Baxter Travenol Long Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir. 1995) (emphasis in original). "[T]he purposes of ERISA . . . warrant significant restraints on the district court's ability to allow evidence beyond what was presented to the administrator." *Id.* at 943. A district court should only exercise this discretion "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination." *Id.* at 944. A district court therefore has the discretion to allow extrinsic evidence only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. In *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211 (9th Cir. 2007), the Ninth Circuit provided a non-exhaustive list of "exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary":

> [C]laims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence

13

that the claimant could not have presented in the administrative process.

This order holds that Ms. Rutherford has sufficiently shown that additional evidence is necessary to conduct an adequate *de novo* review. In the instant action, Ms. Rutherford is concerned about the credibility of Dr. Kimelman, one of the medical examiners who concluded she exhibited "symptom magnification." Accordingly, this order finds that Ms. Rutherford's request to augment the record is warranted.

Ms. Rutherford may take the deposition of Dr. Kimelman. She also seeks to take the deposition of James Furman (who issued the final denial of benefits and arranged for medical and vocational reviews in this matter) and documentary materials as "described in Ms. Rutherford's complaint in this matter at paragraphs 14 through 17" (Johnston Decl. ¶ 5).[4] It is unclear, however, why these items are necessary. Her requests are overbroad. Plaintiff may take Mr. Furman's deposition *only if* she deposes Mr. Kimelman and shows that Mr. Furman is needed to impeach Mr. Kimelman. With respect to the materials described in her complaint, Prudential has already provided Ms. Rutherford with a copy of her short-term and long-term disability policies, saying that this was sufficient to meet her requests. Again, it is unclear from the record why these materials are needed or why Prudential's proffer was insufficient. Accordingly, discovery will not be granted with respect to the materials cited in the complaint.

## CONCLUSION

---

[4] In her complaint, Ms. Rutherford claims that Prudential omitted the following: "[c]omplete copies of all pertinent documents, including without limitation the group disability insurance policy under discussion, the applicable Summary Plan Description, any amendments or alterations to any such documents, and any and all other documentation under which the policy in question may be or may have been administered (which in turn includes copies of any claims manuals, training materials, and the like pertinent to guidance provided to Prudential personnel in processing and evaluating claims for benefits)"; "[m]aterials demonstrating compliance with the administrative processes and safeguards required pursuant to 29 CFR 2560.503-1(b)(5) (requiring that 'claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently to similarly situated claimants of this section in making the benefit determination')"; and "[m]aterials constituting statements of policy or guidance with respect to the plan concerning the denied benefit for Ms. Rutherford's diagnoses, without regard to whether such advice or statement was relied upon in making the benefit determination" (Compl. ¶ 15).

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Ms. Rutherford can proceed on her claim under 29 U.S.C. 1132(a)(1)(B) (award of wrongfully-terminated benefits) but not on her claim under 29 U.S.C. 1132(a)(3) (injunctive relief). Plaintiff's motion for leave to conduct discovery pursuant to FRCP 56(f) is **GRANTED IN PART AND DENIED IN PART.** She can take the deposition of Dr. Kimelman. Following the deposition of Dr. Kimelman, she can take Mr. Furman's deposition only if she shows that it is necessary to impeach Dr. Kimelman. The other request for discovery is denied.

**IT IS SO ORDERED.**

Dated: July 18, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE